**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

|  |  |  |
|---|---|---|
| BIO-LAB, INC., ET AL. | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Court No.  25-00054 |
| | ) | |
| UNITED STATES, | ) | |
| *Defendant,* | ) | |
| AND | ) | |
| | ) | |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. AND | ) | |
| HEZE HUAYI CHEMICAL CO., LTD., | ) | |
| *Defendant-Intervenors.* | ) | |

## RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs

Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation (hereinafter

"Bio-Lab, IWC, and OxyChem" or "Plaintiffs") hereby respectfully move for judgment on the

agency record on the issues raised in their Complaint challenging the final results of the

Department of Commerce's administrative review of the antidumping duty order covering

chlorinated isocyanurates from China. *See Chlorinated Isocyanurates from the People's Republic

of China: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg.

9710 (Feb. 18, 2025). For the reasons set forth in the attached Memorandum of Law and Fact in

Support of Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record, Commerce's *Final

Results* are not supported by substantial evidence on the record and are otherwise not in

accordance with law. Plaintiffs respectfully move this court to so hold, to declare the *Final

Results* unlawful, to remand this case to Commerce consistent with Plaintiffs' Memorandum of

Law and Fact, and to grant such other relief as may be just and proper.

James R. Cannon Jr.
Chase J. Dunn
Cassidy Levy Kent (USA) LLP
2112 Pennsylvania Ave, N.W., Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to Plaintiffs Bio-Lab, Inc., Innovative*
*Water Care, LLC, and Occidental Chemical*
*Corporation*

Date:   July 14, 2025

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

|  |  |  |
|---|---|---|
| BIO-LAB, INC., ET AL. | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Ct. No. 25-00054 |
| | ) | |
| UNITED STATES, | ) | |
| *Defendant,* | ) | **NONCONFIDENTIAL VERSION** |
| AND | ) | Business Proprietary Information |
| | ) | Removed from Brackets on Pages |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. AND | ) | 26, 29-30 |
| HEZE HUAYI CHEMICAL CO., LTD., | ) | |
| *Defendant-Intervenors.* | ) | |
| | ) | |

## MEMORANDUM OF LAW AND FACT
## IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION
## FOR JUDGEMENT ON THE AGENCY RECORD

James R. Cannon Jr.
Chase J. Dunn
CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave, N.W., Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to Plaintiffs Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation*

Date:   July 14, 2025

i

**Table of Contents**

**Page**

STATEMENT PURSUANT TO RULE 56.2 ................................................................. 1

I.    Administrative Determination Under Review ............................................... 1

II.   Issues Presented and Summary of Argument ............................................... 1

III.  Request for Relief ........................................................................................ 4

STATEMENT OF FACTS ...................................................................................... 4

A. Selection of Economically Comparable Countries ..................................... 5

B. Selection of Countries with Significant Producers of Comparable
   Merchandise .............................................................................................. 6

C. Commerce's Determinations ...................................................................... 8

STANDARD OF REVIEW ..................................................................................... 10

ARGUMENT .......................................................................................................... 11

I.    Commerce's Finding that Mexico Was Not at the "Same Level" of Economic
      Development as China Was Not Supported by the Record ............................. 11

      A. The World Bank Amended Mexico's Per Capita GNI and this
         Information Was Placed on the Record Six Months Before the
         Preliminary Results ............................................................................. 11

      B. Commerce's Refusal to Consider the Updated World Bank Data Was
         Not in Accordance with Past Practice ................................................. 14

         1.    The procedure for identifying surrogate countries establishes that the list is
               not exhaustive, it is not limited to six countries, and it can be adjusted at least until
               30 days before the preliminary determination ........................................ 14

         2.    The record does not support the inference that a change to Mexico's per
               capita GNI means that other countries' per capita GNI will also be changed ......... 17

         3.    Commerce had ample time and ability to treat Mexico as being at "the same"
               level as the other countries on the SC List ......................................... 18

      C. The Failure to Consider Mexico as Economically Comparable to China
         Was Not Supported by Substantial Evidence ........................................ 18

II.   Commerce Failed to Evaluate Whether Chlorinated Isos Were "Unusual or
      Unique" Merchandise Warranting an Alternate Surrogate Country Selection

i

Process ............................................................................................................ 19

A. Policy Bulletin 04.1 Provides an Exception to the Typical Surrogate
Country Selection Process ...................................................................... 19

B. Commerce Failed to Evaluate Whether Chlor Isos Constitute "Unusual
or Unique" Merchandise ........................................................................ 20

III. The Finding that Calcium and Sodium Hypo Are "Comparable" to Chlor isos
Otherwise Is Not Supported by Substantial Evidence .................................... 22

A. CYA is the Primary Input of Chlor Isos and Provides a Key Difference
in Chemical Composition ....................................................................... 22

B. The Production Process for Chlor Isos is Significantly More Complex
Than Production of Sodium Hypo or Cal Hypo ...................................... 25

1.      Production of Chlor isos is significantly more expense and requires
substantially more workers that production of hypophosphates ............................ 26

2.      Production of Chlor isos requires more equipment and processing stages than
production of calcium and sodium hypo ................................................................. 27

3.      Production of Chlor isos requires a significantly more complex production
process than that required for calcium or sodium hypo .......................................... 29

4.      Conclusion ....................................................................................... 30

CONCLUSION .............................................................................................. 31

## Table of Authorities

**Page(s)**

### Statutes

5 U.S.C. § 706.................................................................................... 10-11

19 U.S.C. § 1516a(b)(1)(B) ...............................................................10

19 U.S.C. § 1677b(c)(4)............................................................ 2-4, 19, 31

28 U.S.C. § 2640(b) ...........................................................................10

### Regulations

19 C.F.R. § 351.301(c)(3)(ii) ............................................................15

### Court Decisions

*Baoding Mantong Fine Chemistry Co., Ltd. v. United States*, 222 F.
Supp. 3d 1231 (Ct. Int'l Trade 2017)..............................................22

*Bio-Lab, Inc. v. United States*, Slip Op. 25-39, 2025 WL 1099710 (Ct.
Int'l Trade 2025) ......................................................................... *passim*

*Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc*., 467
U.S. 837 (1984).................................................................................10

*Clearon Corp. v. United States*, 38 C.I.T. 1122, 2014 WL 3643332
(2014)................................................................................................12

*Consol. Edison Corp. v. NLRB*, 305 U.S. 197 (1938)..........................11

*Dupont Teijin Films v. United States*, 997 F. Supp. 2d 1338 (Ct. Int'l
Trade 2014)........................................................................................22

*Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261 (Ct. Int'l
Trade 2018)........................................................................................18

*Jiaxing Bro. Fastener Co., Ltd. v. United States*, 961 F. Supp. 2d 1323
(Ct. Int'l Trade 2014)........................................................................19

*Loper Bright Ent. v. Raimondo*, 603 U.S. 369 (2024) ........................10

*Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927 (Fed.
Cir. 1984) ..........................................................................................11

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*

iii

*Co.*, 463 U.S. 29 (1983) .......................................................................................11, 31, 21

*Shanghai Foreign Trade Enterprises Co., Ltd. v. United States*, 318 F.
Supp. 2d 1339 (Ct. Int'l Trade 2004) ....................................................................22

*Shijiazhuang Goodman Trading Co., Ltd. v. United States*, 172 F. Supp.
3d 1363 (Ct. Int'l Trade 2016) ...............................................................................18

*SKF USA Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011) .......................13, 21

*SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351 (Fed. Cir.
2020) .......................................................................................................................10

*Stein Industries Inc. v. United States*, 365 F. Supp. 3d 1364 (Ct. Int'l
Trade 2019) .........................................................................................................14, 21

*Tianjin Magnesium Int'l Co. v. United States*, 722 F. Supp. 2d 1322 (Ct.
Int'l Trade 2010) ....................................................................................................11

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) ................................................10

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .........................................11

**Other Administrative Materials**

Policy Bulletin 04.1 ................................................................................ *passim*

**NONCONFIDENTIAL VERSION**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation (hereinafter "Bio-Lab, IWC, and OxyChem" or "Plaintiffs"), respectfully submit the following memorandum of law and fact in support of their motion for judgment on the agency record.

## STATEMENT PURSUANT TO RULE 56.2

### I.   Administrative Determination Under Review

Bio-Lab, IWC, and OxyChem are domestic producers of Chlorinated isocyanurates ("Chlor isos") and challenge certain aspects of the final results of Commerce's 2022-2023 antidumping duty administrative review of Chlor isos from the People's Republic of China. *See Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 9710 (Feb. 18, 2025) ("*Final Results*") (P.R. 133) and accompanying Issues and Decision Memorandum ("IDM") (P.R. 132); *Chlorinated Isocyanurates From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023*, (July 9, 2024) ("*Preliminary Results*") (P.R. 108) and accompanying Decision Memorandum ("PDM") (P.R. 95).[1]

### II.   Issues Presented and Summary of Argument

(1) Record evidence demonstrated that Mexico was at the "same level" of economic development as China insofar as Mexico's per capita GNI was closer to China's per capita GNI than three of the countries included on Commerce's surrogate country list. Was Commerce's failure to consider whether Mexico was at the "same level" of economic development as China, and its failure to consider Mexico equally alongside the other countries on the surrogate country list, contrary to law?

---

[1] All citations to the administrative record take the form "P.R.__" or "C.R.__".

In every non-market economy ("NME") proceeding, Commerce issues a list of countries that it has identified as potential surrogates for the NME in question (*i.e.,* the surrogate country list or "SC List"). Each country on the SC List is considered to be at the "same level" of economic development as the NME (here, China). Commerce's surrogate country memorandum provides that interested parties may nominate other countries as potential surrogates, and explicitly states that all countries on the case record that are at the same level of economic development as China should be given equal consideration for purposes of selecting a surrogate country. Although Mexico was not included on the SC List in August 2023, in December 2023 the World Bank updated Mexico's per capita GNI for 2022. As such, the source for Commerce's SC List showed that Mexico's GNI was more comparable to China's than the per capita GNIs of three of the countries on the SC List. Rather that evaluating whether Mexico was at the "same level" of economic development as China, Commerce rejected Mexico from consideration solely because it was not on the SC List first published in August 2023. Commerce's failure to address whether Mexico was at the "same level" of economic development, and its failure to give Mexico equal consideration as a potential surrogate, renders its selection of a surrogate country unsupported by substantial evidence and contrary to law.

(2) Record evidence demonstrated that Chlor isos were "unusual or unique" merchandise within the meaning of Policy Bulletin 04.1, which calls for Commerce to alter its typical surrogate country selection process by beginning the analysis with the identification of surrogates that are significant producers of comparable merchandise before evaluating a surrogate's level of economic comparability. Was Commerce's failure to address whether Chlor isos were "unusual or unique" within the meaning of Policy Bulletin 04.1, and its failure to alter its surrogate country selection process, contrary to law?

In NME cases, 19 U.S.C. § 1677b(c)(4) calls for Commerce to select a surrogate country that is both economically comparable to the NME and that is also "a significant producer of comparable merchandise." Commerce's practice, outlined in Policy Bulletin 04.1, is to begin its

surrogate country selection process by identifying countries that are economically comparable to the NME and then to examine whether any of those countries are significant producers of comparable merchandise. Policy Bulletin 04.1, however, provides that this sequence should be reversed in cases where the subject merchandise is "unusual or unique." The record contained ample evidence demonstrating that Chlor isos satisfied the definition of "unusual or unique" merchandise within the meaning of Policy Bulletin 04.1. Commerce failed to address this evidence and failed to conduct any analysis as to whether Chlor isos were "unusual or unique" within the meaning of Policy Bulletin 04.1. Consequently, Commerce's implementation of § 1677b(c)(4) was inconsistent with prior practice and contrary to law.

(3) To determine that Romania was a "significant producer of comparable merchandise" for purposes of § 1677b(c)(4)(B), Commerce found that calcium hypochlorite ("calcium hypo") and sodium hypochlorite ("sodium hypo") were "comparable" to Chlor isos. However, calcium and sodium hypo have different physical characteristics and a significantly less complex production process than Chlor isos. In these circumstances, was Commerce's finding supported by substantial evidence?

Commerce's finding that calcium and sodium hypo are "comparable" to Chlor isos is not supported by substantial evidence. Commerce's analysis particularly failed to account for the importance of cyanuric acid ("CYA") as a major input of Chlor isos, which imparts the essential characteristics of the finished product. Without CYA, Chlor isos do not act as a stabilizer, are not long-lasting in water, and residential swimming pool applications would not account for over 85 percent of sales. Commerce ignored this major difference between Chlor isos and calcium or sodium hypo. It also failed to address the different forms of the products, the different levels of chlorine contained in the products, and the different production processes utilized in the production of Chlor isos and calcium or sodium hypo. As such, Commerce's finding that calcium hypo and sodium hypo are "comparable" to Chlor isos is not supported by substantial evidence

under Commerce's standard analytical framework. For the same reasons set forth in *Bio-Lab, Inc. v. United States*, Slip Op. 25-39 at 29-40, 2025 WL 1099710 (Ct. Int'l Trade 2025), this issue should be remanded for reconsideration by Commerce

## III.    Request for Relief

Plaintiffs request that this Court hold Commerce's *Final Results* unlawful and otherwise unsupported by substantial evidence and remand Commerce's determination with instructions to:

(1) Consider whether Mexico was at the "same level" of economic development as China given that its per capita GNI was more comparable to China's per capita GNI than countries on the SC List;

(2) Consider whether Chlor isos are "unusual or unique" merchandise within the meaning of Policy Bulletin 04.1 such that its surrogate country selection process should begin with identification of potential surrogates that are significant producers of comparable merchandise; and

(3) Reconsider the finding that calcium or sodium hypochlorite produced in Romania or any other potential surrogate is "comparable merchandise" for purposes of 19 U.S.C. § 1677b(c)(4) based on the substantial record evidence compiled in the challenged administrative review.

## STATEMENT OF FACTS

Because China is considered an NME in the context of antidumping duty proceedings, it was necessary for Commerce to select an appropriate surrogate market economy to value the Chinese respondents' factors of production ("FOPs"). Pursuant to 19 U.S.C. § 1677b(c)(4), Commerce must select, to the extent possible, a surrogate country that is (1) at a level of economic development comparable to China, and (2) a significant producer of comparable

merchandise. Although the statute does not create a hierarchy among these two criteria, Commerce's practice is to normally begin its surrogate country selection by first identifying countries that are economically comparable to China and then evaluating whether any of those countries are significant producers of comparable merchandise. *See* Letter from Petitioners, "Comments on Surrogate Country List" (Oct. 19, 2023) ("*Comments on SC List*") (P.R. 32) at Exhibit 1 (Import Administration Policy Bulletin No. 04.1: Non-Market Economy Surrogate Country Selection Process (Mar. 1, 2004) ("Policy Bulletin 04.1")).

### A. Selection of Economically Comparable Countries

In October 2023, Commerce placed on the record a "<u>non-exhaustive</u> list of countries that Commerce has determined, based on per capita Gross National Income ('GNI'), is {sic} at the <u>same level</u> of economic development as China." Commerce Memorandum, "Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information" (October 12, 2023) ("*SC Memo*") at Attachment 1 (Commerce Memorandum, "List of Surrogate Countries for Antidumping Investigations and Reviews from the People's Republic of China" (Aug. 27, 2023) ("*SC List Memo*")) (P.R. 29) (emphasis added). Based on a comparison of per capita GNI published by the World Bank, Commerce included Romania, Chile, Bulgaria, Costa Rica, Malaysia, and Turkey on its August 2023 SC List. *See id.*

Interested parties were invited comment on the non-exhaustive list "as a <u>*starting point*</u> for surrogate country selection," and Commerce specifically requested that interested parties "<u>*propose for consideration other countries*</u> that are at a level of economic development comparable to China." *Id.* at 1 (emphasis added).

In December 2023, the World Bank updated its per capita GNI calculation for Mexico for 2022. *See* Letter from Petitioners, "Rebuttal Comments on Surrogate Values" (Jan. 2, 2024)

("*Rebuttal SV Cmts*") (P.R. 65-66) at 3 and Attachment 1. The World Bank's revision

demonstrated that Mexico's per capita GNI was more comparable to China's per capita GNI than

the per capita GNI of Romania, Chile, or Turkey:

| Table 1<br>UPDATED COMPARISON OF THE PER CAPITA GNI<br>(ATLAS METHOD) FOR ALL COUNTRIES<br>ON COMMERCE'S SC LIST & MEXICO | | | |
|---|---|---|---|
| **Country** | **World Bank GNI Data (Year)** | **Per Capita GNI (Atlas Method)** | **%Diff from China** |
| Romania | 2022 | 15,570 | 21.17% |
| Chile | 2022 | 15,360 | 19.53% |
| Bulgaria | 2022 | 13,350 | 3.89% |
| **China** | **2022** | **12,850** | |
| Costa Rica | 2022 | 12,920 | -0.54% |
| Malaysia | 2022 | 11,780 | -8.33% |
| Mexico | 2022 | 10,820 | -15.80% |
| Turkey | 2022 | 10,640 | -17.20% |

*Source*: *Rebuttal SV Cmts* at Attachment 1 (P.R. 65-66).

Given the proximity of Mexico's per capita GNI to China's per capita GNI, and applying

Commerce's methodology for selecting economically comparable countries, Mexico was at the

"same level" of economic development as China. Therefore, Mexico should have been given

"equal consideration" as a potential surrogate alongside the SC List countries. *See id.*; *see also*

Letter from Petitioners, "Petitioners' Case Brief" (Nov. 1, 2024) ("Petitioners' Case Br.") (P.R.

119) at 2-5.

### B. Selection of Countries with Significant Producers of Comparable Merchandise

As noted above, the normal sequence for identifying surrogate countries begins with the

creation of the SC List and the identification of six countries deemed to be at the "same" level of

economic development as China. Policy Bulletin 04.1 outlines an exception to this normal

sequence for merchandise that is "unusual or unique." For such merchandise it is "more appropriate for the team to address economic comparability only after the significant producer of comparable merchandise requirement is met." Policy Bulletin 04.1.

Bio-Lab, IWC, and OxyChem presented evidence showing that Chlor isos constitute "unusual or unique" merchandise within the meaning of Policy Bulletin 04.1, and argued that Commerce should begin its search for a surrogate by identifying significant producers of comparable merchandise. *See* Letter from Petitioners, "Petitioners' Comments on Primary Surrogate Country Selection" (Dec. 6, 2023) ("*SC Selection Cmts*") (P.R. 45-47; C.R. 36-38) at 4-8; Letter from Petitioners, "Petitioners' Comments Concerning the Preliminary Determination" (May 29, 2024) ("*Pre-Preliminary Cmts*") (P.R. 88; C.R. 65) at 4-8. This evidence included the unique physical characteristics of Chlor isos that were imparted by the existence of CYA and the complex nature of the production process. *See id.*

For example, the production of Chlor isos requires CYA, which is an essential input that imparts a key and unique physical characteristic to the finish product. *See SC Selection Cmts* at 6-7; *Pre-Preliminary Cmts* at 5. Specifically, CYA is a stabilizer which enables the subject merchandise to function as a long-lasting source of chlorine in residential swimming pools. *See Pre-Preliminary Cmts* at Exhibit C (at Exhibit 1 ("Chemistry of the Chlorinated Isocyanurates" (Oct. 6, 1997)) at 4-5 ("Using a stabilizer in a swimming pool reduces the HOC1 decomposition rate due to the absorption of UV light.")). Indeed, the Chinese producers refer to CYA as "the major material of the subject goods." Letter from Heze Huayi, "Section C&D Response" (Nov. 13, 2023) ("Heze Huayi DQR") (P.R. 39; C.R. 20) at DQR at 5. Likewise, Commerce and the U.S. International Trade Commission ("USITC") define Chlor isos as "derivatives of cyanuric acid," reflecting the importance of CYA to the finished product. *SC Selection Cmts* at 5-6 and

Exhibit 1 (Calcium Hypochlorite from China, Inv. Nos. 701-TA-510 and 731-TA-1245 (Preliminary), USITC Pub. 4452 (February 2014) at 7).

Given the importance of CYA as imparting a fundamental characteristic of Chlor isos, which distinguished the subject merchandise from other water treatment chemicals, the presence of CYA was a "unusual or unique" feature of the product for purposes of Policy Bulletin 04.1.

Otherwise, Bio-Lab, IWC, and OxyChem submitted extensive documentation showing that Chlor isos are not "comparable" to calcium and sodium hypo under Commerce's traditional framework. This evidence included the unique physical characteristics of Chlor isos that were imparted by the existence of CYA and the complex nature of the production process. *SC Selection Cmts* at 4-8; *Pre-Preliminary Cmts* at 4-8. On nearly identical facts, this Court recently held that Commerce had failed to demonstrate that calcium and sodium hypo had comparable physical characteristics or comparable production processes. *See Bio-Lab, Inc. v. United States*, Slip Op. 25-39 at 31-35, 37-40.

Plaintiffs proposed that Mexico would be the best surrogate country because Mexico had demonstrated production of identical merchandise and had been selected as the primary surrogate in several previous administrative reviews of the antidumping duty order on Chlor isos. *See SC Selection Cmts* at 8-11 and Exhibits 2, 4-7. There was no debate that Mexico was the only producer of Chlor isos among the potential surrogates. See IDM at Comment 1.

### C. Commerce's Determinations

Commerce preliminarily rejected these arguments and selected Romania as the primary surrogate country. *See* PDM at 6-18. Commerce refused to consider the updated per capita GNI information published by the World Bank in December 2023, instead relying on its August 2023 SC Memo. *Id.* at 13. Commerce did not address whether Chlor isos constituted "unusual or

unique" merchandise under Policy Bulletin 04.1. *See generally id.* And although Commerce held that CYA did not constitute a "major input" under Policy Bulletin 04.1, it conducted no analysis of the extensive record evidence discussed above. *See id.* at 13.

In its case brief, Bio-Lab, IWC, and OxyChem reiterated that record evidence demonstrated that Mexico was comparable in terms of economic development to China, and was in fact "at 'the same' level of economic" development as China given its 2022 per capita GNI was closer to China than other countries on the SC List. *See* Petitioners' Case Br. at 4-5. The case brief reiterated that Chlor isos were "unusual" products that warranted reversing the typical surrogate country sequencing. *See id.* at 9-10. The case brief also further explained that Mexico was the only potential surrogate country that produced the Chlor isos or comparable merchandise and provided reasonable surrogate values for all FOPs. *See id.* at 8-13.

Ultimately, Commerce issued *Final Results* that reiterated its *Preliminary Results*. *See generally* IDM at Comment 1. Commerce ignored the World Bank's December 2023 update and refused to consider that Mexico was at the "same level" of economic development as China. *See id.* Commerce conducted no additional analysis regarding whether Chlor isos were "unusual or unique" within the meaning of Policy Bulletin 04.1, and thus warranted a different surrogate country selection process. *See id.* Commerce conducted no additional analysis regarding whether CYA constituted a "major input" under Policy Bulletin 04.1, which requires defining comparable merchandise narrowly. *See id.* Instead, Commerce reiterated its conclusion that calcium and sodium hypo were "comparable" to Chlor isos despite evidence that both products did not include CYA and had different physical characteristics and significantly different production processes. *See id.*

On this basis, Commerce found that Romania was an appropriate surrogate for China. As

explained below, Commerce's refusal to consider Mexico as a potential surrogate and its

conclusion that calcium and sodium hypo were comparable to Chlor isos were not in accordance

with law or supported by substantial record evidence.

## STANDARD OF REVIEW

In appeals of antidumping duty determinations, this Court will hold Commerce's

determination unlawful if it is "unsupported by substantial evidence on the record, or otherwise

not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B); *see also* 28 U.S.C. § 2640(b); *United

States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009) (citing the Administrative Procedures Act at

5 U.S.C. § 706). To determine whether Commerce's interpretation of a statue is in accordance

with law, this Court applies the standard of review set forth in the APA. *See, e.g., SolarWorld

Americas, Inc. v. United States*, 962 F.3d 1351 n.2 (Fed. Cir. 2020). Under the APA, "the

reviewing court shall decide all relevant questions of law, interpret constitutional and statutory

provisions, and determine the meaning or applicability of the terms of an agency action." 5

U.S.C. § 706. Although the courts' legal decision-making formerly followed the two-step

framework outlined in *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*, 467

U.S. 837 (1984), the Supreme Court has recently overruled *Chevron*. *See Loper Bright Ent. v.

Raimondo*, 603 U.S. 369 (2024). In doing so, the Court explained the interpretive framework as

follows:

> The APA…codifies for agency cases the unremarkable, yet elemental
> proposition reflected by judicial practice dating back to *Marbury*: that
> courts decide legal questions by applying their own judgment. It specifies
> that courts, not agencies, will decide "all relevant questions of law" arising
> on review of agency action, § 706 (emphasis added)—even those involving
> ambiguous laws—and set aside any such action inconsistent with the law as
> they interpret it. And it prescribes no deferential standard for courts to
> employ in answering those legal questions.

*Id.* at 371. Stated simply, regardless of any ambiguity in a statute, the Court's duty in applying 5

U.S.C. § 706 is to discern the statute's "best meaning" by "deploying its full interpretive toolkit."

*Id.* at 409.

      To determine whether the agency's decision is supported by substantial evidence, the

Court examines whether the record contains "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474,

477 (1951) (quoting *Consol. Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial

evidence is "more than a scintilla" and "must into account whatever in the record fairly detracts

from its weight." *Id*. at 477, 488. The substantial evidence standard also requires Commerce to

"articulate a satisfactory explanation for its action including a rational connection between the

facts found and the choice made." *Tianjin Magnesium Int'l Co. v. United States,* 722 F. Supp. 2d

1322, 1328 (Ct. Int'l Trade 2010) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State

Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, (1983)). In sum, substantial evidence review requires

the Court to determine whether the evidence and reasonable, evidence-based inferences support

Commerce's findings. *See Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927, 933

(Fed. Cir. 1984).

**ARGUMENT**

I.  **Commerce's Finding that Mexico Was Not at the "Same Level" of Economic
Development as China Was Not Supported by the Record**

    A.  **The World Bank Amended Mexico's Per Capita GNI and this Information Was
Placed on the Record Six Months Before the Preliminary Results**

      In every NME proceeding, Commerce issues a list of countries that it has identified as

being "the same" as the NME in question in terms of economic development. Here, Commerce's

Office of Policy created its list of these economically comparable surrogates for China in August

11

2023. That list was then appended to a request for comments issued in October 2023 in this review. *See SC Memo*; *SC List Memo.* The list is based on a standard methodology that has been approved by the courts. Commerce consults the World Bank's list of countries, ranked by per capita GNI using the "Atlas method." It then selects three countries with a per capita GNI close to and above the NME in question and three countries with a per capita GNI close to and below the NME. *See, e.g., Clearon Corp. v. United States*, 38 C.I.T. 1122, 2014 WL 3643332 at *9 (2014) (finding that "Commerce's reliance on *per capita* GNI reasonable and in accordance with law").

In December 2023, seven months before the *Preliminary Results* were issued, the World Bank updated its per capita GNI database to restate that Mexico's 2022 per capita GNI had changed. As corrected in December, Mexico's per capita GNI was closer to China's per capita GNI than the per capita GNI of Turkey, Romania, or Chile. *See Rebuttal SV Cmts* (P.R. 65-66) at 3 and Attachment 1. Bio-Lab, IWC, and OxyChem therefore requested Commerce to at least treat Mexico as being at "the same" level of economic comparability as Turkey. *See* Petitioners' Case Br. at 4.

Indeed, as shown below, Mexico not only moved ahead of Turkey in relation to China, but it was closer to China than three of the countries deemed to be economically comparable in Commerce's August 2024 Policy memorandum.

| Table 1<br>UPDATED COMPARISON OF THE PER CAPITA GNI<br>(ATLAS METHOD) FOR ALL COUNTRIES<br>ON COMMERCE'S SC LIST & MEXICO | | | |
|---|---|---|---|
| **Country** | **World Bank GNI Data (Year)** | **Per Capita GNI (Atlas Method)** | **%Diff from China** |
| Romania | 2022 | 15,570 | 21.17% |
| Chile | 2022 | 15,360 | 19.53% |
| Bulgaria | 2022 | 13,350 | 3.89% |
| **China** | **2022** | **12,850** | |
| Costa Rica | 2022 | 12,920 | -0.54% |
| Malaysia | 2022 | 11,780 | -8.33% |
| Mexico | 2022 | 10,820 | -15.80% |
| Turkey | 2022 | 10,640 | -17.20% |

*Source*: *Rebuttal SV Cmts* (P.R. 65-66) at Attachment 1

Notwithstanding the World Bank's December update, Commerce refused to consider Mexico as a potential surrogate solely because it was not on the SC List. *See* IDM at Comment 1. Commerce asserted that a "country not on the SC List 'should be selected only to the extent that data considerations outweigh the difference in levels of economic development.'" *Id.* (quoting *SC Memo*). Commerce then held that because Romania was on the SC List and "does not have deficiencies with respect to the determination of significant production of comparable merchandise," there was no reason to consider Mexico as a potential surrogate. *Id.*

Commerce's failure to consider whether Mexico was at the same level of economic development was based on a misapplication of its own stated practice and renders its determination unsupported by substantial evidence and contrary to law. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (explaining that an agency explanation is unreasonable if the agency "entirely failed to consider an important aspect of the problem"); *SKF USA Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011) ("Accordingly, Commerce also has an 'obligation' to address important factors raised by

13

comments from petitioners and respondents."); *Stein Industries Inc. v. United States,* 365 F. Supp. 3d 1364, 1372-1373 (Ct. Int'l Trade 2019) (remanding an issue to Commerce that Commerce had failed to address).

### B. Commerce's Refusal to Consider the Updated World Bank Data Was Not in Accordance with Past Practice

In the *Final Results*, Commerce refused to consider the updated World Bank GNI data demonstrating that Mexico's per capita GNI was more comparable to China's per capita GNI than the per capita GNI of Romania, Chile, or Turkey, three countries on the SC List. *See* IDM at Comment 1. Commerce stated that "it is Commerce's practice to update the SC List once per year after the World Bank's GNI per capita data is updated in July" of each year. PDM at 13; IDM at Comment 1. Commerce defended this position on two grounds:

(1) that reliance on World Bank updates could "could result in arbitrary changes to the list that would be reversed once data for all of the countries is updated," *id.,* and

(2) that updating the list would be "administratively impractical, and unreasonable in terms of predictability." *Id.* Therefore, Commerce held that "mid-year changes to the data {do not} warrant updating the SC List." *Id.*

Neither reason justifies the result here.

#### 1. *The procedure for identifying surrogate countries establishes that the list is not exhaustive, it is not limited to six countries, and it can be adjusted at least until 30 days before the preliminary determination*

Commerce's *SC Memo* sets preliminary deadlines for comments and rebuttal with respect to surrogate countries and surrogate values. *See, e.g.*, *SC Memo* at 1-2. In the context of an investigation or review, however, this is not the final deadline for submitting evidence with respect to appropriate surrogate values. Recognizing that statistical and other factual information

concerning surrogate values may not be fully available at the beginning of an administrative

review, Commerce regulations provide that "{f}actual information submitted to value factors

under § 351.408(c) {FOPs} … are due no later than 30 days before the scheduled date of the

preliminary results of review." 19 C.F.R. § 351.301(c)(3)(ii); *see also Bio-Lab, Inc. v. United

States*, Slip Op. 25-39 at 11.

Reflecting this procedure, Commerce's invitation to comment states that the SC List is

"non-exhaustive" and invites parties to nominate additional countries for consideration. *SC

Memo* at 1. In all NME cases, interested parties are invited comment on the non-exhaustive list

"as a *starting point* for surrogate country selection," and Commerce specifically requests that

interested parties "*propose for consideration other countries* that are at a level of economic

development comparable to China." *Id.* at 1 (emphasis added). Commerce explained further that

> Countries on the case record that are at the *same level* of economic
> development as China *should be given equal consideration* for the purposes
> of selecting a surrogate country. Countries that are not at the same level of
> economic development as China's, but still at a level of economic
> development comparable to China, should be selected only to the extent that
> data considerations outweigh the difference in levels of economic
> development.

*Id.* at 2 (emphasis supplied).

Here, before the initial comment period ended, the World Bank amended Mexico's 2022

per capita GNI, and Bio-Lab, IWC, and OxyChem filed those data in January 2024. *See Rebuttal

SV Cmts* (P.R. 65-66) at 3 and Attachment 1. There is no dispute that these data were timely filed

or that the *Preliminary Results* was not issued until six months after that submission.

Notably, in the 2020-2021 review, Commerce was confronted with essentially the same

fact pattern. In that segment, Mexico was initially included on the SC List issued for surrogate

country comments in September 2021. However, after the SC List was issued for comment in

September 14, 2021, the World Bank updated its per capita GNI figures and the figure for

Mexico fell below six countries deemed economically comparable to China. Commerce then

issued a new SC List on December 1, 2021. Faced with the fact that it initially sought comments

on a SC List that included Mexico, coupled with the fact that Mexico's 2020 per capita GNI later

caused it to fall off the SC List, Commerce decided that nine countries would be deemed

economically "comparable": all six of the countries on the original GNI List, plus three new

countries added by the December 2021 SC List.

> In this instance, Commerce finds no reasonable basis to reject either
> list and is considering both surrogate country lists on the record as
> each provides a list of countries that are at a level of economic
> comparability and serve as an adequate group to consider when
> gathering SV data.
>
> … {W}e find it reasonable in this instance to also consider the newer
> surrogate country list even though this later surrogate country list
> was not placed on the record until after the comment period.
> However, we note that, while we find no basis in this instance to
> reject either list, the reason Commerce places a list on the record
> early in a proceeding and requests comments is so that it may have
> adequate time to consider parties' comments in selecting a surrogate
> country and surrogate values. Here, no party challenged the
> economic comparability of countries identified by Commerce on
> either surrogate country list.

*Pre-Preliminary Cmts* (P.R. 88; C.R. 65) at Exhibit B (Commerce Memorandum, "Decision

Memorandum for the Preliminary Results of the 2020-2021 Antidumping Duty Administrative

Review: Chlorinated Isocyanurates from the People's Republic of China" (June 20, 2022) at 15-

16).

Although the timing of the SC Lists was impacted by the COVID pandemic, Commerce's

ability to adjust the list is no different in this case than in the 2020-2021 review. Here, Bio-Lab,

IWC, and OxyChem argued that Mexico should be considered at the same level of economic

development as China in its initial comments on the selection of a surrogate country. *See*

*Comments on SC List* (P.R. 32). It then submitted the revised World Bank data over six months

before the *Preliminary Results* were due. Thus, the Plaintiffs here did challenge Commerce's SC

List and whether Mexico should be included and then submitted the World Bank statistics

showing that Mexico was economically "the same" as the other countries on the SC List. For

these reasons, Commerce's refusal to add Mexico to the SC List is inconsistent with its own

instructions and past practice.

### 2. The record does not support the inference that a change to Mexico's per capita GNI means that other countries' per capita GNI will also be changed

Commerce defends its unwillingness to treat Mexico as equal to the other SC List

countries on the grounds that reliance on World Bank updates could cause "arbitrary changes to

the list that would be reversed once data for all of the countries is updated." IDM at Comment 1.

However, the World Bank's updates are not "arbitrary," they are the product of the World

Bank's calculation of per capita GNI over time and reflect the latest available data for all of the

countries on the World Bank list. *See Rebuttal SV Cmts* (P.R. 65-66) at Attachment 1.

Comparing the World Bank list in July 2023 and in December 2024, it is evident that the

World Bank changed very few of the figures for 2022 per capita GNI between July and

December 2023. *Compare SC List*, Attachment, *with Rebuttal SV Cmts*, Attachment 1. The per

capita GNI for China did not change and neither did any of the six SC List countries change. On

this record, it is rational to infer that the World Bank corrected the figure for Mexico, not that the

change was "arbitrary" or that there might be errors with respect to other countries. It is not

rational to insist on using erroneous data regarding Mexico's 2022 per capita GNI on the theory

that there might be errors or other adjustments with respect to other countries' per capita GNI,

and for which there is no evidence.

### 3. Commerce had ample time and ability to treat Mexico as being at "the same" level as the other countries on the SC List

As set forth above, Commerce regulations and past practice belie the claim that updating the SC List would be "administratively impractical, and unreasonable in terms of predictability." *Id.* With more than six months remaining before its *Preliminary Results*, Commerce had plenty of time to consider whether Mexico was at "the same" level as the other SC List countries in terms of economic development. In its 2020-2021 review, discussed *supra*, Commerce issued a new SC List in December and had no difficulty expanding the list of six countries to include nine countries.

Regarding whether the addition of Mexico was reasonable or predictable, the fact that Commerce's request for comments stated that the SC List was a "non-exhaustive" list and a "starting point" placed all parties on notice that additional data submitted on the record prior to the *Preliminary Results* would have a bearing on the selection of economically comparable countries. As such, whether the per capita GNI figures were available in August or in December, it was reasonably predictable that such data would impact the selection of a surrogate. Consequently, Commerce's refusal to address the December World Bank data was unreasonable and inconsistent with the administrative record.

### C. The Failure to Consider Mexico as Economically Comparable to China Was Not Supported by Substantial Evidence

It is a bedrock principle of the substantial evidence standard of review that Commerce is "required to consider the evidence on the record as a whole." *Shijiazhuang Goodman Trading Co., Ltd. v. United States*, 172 F. Supp. 3d 1363, 1374 (Ct. Int'l Trade 2016). Commerce is "required by the 'substantial evidence' analysis to consider <u>all of the evidence in the record</u> in order to make a reasonable determination on the merits." *Guizhou Tyre Co., Ltd. v. United*

*States*, 348 F. Supp. 3d 1261, 1276 (Ct. Int'l Trade 2018) (emphasis added). Indeed, this Court

"cannot sustain the Department's decision to turn a blind eye on evidence that is entirely

pertinent to its ultimate conclusion." *Id.* at 1277.

Yet, that is precisely what Commerce did here. Commerce "turn{ed} a blind eye on

evidence that {was} entirely pertinent to its ultimate conclusion" regarding Mexico's status as a

potential surrogate. Accordingly, Commerce's failure to consider all of the evidence in the

record (*i.e.*, the updated World Bank data) renders its surrogate country selection in this review

unsupported by substantial evidence and contrary to law.

## II.    Commerce Failed to Evaluate Whether Chlorinated Isos Were "Unusual or Unique" Merchandise Warranting an Alternate Surrogate Country Selection Process

### A.    Policy Bulletin 04.1 Provides an Exception to the Typical Surrogate Country Selection Process

Pursuant to 19 U.S.C. § 1677b(c)(4), for purposes of valuing FOPs in calculating the

normal value of merchandise produced in an NME, Commerce

> … shall utilize, to the extent possible, the prices of costs of factors
> of production in one or more market economy countries that are –
>
> (A) at a level of economic development comparable to that of the
> nonmarket economy country, and
>
> (B) significant producer of comparable merchandise.

Although the statute does not prioritize economic comparability or merchandise

comparability, Commerce has employed a "sequential consideration of the statutory elements"

that starts with the statutory requirement to select a surrogate that is comparable in terms of

economic development. *Jiaxing Bro. Fastener Co., Ltd. v. United States*, 961 F. Supp. 2d 1323,

1328 (Ct. Int'l Trade 2014). Policy Bulletin 04.1 cautions, however, that "there are also cases in

which it is more appropriate for the team to address economic comparability only *after* the

significant producer of comparable merchandise requirement is met." *Id.* Specifically, "particular emphasis on 'significant producer of comparable merchandise' is warranted" in cases that "involve subject merchandise that is unusual or unique (with correspondingly unusual or unique inputs or other unique aspects of the cost of production)" and cases "where major inputs are not widely traded internationally." *Id.*

In other words, Commerce "contemplated and provided expressly for situations in which the second factor {(*i.e.,* merchandise comparability)} should function as a 'threshold' when screening potential surrogate countries" rather than using economic comparability as a "threshold" criterion. *See Bio-Lab, Inc. v. United States*, Slip Op. 25-39 at 24; *see also id.* at 24 (recognizing that "in certain circumstances, Commerce provides a full exception to its default treatment of the first factor, economic comparability, as a 'threshold' criterion.").

### B. Commerce Failed to Evaluate Whether Chlor Isos Constitute "Unusual or Unique" Merchandise

Bio-Lab, IWC, and OxyChem argued early and often that Chlor isos constitute "unusual or unique merchandise" within the meaning of Policy Bulletin 04.1. For example, Plaintiffs argued the "unique nature of chlor isos" was evidenced by the "the limited number of countries with finished production." *Comments on SC List* (P.R. 32) at 5. Plaintiffs argued that "Chlorinated isos are an unusual specialty chemical product that derives key characteristics, functionality, and end use from cyanuric acid" and thus "chlor isos should be considered unique or unusual products within the meaning of Policy Bulletin 04.1." *SC Selection Cmts* (P.R. 45-47; C.R. 36-38) at 4-5. Plaintiffs stressed that Chlor isos were "an unusual specialty chemical product that derives key characteristics, functionality, and end uses from cyanuric acid." *Pre-Preliminary Cmts* (P.R. 88; C.R. 65) at 4-5. In their case brief, Bio-Lab, IWC, and OxyChem

again argued that Chlor isos were "an unusual specialty chemical product derived from cyanuric acid" and that it was imperative that Commerce "identify a comparable product that not only includes chlorine as an input, but also includes cyanuric acid." Petitioners' Case Br. (P.R. 119) at 9-10; *see also id.* (quoting the exception outlined in Policy Bulletin 04.1).

And yet, Commerce failed to address these arguments in the *Preliminary Results* and *Final Results*. In the *Preliminary Results*, Commerce acknowledged that Plaintiffs had argued for the invocation of the exception outlined in Policy Bulletin 04.1 insofar as "chlorinated isos satisfie{d} this requirement because of the use of the input urea in the production of CYA which is unique to chlorinated isos and not hypochlorites." PDM at 9. However, Commerce conducted no further analysis as to whether Chlor isos were "unusual or unique" or whether invocation of the sequencing exception was warranted. *See generally* PDM at 9-14. Similarly, in the *Final Results* Commerce did not address whether Chlor isos were "unusual or unique" or whether invocation of the sequencing exception as warranted in this case. *See generally* IDM at Comment 1.

Commerce's failure to address any of these arguments renders its determination unsupported by substantial evidence and contrary to law. The Supreme Court has explained that that an agency explanation is unreasonable if the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. "Accordingly, Commerce also has an 'obligation' to address important factors raised by comments from petitioners and respondents." *SKF USA Inc.*, 630 F.3d at 1374. In past cases where Commerce entirely failed to address an argument presented by an interested party, this Court has remanded that issue to Commerce. *See, e.g., Stein Industries,* 365 F. Supp. 3d at 1372-1373. The Court should do the same here.

III.     **The Finding that Calcium and Sodium Hypo Are "Comparable" to Chlor isos Otherwise Is Not Supported by Substantial Evidence**

To "determine if a product produced by a company in the surrogate country is

comparable, Commerce's established practice is to apply a three-part test that examines 'physical

characteristics, end uses, and production processes." *Shanghai Foreign Trade Enterprises Co.,*

*Ltd. v. United States*, 318 F. Supp. 2d 1339, 1348 (Ct. Int'l Trade 2004). Commerce also

"examines how similar a proposed surrogate producer's production experience is to the NME

producer's production experience." *Baoding Mantong Fine Chemistry Co., Ltd. v. United States*,

222 F. Supp. 3d 1231, 1241 (Ct. Int'l Trade 2017). And in "cases where the subject merchandise

contains a major input that is specialized or used intensively in the production of the subject

merchandise, comparable merchandise should be identified on the basis of a comparison of such

major input." *Dupont Teijin Films v. United States*, 997 F. Supp. 2d 1338, 1342 (Ct. Int'l Trade

2014) (emphasis supplied).

In its recent decision in *Bio-Lab, Inc. v. United States,* discussed *supra*, this Court

remanded the question of merchandise comparability because Commerce failed to address the

record evidence in the 2021-2022 administrative review of the antidumping duty order on Chlor

isos from China. *See Bio-Lab, Inc. v. United States*, Slip Op. 25-39 at 31-35, 37-40. As shown

below, the record in this review contains the same evidence found in the 2021-2022 review

record, and more. For the same reasons that the Court remanded this issue in the prior case, it

should again remand the issue presented in this appeal.

A.  **CYA is the Primary Input of Chlor Isos and Provides a Key Difference in Chemical Composition**

Chlor isos are made up of three major inputs: CYA, chlorine, and caustic soda. *See Pre-*

*Preliminary Cmts* (P.R. 88; C.R. 65) at Exhibit D at 15; *SC Selection Cmts* (P.R. 45-47; C.R. 36-

38) at 6. Chlorine, which is common to Chlor isos and hypochlorites (calcium or sodium), is a sanitizer that functions as a disinfectant and purifies the water in a swimming pool. *See Pre-Preliminary Cmts* at Exhibit C (Exhibit 1 at 1). CYA, which is unique to Chlor isos and is the "major material" used in the production process, is a stabilizer and binds free chlorine in the pool water and releases it slowly, extending the time needed to deplete each dose of the sanitizer. *See id.* at Exhibit C (Exhibit 1 at 4); Heze Huayi DQR (P.R. 39; C.R. 20) at 5 (referring to CYA as "the major material of the subject goods").

In water, chlorinating chemicals generate hypochlorous acid (HOC1), which is the primary disinfectant in aqueous environments. *See Pre-Preliminary Cmts* (P.R. 88; C.R. 65) at Exhibit C (Exhibit 1 at 1). HOC1, however, rapidly degrades from UV rays present in sunlight. CYA shields HOCI from this degradation by bonding and releasing chlorine atoms. *See id.* at Exhibit C (Exhibit 1 at 5). Without a stabilizer, most HOC1 generated would degrade within two hours, but with a stabilizer this degradation slows by a factor of 2-6, preserving disinfection levels and reducing the need to add more non-stabilized chlorinating agents. Furthermore, stabilized chlorine found in Chlor isos is also less corrosive, is less reactive with other dissolved compounds and with materials of construction, and is less volatile than other non-stabilized sanitizers like calcium hypo and sodium hypo. *See Pre-Preliminary Cmts* at Exhibit C (Exhibit 1 at 1).

Fundamentally, the differences in physical characteristics described above are explained by the fact that calcium hypo and sodium hypo are not cyanurates or chlorinated CYA. Chlor isos are "*derivatives of cyanuric acid*, described as chlorinated s-triazine triones,"… for which "{t}here are three primary chemical compositions:  (1) trichloro isocyanuric acid ($Cl_3(NCO)_3$), (2) sodium dichloroisocyanurate (dihydrate) ($NaCl_2(NCO)_3(2H_2 0)$), and (3) sodium

23

dichloroisocyanurate (anhydrous) (NaCl$_2$(NCO)$_3$). *SC Selection Cmts* (P.R. 45-47; C.R. 36-38) at 5-6. Calcium hypo and Sodium hypo notably lack the crucial NCO isocyanate grouping and the two- to three-atom composition of the chlorine element. *Id.*

In its original investigation of calcium hypo the USITC found that Chlor isos and calcium hypo were separate like products, "particularly given the differences in chemical composition {and} chlorine content." *SC Selection Cmts* at 7 and Exhibit 1 (USITC Pub. 4452 at 7). The USITC distinguished the "non-chlorine inputs" used in Chlor isos (*i.e.,* CYA) and determined that although "calhypo, chlorinated isos, and sodium hypochlorite have some degree of overlap in end uses, significant differences exist in their chemical compositions, particularly in the level of available chlorine, as well as the differing non-chlorine inputs." *Id.* Indeed, the USITC recognized that these "significant differences" meant that "putting Chlor isos and calhypo in close proximity can result in a rapid explosion and fire." *Id.*.

Notwithstanding the evidence above, Commerce determined that Chlor isos and calcium and sodium hypo were "comparable." *See* IDM at Comment 1. However, Commerce did not cite any record evidence for this conclusion. Instead, Commerce simply asserted that it had "previously found that these products share similar physical characteristics" and have "many of the same chemical inputs." *Id.* However, the fact that certain products have common inputs does not demonstrate that they are "comparable merchandise" under the statute.

Commerce failed to grapple with the significance of CYA and instead asserted that CYA "merely acts as a binding agent that allows for the slower release of chlorine" and that "this one difference does not meet the definition of a major input." IDM at Comment 1. Commerce thus ignored the stabilizing function of CYA.

Reviewing the similar record in the 2021-2022 review, this Court remanded the issue

because "Commerce did not explain adequately its determination that chlorinated isos, calcium hypo and sodium hypo share similar physical characteristics." *See Bio-Lab, Inc. v. United States*, Slip Op. 25-39 at 35. So too, here, Commerce failed adequately to explain its determination as measured against the record evidence.

In sum, Commerce ignored record evidence demonstrating the critical importance of cyanuric acid (CYA), which is only found in Chlor isos and imparts unique and essential physical characteristics to the finished product (*i.e.,* stability). Accordingly, Commerce's determination that sodium and calcium hypo share common physical characteristics with, and thus are comparable to, Chlor isos is not supported by substantial evidence.

### B. The Production Process for Chlor Isos is Significantly More Complex Than Production of Sodium Hypo or Cal Hypo

In the *Final Results*, Commerce failed to address record evidence demonstrating that Chlor isos require a significantly more complex and expensive production process than calcium or sodium hypo. *See* IDM at Comment 1. In fact, Commerce's sole comment on the production process was to quote its conclusion in a prior review that there were "certain similarities in the production process" between Chlor isos and calcium/sodium hypo. *See id.* Commerce cited no record evidence and conducted no analysis to support its conclusion. As demonstrated below, record evidence in the instant review demonstrates that there are substantial differences in the production of Chlor isos as compared to calcium and sodium hypo. Commerce's failure to address any of this evidence in the *Final Results* renders its conclusion that Chlor isos and calcium and sodium hypo have comparable production processes unsupported by substantial evidence.

1.  *Production of Chlor isos is significantly more expense and requires substantially more workers that production of hypophosphates*

The production of Chlor isos involves a workforce, a plant, and an investment that is an order of magnitude greater than the number of workers and amount of investment involved in the production of calcium or sodium hypo. Specifically, record evidence demonstrated that the cost of building a new Chlor isos production facility is [          ] million dollars, whereas the cost to set up a new sodium hypo facility is approximately [          ]. *Pre-Preliminary Cmts* P.R. 88; C.R. 65) at Exhibit D (Exhibit 4 (Dixon Declaration) at 2-3). Similarly, the operation of a Chlor isos plant required [      ] skilled technicians to monitor thermal and chemical reactions. *See id.; see also* Heze Huayi DQR at Exhibit D-1 (explaining that [      ] workers are involved in the production of Chlor isos). In contrast, record evidence indicated that the operation of a sodium hypo manufacturing facility required only [          ]. *See Pre-Preliminary Cmts* at Exhibit D (Exhibit 4 (Dixon Declaration) at 2-3). These significant differences in plant costs and number of employees reflects the fact that the production of Chlor isos is a multi-step process that involves the production of several intermediate chemicals, which are then further processed to yield Chlor isos, whereas the production of calcium or sodium hypo involves a simpler production process with no intermediate chemicals. *Id.*

The record evidence discussed above is consistent with the USITC's conclusion that Chlor isos, calcium hypo, and sodium hypo are not "manufactured in common facilities with common employees." *SC Selection Cmts* (P.R. 45-47; C.R. 36-38) at Exhibit 1 (USITC Pub. 4452 at 8). In fact, during the USITC's investigation of calcium hypo no "U.S. calhypo producer stated that it could switch production from calhypo to other products." *Id.* Likewise, during the USITC's investigation of Chlor isos, "no responding U.S. producers of Chlor isos stated that they could switch production to any other products." *Id.* The USITC's findings reinforce the

record evidence discussed above, which demonstrates that the production processes for calcium or sodium hypo and Chlor isos are significantly different.

### 2. *Production of Chlor isos requires more equipment and processing stages than production of calcium and sodium hypo*

The production of Chlor isos also requires significantly more pieces of equipment and more production stages than calcium or sodium hypo, further demonstrating the lack of comparability between these products. As noted above, in the *Final Results* Commerce did not address any of the evidence on the record concerning the significant differences in equipment and processing stages required for the production of Chlor isos and the equipment and processing stages required for the production of calcium and sodium hypo. *See* IDM at Comment 1; *see also* PDM at 12-14.

The production of Chlor isos begins with the production of CYA from urea. *See* Heze Huayi DQR (P.R. 39; C.R. 20) at Exhibit D-1. Specifically, respondent Heze Huayi explained that the production of CYA involves the following separate processes, each manned by numerous employees and involving hours' worth of energy consumption and use of extensive equipment:

1. Condensation Reaction
2. Hydrolysis Reaction
3. Suction Filter Tanks
4. Ammonium Sulfate Reactor
5. Centrifugal Machine

*See id.* CYA production also results in several additional by-product recovery and processing operations. *See, e.g., id.* at 5, 8, 16-17 and Exhibit D-1. Thereafter, the production of Chlor isos involves numerous additional processes at a different site:

1. Make-up Tank
2. Chlorination Reactor
3. Suction Filtering Tank

    4.  Tower Drier
    5.  Granulating Machine
    6.  Tableting Machine
    7.  Sewage Treatment Equipment

*See id.* at Exhibit D-1; *see also Pre-Preliminary Cmts* at Exhibit D (Exhibit 4 (Dixon Declaration) at 2-3).

In contrast, sodium hypochlorite is produced from chlorine and sodium hydroxide (caustic soda) which are the two chemicals simultaneously produced by any chlor-alkali producer. This one-step reaction is as follows:

$$Cl_2 \text{ (g)} + 2\,NaOH \text{ (aq)} \;\rightarrow\; NaCl \text{ (aq)} + NaClO \text{ (aq)} + H_2O \text{ (aq)}$$

*See Pre-Preliminary Cmts* at Exhibit D (at 16 and Exhibit 3 (Speight)). As shown above, the Chlorine gas is reacted with liquid caustic soda (sodium hydroxide) to yield salt water (NaCl), sodium hypo liquid (NaClO), and water ($H_2O$). Put differently, the entire production process to make sodium hypo utilizes liquid caustic soda from a holding tank, chlorine recovered from the trichlor chlorinator, and a single vessel ("NaOCl GEN") where the sodium hypo (NaOCl) is produced. In other words, the production of sodium hypo amounts to a partial process involved in one stage of a 12-stage process to manufacture Chlor isos.

In the *Final Results*, Commerce did not consider any of this evidence and instead simply cited to prior reviews without engaging with the evidence on the record of this review. *See generally* IDM at Comment 1. However, it is well-established that "each administrative review is a separate segment of proceedings with its own unique facts. Indeed, if the facts remained the same from period to period, there would be no need for administrative reviews." *Shandong Huarong Mach. Co. v. United States*, 29 C.I.T. 484, 491 (2005). As such, Commerce's determination that the production processes for Chlor isos is similar or comparable to the production of calcium/sodium hypo is unsupported by substantial evidence.

### 3. *Production of Chlor isos requires a significantly more complex production process than that required for calcium or sodium hypo*

As in the 2021-2022 administrative review, which this court analyzed in *Bio-Lab, Inc. v. United States*, Slip Op. 25-39 at 37-40, the record in this review showed that the production of Chlor isos requires significantly more investment, employees, equipment, and production stages than the production of sodium hypo, as shown in Table 2:

| Table 2 Comparison of the Production Processes, Employees, Equipment and Investment to Manufacture Sodium Hypo versus Chlorinated Isocyanurates | | |
|---|---|---|
| | **Sodium Hypo** | **Chlor isos** |
| Production stages | Circulation of chlorine through a dilute caustic coda (sodium hydroxide) solution. | 1) Production of CYA from urea, including<br>  a) [                 ]<br>  b) [      ]<br>  c) [       ]<br>2) Reaction of CYA and Chlorine<br>  a) [          ]<br>  b) [    ]<br>  c) [    ]<br>  d) [          ]<br>3) Finishing<br>  a) [        ]<br>  b) [       ]<br>  c) [    ] |
| Production Employees | [   ] | Over [   ] |

| | | |
|---|---|---|
| Equipment | [                    ]<br>[                    ]<br>[                    ] | [                                    ]<br>    [            ]<br>        [            ]<br>[<br>                                    ]<br>[<br>                [        ]<br>            [        ]<br>        [                    ]<br>[<br>                            ] |
| Plant Investment | [            ] | [            ] |

*Source*: *Pre-Preliminary Cmts* (P.R. 88; C.R. 65) at Exhibit D (at 15 and Exhibit 4 (Dixon Declaration)); Heze Huayi DQR (P.R. 39; C.R. 20) at Exhibit D-1.

As shown, the production of sodium hypochlorite is a two-step process. By comparison, the production of chlor isos involves a dozen steps, plus packing. These significant differences in the production process underscore the substantial differences between Chlor isos and calcium or sodium hypo. Moreover, regarding the production of calcium hypochlorite, there was no record evidence regarding the production of this material. In any event, Commerce did not undertake any analysis of the calcium hypochlorite production process.

### 4. Conclusion

In Slip Op. 25-39, this Court remanded the same issue to Commerce for reconsideration, finding:

> First, Commerce failed to support its assertion that sodium hypo and chlorinated isos both require "electrolysis, evaporation, and chlorine absorption" in their respective production processes. See id. ("Other information on the record and identified in the Preliminary Results shows that electrolysis, evaporation, and chlorine absorption are other processes used in the production of sodium hypochlorite, but these production stages are not accounted for in the petitioners' analysis." (emphasis supplied)).

> Second, Commerce failed even to apply to calcium hypo Commerce's insufficient production process analysis of sodium hypo. See IDM; see also PDM. This failure is significant because Commerce's determination states that both sodium and calcium hypo "share similar physical characteristics and end uses, and a similar production process, as the subject merchandise." IDM at 6 (emphasis supplied).

In light of the foregoing, the court is not able to conclude that Commerce's determination is supported by substantial evidence.

*See Bio-Lab, Inc. v. United States*, Slip Op. 25-39 at 38-39.

For the same reasons, here, the question whether the production process with respect to chlor isos is comparable to the process for calcium or sodium hypochlorite should be remanded. The record here establishes that there are sharp differences between the production processes of Chlor isos and calcium or sodium hypo. These products are not sufficiently comparable for purposes of selecting an appropriate surrogate country which will serve as the basis for calculating normal value. Accordingly, Commerce's determination in the *Final Results* that Chlor isos and calcium or sodium hypo were "comparable" for purposes of 19 U.S.C. § 1677b(c)(4) is not supported by substantial evidence.

## CONCLUSION

For the reasons discussed above, this Court should find Commerce's *Final Results* are not supported by substantial evidence and is otherwise not in accordance with law and should remand this matter to Commerce consistent with the arguments above.

NONCONFIDENTIAL VERSION

Respectfully submitted,

/s/ James R. Cannon, Jr.
James R. Cannon, Jr.
Chase J. Dunn

CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave, N.W.
Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation*

Date:   July 14, 2025

Court. No. 25-00054

## **Certificate of Compliance**

The undersigned hereby certifies that the forgoing submission of "Memorandum of Law and Fact in Support of Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record" filed by Plaintiffs on July 14, 2025, contains 9,072 words, including footnotes, and excluding the table of contents, table of authorities, and signature block, and therefore, complies with the maximum 14,000 word limitation set forth in the Standard Chambers Procedures.

BY: /s/ James R. Cannon Jr.

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| BIO-LAB, INC., ET AL. | ) |
| *Plaintiffs*, | ) |
| | ) |
| V. | ) Ct. No.  25-00054 |
| | ) |
| UNITED STATES, | ) |
| *Defendant,* | ) |
| AND | ) |
| | ) |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. AND | ) |
| HEZE HUAYI CHEMICAL CO., LTD., | ) |
| *Defendant-Intervenors.* | ) |

## <u>ORDER</u>

Upon consideration of Plaintiffs Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation's Rule 56.2 Motion for Judgment Upon the Agency Record and the supporting Memorandum of Law, all responses thereto, and all other papers and proceedings in this action, it is hereby:

ORDERED that Plaintiffs' Motion for Judgment Upon the Agency Record is granted; and it is further

ORDERED that the final results of the Department of Commerce's administrative review of the antidumping duty order covering chlorinated isos from China, *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 9710 (Feb. 18, 2025), are remanded to Commerce for further proceedings for the agency to:

(1) Consider whether Mexico was at the "same level" of economic development as China given that its per capita GNI was more comparable to China's per capita GNI than countries on

the SC List;

(2) Consider whether Chlor isos are "unusual or unique" merchandise within the meaning of Policy Bulletin 04.1 such that its surrogate country selection process should begin with identification of potential surrogates that are significant producers of comparable merchandise; and

(3) Reconsider the finding that calcium or sodium hypochlorite produced in Romania or any other potential surrogate is "comparable merchandise" for purposes of 19 U.S.C. § 1677b(c)(4) based on the substantial record evidence compiled in the challenged administrative review.

**SO ORDERED.**

Dated: _____          _____
          New York, New York                                    Timothy M. Reif, Judge