## THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BIO-LAB, INC., *ET AL.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Ct. No. 25-00054 |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. ) | |
| AND HEZE HUAYI CHEMICAL CO., LTD., ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |

## <u>ORDER</u>

Upon consideration of plaintiffs' motion for judgment upon the administrative record,

response thereto, reply, and all other papers, it is hereby

ORDERED that the motion is denied, and it is further

ORDERED that judgment shall enter in favor of the United States.

_____

JUDGE

Dated:

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BIO-LAB, INC., *ET AL.*, | ) |
| Plaintiffs, | ) |
| v. | ) Consol. Ct. No. 24-00054 |
| THE UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. AND HEZE HUAYI CHEMICAL CO., LTD., | ) |
| Defendant-Intervenors. | ) |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRETT A. SHUMATE
Assistant Attoney General

PATRICIA M. MCCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL
Charlie Chung
Attorney
Office of Chief Counsel
For Trade Enforcement & Compliance
Department of Commerce

TATE NATHAN WALKER
Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 307-0163
Fax: (202) 305-7643
*Attorneys for Defendant*

September 12, 2025

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2..................................................................2

  I.    The Administrative Determination Under Review................................................2

  II.   Issues Presented For Review...............................................................................2

STATEMENT OF FACTS...........................................................................................2

SUMMARY OF ARGUMENT...................................................................................11

ARGUMENT.............................................................................................................12

  I.    Standard Of Review..........................................................................................12

        A. Substantial Evidence..................................................................................12

        B. *Loper Bright* Framework..........................................................................13

        C. Legal Framework For Surrogate Value Selections .......................................16

  II.   Commerce's Selection Of Romania As The Primary Surrogate Country Is
        Supported By Substantial Evidence And Otherwise In Accordance With Law.....19

        A. Commerce's Selected Romania As The Primary Surrogate Country
           In Accordance With The Law And Based On Substantial Evidence...............20

        B. Commerce's Determination Not To Include Data From A Later Update Of The
           World Update GNI Data Is In Accordance With Law And Supported By
           Substantial Evidence..................................................................................23

        C. Commerce's Justification For Refusing To Rely On Partial Data Is In Accordance
           With The Law And Its Past Practice.............................................................25

           1.  Partial Data Diminishes Data Quality....................................................26

           2.  Partial Data Jeopardizes Administrative Flexibility ...............................28

           3.  Commerce's Rejection Of Past Data Is Not Contrary To Past Reviews....29

  III.  Commerce's Determination That Sodium Hypochlorites and Calcium Hypochlorites
        Are Comparable To Chlorinated Isos Is Based On Substantial Evidence And Is In
        Accordance With Law .........................................................................................32

IV.    Commerce Properly Selected The Best Available Information On The Record For Determining Surrogate Values For All Factors Of Production.............................34

    A. Legal Framework For Merchandise Comparability........................................37

    B. Sodium And Calcium Hypochlorites Are Comparable Products To Chlorinated Isos: Major Inputs........................................................................................39

    C. Sodium And Calcium Hypochlorites Are Comparable Products To Chlorinated Isos: Physical Characteristics ........................................................................40

    D. Sodium And Calcium Hypochlorites Are Comparable Products To Chlorinated Isos: End Use ..............................................................................................41

    E. Sodium And Calcium Hypochlorites Are Comparable Products To Chlorinated Isos: Production Process ..............................................................................42

CONCLUSION..............................................................................................................45

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) ........................................................ 12

*Bio-Lab, Inc. v. United States*,
    776 F. Supp. 3d 1315 (Ct. Int'l Trade 2025) ........................................... 32, 35

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) .......................................................................... 12, 13

*Clearon Corp. v. United States*,
    2014 WL 3643332, 38 C.I.T. 1122 (Ct. Intl. Trade 2014) ............................ *20-22*

*Clearon Corp. v. United States*,
    2015 WL 4978995 (Ct. Int'l Trade 2015) .............................................. 31

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ...................................................................... 12

*Dorbest Ltd. v. U.S.*,
    462 F. Supp. 2d 1262 (Ct. Intl. Trade 2006) ........................................ 37-38

*E.I. DuPont de Nemours & Co. v. United States*,
    No. 96-11-02509, 1998 WL 42598 (Ct. Int'l Trade Jan. 29, 1998) ................. 30

*Fresh Garlic Producers Assn. v. United States*,
    121 F. Supp. 3d 1313 (Ct. Intl. Trade 2015) ........................................ 32-33

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ........................................ 13

*Heze Huayi Chemical v. United States*,
    No. 17-0032, 2018 WL 2328183 (Ct. Int'l Trade May 22, 2018) ................. 37, 44

*Hyundai Steel Co. v. United States*,
    659 F. Supp. 3d 1327 (2023) ........................................................... 35

*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992) ...................................................................... 13

*Jacobi Carbons AB v. United States*,
    313 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ........................................ 22

*Jeld-Wen, Inc. v. United States*,
    567 F. Supp. 3d 1344 (Ct. Int'l Trade 2022)......................................................44

*Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*,
    28 F. Supp. 3d 1317 (Ct. Intl. Trade 2014) .............................................. 28, 29

*Jiaxing Bro. Fastener Co. v. United States*,
    11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014)................................................18-19

*Jiaxing Bro. Fastener Co., Ltd. v. United States*,
    822 F.3d 1289 (Fed. Cir. 2016) ....................................................... *passim*

*Juancheng Kangtai Chem. Co., Ltd. v. United States*,
    No. 14-56, 2017 WL 218910 (Ct. Intl. Trade 2017)...........................................44

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024), overruled *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ............................................................. *passim*

*Mid Continent Nail Corp. v. United States*,
    712 F. Supp. 2d 1370 (Ct. Int'l Trade 2010)....................................................37

*Nation Ford Chem. Co. v. United States*,
    166 F.3d 1373 (Fed. Cir. 1999) ........................................................ 18, 19

*NMB Sing. Ltd v. United States*,
    557 F. 3d 1316 (Fed. Cir. 2019) ........................................................... 34

*Nucor Corp. v. United States*,
    612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009)....................................................13

*Qingdao Sea-Line Trading Co., Ltd. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014) ......................................................... 30, 31

*QVD Food Co., Ltd. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011) ............................................................20

## Statutes

5 U.S.C. § 706..............................................................................15

19 U.S.C. § 1516a......................................................................12,15

19 U.S.C. § 1673..........................................................................16

19 U.S.C. § 1677b...................................................................*passim*

**Regulations**

19 C.F.R. § 351.301.................................................................................................26

19 C.F.R. § 351.408...........................................................................................18,20

**Rules**

U.S. Ct. Int'l Trade R. 56.2.....................................................................................1,2

**Administrative Determinations**

*Antidumping Methodologies in Proceedings Involving Non–Market Economy Countries: Surrogate Country Selection and Separate Rates*, 72 Fed. Reg. 13,246 (Dep't of Commerce Mar. 21, 2007))…………………………………………………….…………………….21

*Certain Woven Electric Blankets from the People's Republic of China: Final Determination of Sales at Less Than Fair Value,*
     75 Fed. Reg. 38,459 (Dep't of Commerce Jul. 2, 2010).....................................................38

*Chlorinated Isocyanurates from the People's Republic of China*
     80 Fed. Reg. 4,539 (Jan. 28, 2015) .......................................................................44

*Chlorinated Isocyanurates From the People's Republic of Chin* 88 Fed. Reg. 1,559 (Dep't of Commerce Jan. 11, 2023)……………………………………………………………..31

*Chlorinated Isocyanurates from the People's Republic of China*,
     88 Fed. Reg. 43,271 (Dep't of Commerce Jul. 7, 2023) ................................................39, 40

*Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 9,710 (Dep't of Commerce Feb. 18, 2025) …………………………………………………………………………...….passim

*Chlorinated Isocyanurates from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 56,303 (Dep't of Commerce Jul. 9, 2024)……………………………………………………………………passim

*Chlorinated Isocyanurates from the People's Republic of China: 78 Fed. Reg. 4386 (Dep't of Commerce Jan. 22, 2013*……………………………………………………………..41

*Chlorinated Isocyanurates from the People's Republic of China*,
     89 Fed. Reg. 455 (Dep't of Commerce Jan. 4, 2024).........................................................39

*Pure Magnesium from the People's Republic of China: Final Results of the 2008-2009 Antidumping Duty Administrative Review of the Antidumping Duty Order*, 75 Fed. Reg. 80,791 (Dep't of Commerce Dec. 23, 2010…………………………………………..……38

*Notice of Final Determination of Sales at Less Than Fair Value: Chlorinated Isocyanurates from the People's Republic of China*, 70 Fed. Reg. 24,502 (Dep't of Commerce May 10, 2005)....................................................43

*Sebacic Acid from the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 65674 (Dep't of Commerce Dec. 15, 1997)…44

**Other Authorities**

U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, *Policy Bulletin* 04.1 (2004), *http://enforcement.trade.gov/policy/bull04-1.html* (last October 17, 2024)....................................................................................................................*passim*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| BIO-LAB, INC., *ET AL.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Ct. No. 25-00054 |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. ) | |
| AND HEZE HUAYI CHEMICAL CO., LTD., ) | |
| ) | |
| Defendant-Intervenors. ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Court's rules, defendant, the United States, respectfully responds to the motion for judgment on the agency record filed by plaintiffs, Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation (collectively, Bio-lab or petitioners). Bio-Lab challenges the Department of Commerce's (Commerce) final results of the 2022-2023 administrative review of the antidumping duty order covering chlorinated isocyanurates (chlorinated isos) from the People's Republic of China (China). As demonstrated below, Commerce's determination is supported by substantial evidence and is in accordance with law. Accordingly, we respectfully request that the Court sustain Commerce's final results and deny Bio-Lab's motion for judgment on the agency record.

## STATEMENT PURSUANT TO RULE 56.2

### I.    The Administrative Determination Under Review

The administrative determination under review is *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 9,710 (Dep't of Commerce Feb. 18, 2025) (final results), (P.R. 133),[1] and accompanying Issues and Decision Memorandum (IDM), (P.R. 132).  The review covered producers and exporters Heze Huayi Chemical Co., Ltd and Juancheng Kangtai Chemical Co., Ltd. (collectively respondents).  The period of review is June 1, 2022, through May 31, 2023.

### II.    Issues Presented For Review

1.    Whether Commerce's selection of Romania as the primary surrogate country and exclusion of Mexico from the surrogate country list was in accordance with the law and supported by substantial evidence.

2.    Whether Commerce properly considered economic comparability before merchandise comparability in selecting the primary surrogate country.

3.    Whether Commerce properly determined that sodium and calcium hypochlorites were comparable products to chlorinated isos.

## STATEMENT OF FACTS

On August 3, 2023, Commerce initiated the fourteenth administrative review of the antidumping duty order covering chlorinated isos from China for the period June 1, 2022, through May 31, 2023.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 51,217, 51,276 (Dep't of Commerce Aug. 3, 2023) (P.R. 10).  The

---

[1] Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the underlying administrative review.

administrative review covered the respondents.  *See* IDM.  Because China is a non-market economy country, the Tariff Act requires Commerce to calculate the normal value of chlorinated isos based on surrogate values found in a comparable market economy.  *See* 19 U.S.C. § 1677b(c)(1).

Pursuant to 19 U.S.C. § 1677b(c)(4), to select a primary surrogate country, Commerce compiled a surrogate country list of market economies that are comparable to China in terms of economic development.  *See Chlorinated Isocyanurates from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 56,303 (Dep't of Commerce Jul. 9, 2024) (P.R. 108), and accompanying preliminary decision memorandum (PDM) at 6-7 (P.R. 95).

That surrogate country list, issued on August 27, 2023, listed Bulgaria, Chile, Costa Rica, Malaysia, Romania, and Türkiye as at the same level of economic development as China based on per capita gross national income (GNI) data available from the 2022 World Bank's World Development Report's Atlas method.  *See Re: 2022-2023 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China: Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information*, (Oct. 12, 2023) (Surrogate Country Request) at Attachment 1 (Surrogate Country List), (P.R. 29); *see also* PDM at 13.  Commerce explained that GNI is the "primary indicator of a country's level of economic development."  Surrogate Country List at 1.  China had a GNI of $12,850, and Commerce chose six countries, three above and three below China, with a GNI ranging from $10,590 (Turkey) (~-17 percent) to $15,660 (Romania) (21.6 percent).  *Id.* at 2. Mexico was not chosen because its GNI was $10,410 and, therefore, Commerce found Mexico not to be at the same level of economic development as China.  *Id.* at 4.

3

Commerce explained that this list is not exclusive, but that "{c}ountries that are not at the same level of economic development as China's, but still at a level of economic development comparable to China, should be selected *only* to the extent that data considerations outweigh the difference in levels of economic development." Surrogacy Country List at 2 (emphasis added). Commerce explained its methodology for formulating this list. *See* PDM at 6-7; *see also Remand Results*, ECF No. 69, *Clearon Corp. v. United States*, No. 13–00073, at 9 (Ct. Int'l Trade Dec. 11, 2014).

When Commerce released the surrogate country list, it solicited comments on the list. *See* Surrogate County Request at 1-2. Specifically, Commerce instructed interested parties to comment on (1) whether a country on the surrogate list was a "significant producer of merchandise comparable to the merchandise subject to this review," (2) "{i}nformation regarding data availability and the quality of the data," and (3) "{i}nformation regarding data availability and quality of financial statements." *Id.* at 1-2.

On October 19, 2023, and October 23, 2023, Commerce received comments and subsequent rebuttal comments from Bio-Lab and respondents, respectively, regarding the surrogate country list. *Re: Chlorinated Isocyanurates from the People's Republic of China: Comments on Surrogate Country List*, (Oct. 19, 2023) (GNI Comments) (P.R. 32); *Re: Chlorinated Isocyanurates from the People's Republic of China: Rebuttal Comments on GNI List*, (Oct. 23, 2023) (Rebuttal GNI Comments) (P.R. 33).

Bio-Lab asserted that Commerce should select Mexico as the primary surrogate country because (1) Mexico is at a level of economic development comparable to China and (2) given the "unique nature" of chlorinated isos, requiring cyanuric acid (CYA) or urea in production, the other six countries on Commerce's list do not produce identical or comparable merchandise. *See*

GNI Comments at 2; *see also* PDM at 8.  As a result, Bio-Lab also argued that "Commerce should consider Mexico as an acceptable 'off-list' surrogate country alternative, consistent with its prior practice."  GNI Comments at 2.  Bio-Lab observed that in Commerce's eight prior reviews, Commerce selected Mexico six times as economically comparable to China and found the country to be a producer of identical merchandise.  GNI Comments at 2.

In respondent's rebuttal comments, they argued that Commerce need not select Mexico, which was not present on the surrogate country list and had not been on the surrogate country list for 2 years, because the list already contained at least one country – Malaysia – that "fufill{ed} all of the Department's surrogate country criteria."  Rebuttal GNI Comments at 2-3. Respondents argued that calcium hypochlorites and sodium hypochlorites are two comparable products that Malaysia produces in significant quantities and "sources a complete and reliable surrogate value record for all inputs."  Rebuttal GNI Comments at 2-3; *see also* Rebuttal GNI Comments at Attachment 1.  Accordingly, respondents argued that there was no reason for Commerce to depart from its practice of relying on data from countries on the surrogate country list, except when none of the listed countries are suitable because they do not produce comparable merchandise, do not provide a reliable source of publicly available surrogate data, or are unsuitable for use for other reasons.  *See id.* at 2; *see also* PDM at 12.  In support, respondents attached UN Comtrade data and relevant tariff schedule for Malaysia and produced a report from the United States Environmental Protection Agency in support of its product comparability argument because Malaysia did not produce identical merchandise.  Rebuttal GNI Comments at Attachments 1-3.

Between December 6, 2023, and June 6, 2024, Commerce received Bio-Lab's and respondents' additional information and arguments on the primary surrogate country selection

and surrogate country values.  With respect to the primary surrogate country selection, Bio-Lab argued that Commerce should select a country that produces merchandise identical to the subject merchandise because chlorinated isos contains CYA, which confers distinct properties to chlorinated isos and makes them "unusual or unique."  *See Re: Chlorinated Isocyanurates from the People's Republic of China (2022-2023 Review): Petitioners' Comments on Primary Surrogate Country Selection*, (Dec. 6, 2023) (Additional Surrogate Country Comments) at 5 (P.R. 45).  Given the unique nature of chlorinated isos as a specialty chemical, Bio-Lab argued that Commerce was required to narrowly define comparable merchandise as merchandise produced with CYA or urea.  *Id.*  Bio-Lab argued that calcium and sodium hypochlorites should not be selected as comparable merchandise because they do not contain CYA.  *Id.* at 6. Additionally, Bio-Lab asserted that in 2014 and 2015 the U.S. International Trade Commission (USITC) made an instructive, but not dispositive, finding that sodium hypochlorite and calcium hypochlorite are separate like products from chlorinated isos based on chemical composition and manufacturing processes.  *See id.* at 7.  Given such unique nature of chlorinated isos, Bio-Lab argued that none of the countries on the surrogate country list produces chlorinated isos, and, as a result, Mexico should be selected as the primary surrogate country because it produces chlorinated isos.  *See id.* at 4-8.

On January 2, 2024, Bio-Lab reiterated its argument that Commerce should select Mexico as the primary surrogate country.  *See Re: Chlorinated Isocyanurates from the People's Republic of China (2022-2023 Review): Rebuttal Comments on Surrogate Values*, (Jan. 2, 2024) (Pet. Rebuttal SV Comments) at 3 (P.R. 65).  Moreover, in that submission, Bio-Lab submitted updates that the World Bank had made in December 2023 to its July 2023 list of 2022 GNI data and asserted that, based on updates to the data for Mexico, Mexico's GNI was closer to China's

GNI than Türkiye's, arguing that Commerce should consider that Mexico is now "well within the range of the GNI's established by Commerce's *GNI* list." (emphasis in original). *Id.*; Attachment 1 (Partial GNI Update).

If, however, Commerce did not select Mexico Bio-Lab argued that Commerce should select Romania as the primary surrogate country. *See Re: Chlorinated Isocyanurates from the People's Republic of China (2022-2023 Review): Petitioners' Comments Concerning the Preliminary Determination*, (May 29, 2024) (Petitioner Prelim Comments) at 8 (P.R. 88).  Bio-Lab argued that because "Romania is . . . a significant producer of sodium hypochlorite and provides reliable data with respect to every factor of production." *Id.* at 9.  Additionally, Bio-Lab cited to the availability of reliable data from Romania, including from a large producer of sodium hypochlorite, S.C. Chimcomplex S.A. Borzesti (Chimcomplex), and reliable information "to provide values for all the factors of production." *Id.* at 8.

In contrast, respondents, in their additional comments, continued to argue that Commerce's statutory requirement in choosing the surrogate country is to find an economically comparable country that is a significant producer of *comparable*, not identical, merchandise. *See Re: Chlorinated Isocyanurates from the People's Republic of China: Preliminary Comments*, (June 6, 2024) (Resp. Prelim. Comments) at 3 (P.R. 91).  Respondents also argued that Commerce "has an established practice rooted in the statutory requirements of relying on countries on the surrogate country list unless there is not a suitable surrogate country on the list." *Re: Chlorinated Isocyanurates from the People's Republic of China: Rebuttal SC Comments*, (December 18, 2023) (Resp. Rebuttal SC Comments) at 2 (P.R. 50).

On June 28, 2024, Commerce published its preliminary results and selected Romania as the primary surrogate country.  *See* PDM.  Commerce preliminarily found that, with respect to

the countries on the list of countries at the same level of economic development as China, the export data demonstrated that both Malaysia and Romania were significant producers of comparable merchandise.  Commerce ultimately selected Romanian because Romania had usable surrogate values for all the respondents' factors of production (FOPs), as well as usable financial ratios from a Romanian company, Chimcomplex.  PDM at 9-15, 19.  Commerce considered the factors production including, but not limited to, hours of labor required, quantities of raw materials used, amounts of energy and other utilities consumed, representative capital costs, and transportation costs.  19 U.S.C. § 1677b(c)(3).

With respect to the updated December 2023 World Bank GNI data that Bio-Lab submitted, Commerce explained that mid-year changes to the GNI data do not warrant updating the August 2023 surrogate country list, particularly because no evidence indicated that the update was for all and not just some countries.  PDM at 13.  Specifically, Commerce observed that China's and Chile's data had not been updated.  *Id.*  Commerce also explained that GNI does not significantly change over such a short period of time, from July of 2022 to December of 2022, and that Commerce's practice is to update the surrogate country list once per year after the World Bank publishes its annual, complete GNI data in July of a given year.  *Id.*  Commerce observed that the World Bank data website explains that its GNI per capita data set's periodicity is annual.  *Id.* at 13 (citing *GNI per Capita, Atlas Method*, World Bank, https://perma.cc/A6D9-5D92, last accessed September 9, 2025, noting annual updates under the details tab); *see* Surrogate Country List at 3.  Commerce also explained that the World Bank will update its pdf listing of the annual GNI numbers in July of a given year and will replace the previous year's data at that time.  PDM at 13 (citing *Gross National Income per Capita, Atlas Method and PPP*, World Bank, (July 1, 2023), https://perma.cc/C92W-XN6U, last accessed September 9, 2025).

Accordingly, with Mexico not economically comparable to China and Malaysian data being inferior to Romania, Commerce selected Romania as the preliminary surrogate country with the best data to value the FOPs. *Id.* at 19.

Additionally, Commerce explained that in the prior year's administrative review, 2021-22, Commerce found that calcium and sodium hypochlorites are comparable merchandise to chlorinated isos because they share similar physical characteristics, end uses, and production process. *See id.* at 13-14. Specifically, Commerce reiterated its decision from the prior administrative review that CYA is not a "major input" that warrants a narrow definition of comparable merchandise because "industrial commodity chemicals" are identified in Policy Bulletin 04.1 as products characterized by "the large number, and generic nature, of the inputs makes input matching very complicated." Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004) (Policy Bulletin 04.1) at 2, available at https://enforcement.trade.gov/policy/bull04-1.html; PDM at 14. In the absence of new information on the record of the subject administrative review, Commerce continued to find that CYA is not a "major input," and found that calcium hypochlorites and sodium hypochlorites are merchandise comparable to chlorinated isos. *See id.*

Between November 1, 2024, and November 8, 2024, Commerce received case briefs and rebuttal case briefs from Bio-Lab and respondents. *See Re: Chlorinated Isocyanurates from the People's Republic of China: Case Brief*, (Nov. 1, 2024) (Resp. Case Brief) (P.R. 118); *Re: Chlorinated Isocyanurates from the People's Republic of China (2022-2023 Review): Petitioners' Case Brief*, (Nov. 1, 2024) (Petitioner Case Brief) (P.R. 119); *Re: Chlorinated Isocyanurates from the People's Republic of China: Rebuttal Brief* (Nov. 8, 2024) (Resp. Rebuttal Case Brief) (P.R. 123); and *Re: Chlorinated Isocyanurates from the People's Republic*

*of China (2022-2023 Review): Petitioners' Rebuttal Brief* (Nov. 8, 2024) (Pet. Rebuttal Case

Brief) (P.R. 124).  Respondents continued to argue that Commerce should select Malaysia as the

primary surrogate country, while Bio-Lab again asserted that Commerce should select Mexico.

*See* Resp. Case Brief; and Pet. Case Brief.  Specifically, Bio-Lab argued that the December 2023

update to the World Bank GNI data for Mexico indicated that the country was economically

comparable to China.  *See* Petitioner Case Brief at 2-5.  Bio-Lab further argued that even if

Commerce did not accept the updated GNI data for Mexico, it should deviate from its typical

sequential process of first identifying countries that are economically comparable before

determining which of those economically comparable countries are producers of comparable

merchandise.  *Id.* at 8-12.  Instead, Bio-Lab argued that Commerce should balance both factors

of economic comparability and merchandise comparability and conclude that the presence of

CYA in chlorinated isos makes it an unusual specialty chemical product that would warrant

Commerce selecting the producer of identical merchandise–Mexico–even if it was not on the

surrogate country list.  *See id.*

On February 7, 2025, Commerce published its *Final Results*, in which it continued to

select Romania as the primary surrogate country because it is at the same level of economic

development as China, is a significant producer of comparable merchandise, and has publicly

available data for all the respondents' FOPs that constitute the best available information on the

record.  IDM at comment 1.  In the *Final Results*, Commerce also continued to decline to use the

December 2023 World Bank GNI data for Mexico and did not deviate from its general practice

of considering only whether countries on the surrogate country list are significant producers of

comparable merchandise.  *Id.*  Commerce explained that it was not updating the August 2023

surrogate country list with the December 2023 GNI data for Mexico because it was unreasonable

to "rely on intermittent and partial World Bank updates because they are not comprehensive and do not reflect how all other countries, besides Mexico, may have shifted on an annual basis in their economic development." *Id.* at 8.  Commerce explained that adopting Bio-Lab's position to require more frequent updates would be "administratively impractical, and unreasonable in terms of predictability, to constantly adjust the SC List based on partial and intermittent changes to the World Bank data." *Id.*

Commerce also continued to use its sequential methodology of first identifying countries at the same level of economic development before considering which of those countries are significant producers of comparable merchandise. *Id.* at 5-9.  Finally, Commerce determined that CYA does not constitute a "major input" that would warrant defining comparable merchandise narrowly, and thus, continued to find that sodium and calcium hypochlorites are comparable to chlorinated isos. *Id.* at 10.  Commerce relied upon its Policy Bulletin 04.1 in concluding that "CYA does not meet the definition of a major input . . ."  because CYA is not a "'processed agriculture, aquatic, and mineral product{},'" nor was it an "'industrial commodity chemical{}.'" *Id.* at 9 (quoting Policy Bulletin 04.1 at 3.).  Bio-Lab challenges these aspects of the *Final Results*.

## SUMMARY OF ARGUMENT

Commerce reasonably selected Romania as the primary surrogate country because Romania is a significant producer of comparable merchandise and was on Commerce's surrogate country list.  In accordance with the statute and Policy Bulletin 04.1, in selecting a market economy that is a "significant producer of comparable merchandise," Commerce reasonably prefers primary surrogate countries that are economically comparable to China and are significant producers with sufficient data.  Because Mexico was not present on the surrogate

country list, Mexico was not considered as a primary surrogate country because the countries on the surrogate country list provided adequate data and there was thus no reason to depart from the countries on the list considering Commerce's regulatory preference to value FOPs from one country. Relatedly, nothing on the record warranted Commerce deviating from its sequential consideration of economic comparability before product comparability.

Finally, Commerce correctly found that sodium and calcium hypochlorites are comparable products to chlorinated isos due to their similar end use, chemical similarities, and comparable production process, in line with Commerce's prior administrative decisions. These products are all just variations of chlorine and all have similar end uses. Therefore, the Court should sustain Commerce's final results.

## ARGUMENT

**I.    Standard Of Review**

**A.    Substantial Evidence**

The Court will uphold Commerce's antidumping duty determination if it is supported by "substantial evidence on the record" and is otherwise "in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "more than a mere scintilla" of relevant and reasonable evidence to support the underlying conclusions. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The requisite proof amounts to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (footnote and internal quotation marks omitted).

That the Court may draw two inconsistent conclusions from the record "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v.*

*Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted).  Rather, when Congress has entrusted an agency to administer a statute that demands inherently fact-intensive inquiries, such as in this case, the agency's conclusions may be set aside if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion.  *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *accord Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1287 (Ct. Int'l Trade 2009).

Thus, "the Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion." *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001); s*ee also Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) ("{T}he Court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.") (citations and internal quotation marks omitted).  Commerce does not need to provide an explicit explanation if its path is reasonably discernible. *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998) (citing *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("A court may 'uphold {an agency's} decision of less than ideal clarity if the agency's path may reasonably be discerned.'" (citation omitted)).

### B.    *Loper Bright* Framework

Construing the Administrative Procedure Act, 5 U.S.C. § 706, the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024), overruled *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837 (1984).

13

*Loper Bright* holds that mere ambiguity in the statute is not a delegation of law interpreting power to the agency and that "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* at 412. Although *Loper Bright* overruled step two of the *Chevron* framework, in which courts deferred to agencies' reasonable interpretation of silent or ambiguous statutes, the Court instructed,

> In exercising such judgment, though, courts may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes. Such interpretations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance" consistent with the {Administrative Procedures Act}.

*Id.* at 394 (quoting *Skidmore v. Swift & Co*, 323 U.S. 134, 140 (1944)). Further, in cases in which a statutory ambiguity implicates a technical matter, the Court observed that

> the court will go about its task with the agency's "body of experience and informed judgment," among other information, at its disposal. And although an agency's interpretation of a statute "cannot bind a court," it may be especially informative "to the extent it rests on factual premises within {the agency's} expertise." Such expertise has always been one of the factors which may give an Executive Branch interpretation particular "power to persuade, if lacking power to control."

*Id.* at 402 (quoting *Skidmore*, 323 U.S. at 140; *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98 n.8 (1983)). Thus, courts are informed by agencies' interpretation and experience with statutes that Congress entrusted them to administer.

The Court also recognized that there are instances in which a statute either expressly or impliedly authorizes an agency to exercise discretion:

> the statute's meaning may well be that the agency is authorized to exercise a degree of discretion. Congress has often enacted such statutes. For example, some statutes expressly delegate{} to an agency the authority to give meaning to a particular statutory term. Others empower an agency to prescribe rules to fill up the details of a statutory scheme, or to regulate subject to the limits imposed

by a term or phrase that leaves agencies with flexibility, such as appropriate or reasonable.

*Loper Bright*, 603 U.S. at 394-95 (internal citations and quotation marks omitted).  In such instances, reviewing courts "independently interpret the statute and effectuate the will of Congress subject to constitutional limits" "by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reason{able} decision making within those boundaries."  *Id.* at 371 (internal citations and quotation marks omitted).

Additionally, the Court directed that earlier cases relying on *Chevron* remain good law. *See id.* at 412 (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014); *Dickerson v. United States*, 530 U.S. 428, 443 (2000)).  Thus, precedent sustaining Commerce's interpretation of the antidumping and countervailing duty statutes, including determinations necessary to perform its statutory duty like determining surrogacy values, remains in effect under the principle of *stare decisis* even if a court had reached its prior decision under step two of the *Chevron* analysis.

Finally, *Loper Bright* construed the APA, which "specifies that courts, not agencies, will decide '*all* relevant questions of law' arising on review of agency action, . . . – even those involving ambiguous laws – and set aside any such action inconsistent with the law as they interpret it." 603 U.S. at 392 (quoting 5 U.S.C. § 706) (emphasis in original).  Unlike *Loper Bright*'s reliance on the APA, the standard of review for Commerce's antidumping determinations lacks any similar admonition.  19 U.S.C. § 1516a(b)(1)(B)(i) (standard limited to setting aside determinations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law").

15

C.     **Legal Framework For Surrogate Value Selections**

An antidumping duty represents the amount by which the "normal value" of subject merchandise exceeds its "export price (or the constructed export price)."  19 U.S.C. § 1673.  In proceedings involving a non-market economy, such as China, Commerce determines the subject merchandise's normal value by relying on the "best available information" from a market economy country or countries to derive surrogate valuations for the Chinese entity's FOPs, including raw materials, labor, and utilities.  *See* 19 U.S.C. § 1677b(c).  To those factors, Commerce also adds "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  *Id*. at § 1677b(c)(1)(B).

The statute requires that Commerce use, "to the extent possible," surrogate factors from "one or more market economy countries that are – {(1)} at a level of economic development comparable to that of the nonmarket economy country, and {(2)} significant producers of comparable merchandise."  *Id.* § 1677b(c)(4)(A)-(B).  If more than one market economy country is economically comparable and a significant producer of comparable merchandise, then Commerce evaluates and compares the reliability and completeness of the record data from those countries.  *See* Policy Bulletin 04.1.

Following the order of requirements in 19 U.S.C. § 1677b(c)(4)(A)-(B) as written, Commerce sequentially considers the two statutory elements: "economic comparability" first and production of "comparable merchandise" next in choosing the primary surrogate country. 19 U.S.C. § 1677b(c)(4)(A)-(B); *see also* Policy Bulletin 04.1.  Accordingly, Commerce first compiles a list of countries that are economically comparable to the non-market economy country at issue based on their GNI, as reported in the most current *annual issue* of the World

Development Report from the World Bank. *See* Policy Bulletin 04.1 (emphasis added); *see also* Surrogate Country List at 2-6.

Next, Commerce looks at whether "comparable merchandise" is produced by the countries that have comparable GNI's to the non-market economy country at issue. Although this statutory requirement is satisfied if identical merchandise is produced, the statute requires only that Commerce select *comparable* merchandise. *See* 19 U.S.C. § 1677b(c)(4)(B). Commerce identifies "comparable merchandise on the basis of physical differences in the merchandise and whether the product is one of low or high value-added." *See* Policy Bulletin 04.1. Specifically, in the case of industrial commodity chemicals, "the large number, and generic nature, of the inputs makes input matching very complicated . . . {t}herefore, it may make more sense for {Commerce} to consider the physical characteristics of the merchandise, and the extent of further value-added process in identifying comparable merchandise." *See id.* Only when there are major inputs that are specialized, dedicated, or used intensively in the production of subject merchandise will Commerce more narrowly define comparable merchandise. *See id.*

Moreover, Commerce will consider a country that is not on the surrogate country list only if Commerce determines that none of the countries listed are viable options because they (a) are not significant producers of comparable merchandise, (b) do not provide sufficient reliable sources of publicly available SV data, or (c) are not suitable for use based on other reasons. *See id.; see also Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017-2018,* 85 Fed Reg. 71,308 (November 9, 2020), and accompanying IDM at 3 (declining to rely on a country off of the surrogacy list because a country on the list fulfills Commerce's surrogate country requirements).

Only in exceptional cases when subject merchandise is "unusual or unique," with correspondingly unusual or unique inputs or aspects of cost of production, does Commerce diverge from its sequential examination and consider economic comparability after the significant producer of comparable merchandise requirement. Policy Bulletin 04.1. Policy Bulletin 04.1 explains that the exception to this sequential consideration might apply in rare cases, such as when subject merchandise is produced in only a few countries or a particular input is not commonly traded internationally. *See id.*

By statute, Commerce must select the "best available information" on record to value the factors of production. *Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016) (citing 19 U.S.C. § 1677b(c)(1)(B)). However, because the statute is silent regarding what constitutes the "best available information," Commerce possesses "broad discretion" in deciding what record evidence meets the criteria. *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (citations omitted); *see also Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999). In practice, Commerce strives to select, to the extent practicable, surrogate values that are product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of review, and tax and duty exclusive. *See generally* Policy Bulletin 04.1; *see also Jiaxing Bro.*, 822 F.3d at 1293.

Commerce also has a regulatory preference to use as much data as possible from a single primary surrogate country. *See* 19 C.F.R. § 351.408(c)(2); *Jiaxing Bro.*, 822 F.3d at 1294 n.3 (citing Policy Bulletin 04.1). This Court has explained that Commerce will "*only resort* to a secondary surrogate country if data from the primary surrogate country are *unavailable or unreliable*." *See Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1332–33 (Ct.

Int'l Trade 2014) (citations omitted) (emphasis added), *aff'd*, *Jiaxing Bro.*, 822 F.3d 1289 (Fed. Cir. 2016).

Commerce may rely on "imperfect" data. *Jiaxing Bro.*, 822 F.3d at 1301 (citing *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)). Commerce is not required to *duplicate the precise experience of the manufacturer* in the non-market economy. *Nation Ford*, 166 F.3d at 1377. Instead, Commerce seeks to identify and to rely on the record data that "most accurately represents the fair market value" of the relevant factor of production. *Id.*

Accordingly, given Commerce's discretion to determine the "best available information," and the fact-specific nature of this deferential case-by-case inquiry, a review of Commerce's determination should question "not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing Bro.*, 822 F.3d at 1300-01 (citing *Zhejiang*, 652 F.3d at 1341).

## II.    Commerce's Selection Of Romania As The Primary Surrogate Country Is Supported By Substantial Evidence And Otherwise In Accordance With Law

Commerce's selection of Romania as the primary surrogate country is in accordance with law and supported by substantial evidence. Commerce determined that Romania was the appropriate primary surrogate country because Romania was at a comparable level of economic development to China, was a significant producer of comparable merchandise, and provided the best data for valuing certain FOPs. IDM at 5. Commerce properly rejected Mexico as a primary surrogate country because, in accordance with its practice, Commerce relied on comprehensive annual GNI data from the World Bank, rejecting a partially updated set of data, and found that Mexico's GNI is not comparable to China's.

## A.    Commerce Selected Romania As The Primary Surrogate Country In Accordance With The Law And Based On Substantial Evidence

Commerce has a vigorous process for determining which counties appear on its surrogate country list.  IDM at 5-11; PDM at 6-13.  The Federal Circuit explains that the formation of the surrogacy country list is Commerce's first step of a

> four-step process to select a surrogate country:
> (1) the Office of Policy ("OP") assembles a list of potential surrogate countries that are at a comparable level of economic development to the {non-market economy} country; (2) Commerce identifies countries from the list with producers of comparable merchandise; (3) Commerce determines whether any of the countries which produce comparable merchandise are significant producers of that comparable merchandise; and (4) if more than one country satisfies steps (1)–(3), Commerce will select the country with the best factors data.

*Jiaxing Bro.*, 822 F.3d at 1293 (quoting *Vinh Hoan Corp. v. United States,* 49 F. Supp. 3d 1285, 1292 (Ct. Int'l Trade 2015)) (internal quotation marks and citations omitted).  Congress delegated to Commerce this duty to select a surrogate country and its corresponding data.  *See QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1320 (Fed. Cir. 2011) ("Because it is not always possible to determine the normal value of goods from nonmarket economy countries . . . {as} outlined in 19 U.S.C. § 1677b(a)(1), Congress allows Commerce to value the factors of production . . . {using} best available information from appropriate market economy countries, referred to as 'surrogate countries.'" (citations omitted)); *see also* 19 U.S.C. § 1677b(c)(1)( "the administering authority shall determine the normal value of the subject merchandise.").

GNI ranking is "a threshold statutory criterion that must be met before other criteria are considered" in forming the potential surrogacy country list pursuant to 19 U.S.C. § 1677b(c)(4).  *See Clearon Corp. v. United States*, No. 13-73, 2014 WL 3643332, at *11 (Ct. Int'l Trade July 24, 2014).  Accordingly, under 19 C.F.R. § 351.408(b), Commerce "will place primary emphasis

on per capita {GDP}" as the measure of economic comparability.  Commerce relies on per capita

GNI instead of per capita GDP because "while the two measures are very similar, per capita GNI

is reported across almost all countries by an authoritative source (the World Bank)," and

Commerce "believes that the per capita GNI represents the single best measure of a country's

level of total income and thus level of economic development."  *Vinh Hoan*, 49 F. Supp. 3d at

1293 n.5 (quoting *Antidumping Methodologies in Proceedings Involving Non–Market Economy*

*Countries: Surrogate Country Selection and Separate Rates*, 72 Fed. Reg. 13,246, 13,246 n.2

(Dep't of Commerce Mar. 21, 2007)) (internal quotation marks omitted).

To fulfill its Congressional mandate to determine which countries are economically

comparable under the Tariff Act, Commerce has promulgated a policy to guide the surrogate

country selection process in the formation of a surrogate country list.  *See* Policy Bulletin 04.1.

After Commerce compiles the initial surrogate country list, it will then consider whether the

countries on the list are significant producers of comparable merchandise, and if more than one

country satisfies the required criteria, Commerce chooses the country with the "best factors

data."  *See* Policy Bulletin 04.1; *see also Clearon*, 2014 WL 3643332, at *8.  Commerce's

process ensures selection of a primary surrogate country that is economically comparable and a

significant producer of comparable merchandise when possible.  Commerce will stray from the

surrogacy list only when it "determines all of the final listed countries lack sufficient data."

*Clearon*, 2014 WL 3643332, at *8.  "Commerce has a regulatory preference for valuing all

factors of production, with the exception of labor, from one surrogate country."  *Id.* at *5 (citing

19 C.F.R. § 351.408(c)(2)) ("The Secretary normally will value all factors in a single surrogate

country.").

In this case, Commerce acted according to its past practice and identified Romania, Chile, Bulgaria, Costa Rica, Malaysia, and Turkey as countries that are at the same level of economic development as China.  *See* Surrogate Country List at 2.  Pursuant to Commerce's practice, this list of companies was selected by the Office of Policy based on the World Bank's 2022 July annual issue of GNI rankings.  *See id.*; *see also* Policy Bulletin 04.1.  Specifically, these six countries were the three market countries ranked immediately higher, and the three countries ranked immediately lower than China's GNI.  *See id.*  Mexico was not selected because its GNI was not within the set range from China.  *See id; see also Clearon*, 2014 WL 3643332, at *3 ("the {surrogacy} list did not include India because India's per capita GNI did not fall within the range of countries proximate to the PRC." (citation omitted) (emphasis omitted).

Commerce has explained this process in detail in that it "compiles the list by 'compar{ing} the change in China's per capita GNI to the changes in the per capita GNIs of the existing set of surrogate countries,' and 'then determine{ing} whether it is necessary to re-center the GNI range in light of the year-to-year GNI changes, looking for GNI ranges that are 'evenly distributed around { } {China's} GNI.' 'After centering the GNI range, Commerce searches for countries within that range that are suitable candidates for inclusion on the list.'" *Jacobi Carbons AB v. United States*, 222 F. Supp. 3d 1159, 1178 (Ct. Intl. Trade 2017) (internal citations omitted) (brackets in the original).

From this list, Commerce lawfully found that Romania "represent{ed} the most appropriate surrogate country" because the record evidence demonstrates that Romania (1) was at the same level of economic development comparable to China, (2) a significant producer of comparable merchandise, and (3) sourced publicly available data for all respondents' factors of

production that constitute the best available information on the record. IDM at 5; *see also Jiaxing Bro.*, 822 F.3d at 1293.

Specifically, pursuant to Commerce's established practice explained in Policy Bulletin 04.1, Commerce placed Romania on the Surrogate Country List based on 2022 GNI data from the World Bank, and no interested party provided any evidence detracting from Commerce's finding that Romania was at the same level of economic development as China. *See* IDM at 6. As such, Commerce found that 19 U.S.C. § 1677b(c)(4)(A) criteria were satisfied in the absence of any contrary evidence on the record. *See id.* Commerce also found that Romania satisfies 19 U.S.C. § 1677b(c)(4)(B) because it is a significant producer of comparable merchandise, and that it sources usable surrogate value for all factors of productions as well as usable financial ratios calculated from Chimcomplex's financial statements. *Id.* at 13-14. Indeed, Bio-Lab agreed with Commerce, in its alternative argument, that "Chimcomplex, a Romanian producer of *comparable merchandise*...{is} a reliable source for calculating financial ratio surrogate values." Pet. Rebuttal Case Brief. at 5 (emphasis added). Therefore, Commerce selected Romania as the primary surrogate country, in accordance with 19 U.S.C. § 1677b(c)(4)(A)-(B).

B.    **Commerce's Determination Not To Include Data From A Later Update Of The World Bank GNI Data Is In Accordance With Law And Supported <u>By Substantial Evidence</u>**

Bio-Lab argues that Commerce erred in not utilizing the December 2023 World Bank updates to Mexico's GNI to adjust the August 2023 surrogate country list, an update Bio-Lab opines would cause Mexico to be a country at the same level of economic development as China. Plaintiffs' Case Brief (Pl. Br.), ECF No. 22 (July 14, 2025) at 11-19. Bio-Lab argues that it timely placed updated World Bank data into the record that reflected a "corrected" Mexican GNI that was "closer to China's per capita GNI than the per capita of GNI of Turkey, Romania, or

23

Chile"–all countries placed on the surrogacy country list.  Pl. Br. at 12.  Specifically, Bio-Lab

cited that Mexico's December of 2023 GNI reflected only a 15.80 percent decrease from China's

GNI and that Turkey and Romania reflected larger departures from China, -17.20 percent and

21.17 percent, respectively.  Pl. Br. at 13 (citing Rebuttal Surrogate Value Comments at

Attachment 1).  Bio-Lab opines that Commerce "fail{ed} to consider whether Mexico was at the

same level of economic development," when it refused to update its surrogacy country list to

account for this new "corrected" data from the World Bank.  Pl. Br. at 13.  Bio-Lab alleges that

Commerce, contrary to its practice, "'turned a blind eye on'" the evidence in support of Mexico

as the primary surrogate country, although Commerce had an ample amount of time to consider

such evidence in full because Bio-Lab timely placed the "updated" World Bank data into the

record.  *See id.* at 18-19 (quoting *Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261,

1276 (Ct. Int'l Trade 2018)).

  As an initial matter, Commerce did not ignore the record evidence that Bio-Lab

submitted in support of Mexico as a surrogate country, as Bio-Lab appears to imply.  *See* Pl. Br.

at 13-14 (where Bio-Lab cites caselaw regarding Commerce's failure to address parties'

arguments).  Commerce evaluated all the data in the record and considered the interested parties'

comments on them at multiple stages of the proceeding.  In the *Preliminary Results,* Commerce

considered Bio-Lab's contention that the December 2023 update revised Mexico's GNI from

$10,410 to $10,820 and, thus, moved Mexico's GNI closer to China's GNI of $12,850, as

reported in the World Bank's regular annual data published in July 2023.  *Compare* Partial GNI

Update *with* Surrogate Country List p. 2; *see also* PDM at 12.  Commerce concluded, however,

to continue to use its August 2023 surrogate country list, which did not include Mexico, because

the December 2023 updated GNI data did not reflect a complete update to all countries on the

surrogacy country list including, most importantly, China–the centering point of the list.  *See* Surrogate Country List; *see also* PDM at 13.

In contrast to the December 2023 data update, the August 2023 surrogate country list was based on the complete, annual data release from the World Bank, which allowed Commerce to "{compare} the change in the NME country's *per capita* GNI to the respective changes in *per capita* GNIs of the existing set of {surrogate countries}" and then to "determine whether it is necessary *to recenter* the GNI range in light of the year-to-year GNI changes."  *See* IDM at 8 (emphasis added).

Thus, Commerce did not refuse to consider the Mexican data; Commerce considered the submitted data and declined to use it to redo its surrogacy country list that was formed using "standard methodology that has been approved by this Court," as Bio-Lab recognizes.  Pl. Br. at 12 ("The list is based on a standard methodology that has been approved by the courts.")

C.    **Commerce's Justification For Refusing To Rely On Partial Data Is In Accordance With The Law And Its Past Practice**

Seemingly acknowledging that Commerce did in fact consider its arguments, Bio-Lab asserts two reasons why Commerce refused to utilize the updated World Bank data.  First, Bio-Lab opines that it was untrue that Commerce embracing mid-cycle GNI updates would "'result in arbitrary changes to the {surrogacy country} list that would be reversed once data for all of the countries is updated.'"  Pl. Br. at 14 (quoting PDM at 13).  Second, that Commerce was incorrect that "updating the list would be 'administratively impractical, and unreasonable in terms of predictability.'"  Pl. Br. at 14 (quoting PDM at 13).

In support of its contentions, Bio-Lab argues that Commerce's surrogacy country list need not be blindly adhered to, but in fact Commerce's regulation allow for subsequent updates to factual data information submitted "to value factors under § 351.408(c) . . . are due no later

than 60 days before the scheduled date of the preliminary results of review." 19 C.F.R.

§ 351.301(c)(3)(ii)(A). Further, Commerce also initiated comments on its "non-exhaustive" surrogacy country list and invites parties to nominate additional countries for consideration. Pl. Br. at 15 (citing Surrogate Country List at 1).

Although Bio-Lab is correct that the surrogacy country list is non-exhaustive and that Commerce welcomes suggestions for comments regarding other possible countries, that does not mean Commerce will abandon its court affirmed practice to rely upon comparable data to form the surrogacy country list in the first place. Bio-Lab conflates this issue as an issue of Commerce's intractably not accepting newer and more current data for consideration in the formation of a new surrogacy country list or to at least hold Mexico as essentially being on the list. The pertinent issue, however, is about data quality and administrative practicability that allowing this updated data introduces.

### 1.    Partial Data Diminishes Data Quality

As to data quality, Commerce explained that updating the surrogacy country list with new, partial data would create data reliability problems. Commerce illustrated this by observing that, although the December 2023 data changes Mexico GNI to $10,820 from $10,410, *compare* Surrogate Country List Attachment 1 at 4 *with* Rebuttal Comments on Surrogate Values at Attachment 1, the GNI data from China was not updated. And the data from Chile was not updated with both  Chile and China remaining at $15,360 and $12,850.00 respectably. *Id.* Thus Bio-Lab would have Commerce compare data from different data sets. This would not result in a reliable conclusion, especially considering that Commerce must find a reliable, predictable center point, in this case China's GNI, to form a range of countries on the list. *Jacobi Carbons*, 222 F. Supp. 3d at 1178.

Moreover, Bio-Lab's contention that Mexico's change was a correction is belied by the record. Pl. Br. at 12 (asserting that the World Bank data for Mexico was "corrected in December."). The record contains no such evidence, only Bio-Lab's contentions. Commerce explained that the World Bank updates its database throughout the year, but not its annual list .pdf that is updated, in most years, in July. PDM at 13 (citing (citing *Gross National Income per Capita, Atlas Method and PPP*, World Bank, (July 1, 2023), https://perma.cc/C92W-XN6U, last accessed September 9, 2025). No such "correction" is reflected in the record, and nothing contravenes Commerce's explanation of how the World Bank data functions, which itself notes that it is updated "annually." *Id.*

Further, Bio-Lab never called it a correction when initially submitting the data and instead simply called it an "update{}." Pet. Rebuttal SV Comments. at 3. This makes sense when recognizing that other data changed beside the Mexican data. Further, Turkey increased its GNI slightly from $10,590 to $10,640, Bulgaria shifted upward from $13,250 to $13,350, and Romania shifted downward from $15,660 to $15,570. *Compare,* Surrogate Country List at Attachment 1, p. 4 to Pet. Rebuttal SV Comments at Attachment 1 at 1.

This demonstrates that these periodic year-to-year shifts in a country's GNI undercut Bio-Lab's unsupported attempt to characterize the incomplete update of the December 2023 Mexico GNI data as a mere correction to "erroneous" 2022 GNI data for Mexico. Pl. Br. at 17. Rather, the December 2023 update was an intermittent, mid-year change to only certain data. This type of change is what Commerce found does not warrant an update to the surrogacy country list because "GNI per capita does not change significantly over such a short period of time." PDM at 13. Indeed, the changing nature of GNI data from year to year underpins Commerce's determination to treat the annual release of complete GNI data as a whole .pdf sheet as the

"triggering event" to reconsider potential countries on the surrogate country list.  *See* IDM at 8; PDM at 13.

### 2.    Partial Data Jeopardizes Administrative Flexibility

As to any arguments contrary to Commerce's concern about administrative ease, it is important for Commerce to have a consistent list of the countries for interested parties to provide comments on and ensure that data can be collected throughout the proceedings.  Bio-Lab's frequent update position would result in the loss of a center because China was not updated while other data sets were.  PDM at 13; *see also Jacobi Carbon*, 222 F. Supp. 3d at 1178.  Commerce cannot continually update the surrogacy country list and then drop relevant comments and data from the parties that Commerce had been considering earlier in the proceedings, making them irrelevant upon a partial shift in some data in December after the July annual update.  That would result in "procedural hurdles and unfairness," as respondents argued to Commerce.  *See* Pet. Rebuttal Case Brief at 3.

A party may advocate for a new surrogate country to be listed as Bio-Lab has done with regard to Mexico, but upending the entire surrogacy list months into the proceeding would result in administrative impracticability.  Commerce's discretion extends this far into how it may administer its duties under the statute. *See, e.g., Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 28 F. Supp. 3d 1317, 1329 (Ct. Intl. Trade 2014) ("Commerce has broad discretion to set the procedures it needs in order to adequately perform and enforce its regulatory role").

Given the identified uncertainties surrounding the updated Mexican GNI data in the December 2023 partial GNI update, Commerce continued to determine in the *Final Results* that it was unable to rely on the incomplete data to reasonably conclude that Mexico's GNI had

gotten closer to that of China than any of the six other countries that Commerce included in the August 2023 surrogate country list, which was based on the comprehensive annual July 2022 World Bank data. IDM at 8. Accordingly, Commerce reasonably determined in the *Final Results* "to not rely on intermittent and partial World Bank updates because they are not comprehensive and do not reflect how all other countries, besides Mexico, may have shifted on an annual basis in their economic development." *Id.* Rather, Commerce continued to rely on the August 2023 surrogate country list, which did contain a country–Romania–that was at the same level of economic development as China, was a producer of comparable merchandise, and had no data concerns that would warrant Commerce considering a country that was not on the list, such as Mexico.[2]

### 3.    Commerce's Rejection Of Past Data Is Not Contrary To Past Reviews

Additionally, Bio-Lab misconstrues facts in arguing that Commerce deviated from its practice by not including Mexico on the surrogate country list, in contrast to the 2020-2021 administrative review in this proceeding. *See* Pl. Br. at 15-16; *see also* Pet. Prelim Comments at Exhibit B (20-21 PDM). Bio-Lab observes that in the 2020-2021 administrative review, Commerce added three more countries to the original six countries on the surrogate country list. *See* Pl. Br. at 16. Bio-Lab further alleges that "Commerce was confronted with essentially the same fact pattern" in this administrative review, but in making that argument, Bio-Lab fails to fully compare the separate record evidence in two different segments of this proceeding. Pl. Br. at 15-16.

---

[2] Moreover, Commerce never stated that Mexico could never be selected as the primary surrogate country. *See id.* at 7 ("While Mexico does not, in this instance, satisfy the first criterion for surrogate country selection, this does not mean that Mexico would never be selected").

As a threshold matter, courts have upheld Commerce's long-standing practice to treat each segment of an antidumping proceeding, including any subsequent administrative reviews that may follow, as independent segments with separate records that lead to independent determinations.  *See E.I. DuPont de Nemours & Co. v. United States*, No. 96-11-02509, 1998 WL 42598, at *11 (Ct. Int'l Trade Jan. 29, 1998); *see also Qingdao Sea-Line Trading Co., Ltd. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) ("{E}ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record")(brackets in the original).  Accordingly, Commerce's factual findings in the 2020-21 administrative review do not dictate the results of the administrative review at issue.  The 2020-21 administrative review occurred during the Covid-19 pandemic.  In this case, Commerce did not deviate from its practice of updating the surrogate country list only when there is a comprehensive GNI update reported by the World Bank.  *See* PDM at 13.

As explained in the 20-21 PDM, and acknowledged by Bio-Lab, a crucial fact in the prior segment is that the timing of the surrogate country list was affected by the COVID pandemic. *See* Pl. Br. at 16 ("{T}he timing of the {surrogate country lists} was impacted by the COVID pandemic…in the 2020-2021 review"); 20-21 PDM at 15.  Specifically, Commerce's surrogate country list based on annual comprehensive 2020 GNI data from the World Bank was not available at the time when Commerce solicited interested parties' information and comments on countries that are comparable to China in economic development (*i.e.* September 14, 2021).  *See* 20-21 PDM at 15.  Accordingly, Commerce's surrogate country list was initially based on 2019 GNI data from the World Bank that reflected the most updated comprehensive data at the time. *See id.*  In that exceptional year affected by the COVID pandemic, Commerce released two annual surrogate country lists for 2019 and 2020 in the same year – on December 1, 2021,

Commerce released the 2020 surrogate country list and placed it on the record. *See id.*; and *Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 1,559 (Dep't of Commerce Jan. 11, 2023), and accompanying Issues and Decision Memorandum (20-21 IDM); *see also* Pl. Br. at 16. Accordingly, "{g}iven this unusual circumstance of two different surrogate country lists being on the record" Commerce did not reject either list. *See* 20-21 PDM at 16. Nevertheless, there has been no departure from Commerce's practice because Commerce relied on only comprehensive GNI updates from the World Bank in both this administrative review and in the prior segment.

In sum, Commerce reasonably determined not to include Mexico on the surrogate country list based on a partial update from the World Bank. Moreover, the Court has upheld Commerce's practice of "burdening the party proposing a non-listed country with demonstrating that no country on the surrogate country list provides the scope of 'quality' data that it requires in order to make a primary surrogate country selection." *See Clearon Corp. v. United States*, 2015 WL 4978995, at *4 (Ct. Intl. Trade Aug. 20, 2015) (quotations in the original). Bio-Lab in this case has failed to demonstrate that no country on the surrogate country list sourced quality data necessary to make the primary surrogate country selection. Thus, this Court should reject Bio-Lab's argument that Commerce is required to utilize the World Bank partial GNI updates. As the Federal Circuit has well explained, there is "nothing in the statute that requires Commerce to consider any particular country as a surrogate country. When Congress does not mandate a procedure or methodology for applying a statutory test, "'Commerce may perform its duties in the way it believes most suitable.'" *Jiaxing Bro.*, 822 F.3d at 1298 (quoting *JBF RAK LLC v. United States,* 790 F.3d 1358, 1364 (Fed. Cir. 2015) (internal citations omitted)). Accordingly,

Commerce's selection of Romania as the primary surrogate country is in accordance with law and based on substantial evidence, and Commerce "provided reasoned analysis in support of its surrogate country determination." *Id.*

III. **Commerce Reasonably Did Not Deviate From Its Sequential Consideration Of Economic Comparability Before Product Comparability In Selecting A Surrogate Country**

In selecting the primary surrogate country, Commerce's established policy, as explained in detail above, is to consider "economic comparability" first and "significant production of comparable merchandise" next, which is in the same sequence as laid out in the statue. *See* 19 U.S.C. § 1677b(c)(4)(A)-(B). Courts have affirmed this sequential methodology in selecting surrogate country, which Commerce has followed for more than two decades. *See, e.g., Jiaxing Bro.*, 822 F. 3d at 1293 ("As early as 2004, Commerce has followed a four-step process to select a surrogate country{.}"). Moreover, this Court "has affirmed consistently the reasonableness of Commerce's treatment of economic comparability as a threshold criterion." *See Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315, 1330 (Ct. Int'l Trade 2025) (citing *Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1313, 1341 (Ct. Int'l Trade 2015)); *Jacobi Carbons*, 222 F. Supp. 3d at 1172)). This Court has also found that "Commerce's sequential approach is consistent with the 'best reading' of the statute." *Id.* (citing *Loper Bright*, 603 U.S. at 377-80). Thus, Commerce lawfully concludes in the *Final Results* that it "disagree{s} with the petitioners' interpretation of the statute that neither economic comparability nor merchandise comparability is preeminent over the other factor." *See* IDM at 6.

In arguing that Commerce should consider product comparability before economic comparability, Bio-Lab asks Commerce to reject court-affirmed, usual practice. *See* Pl. Br. at 19-21.

In an attempt to advance this new rule, Bio-Lab cites Policy Bulletin 04.1, which contemplates that in exceptionally rare instances where subject merchandise is "unusual or unique", Commerce should reverse its standard sequential analysis by considering "production of comparable merchandise" before economic comparability. Pl. Br. at 2-3, 6-7. Specifically, Policy Bulletin 04.1 states: "Cases where particular emphasis on 'significant producer of comparable merchandise' is warranted are generally those that involve subject merchandise that is unusual or unique (with correspondingly unusual or unique inputs or other unique aspects of the cost of production)", or "where major inputs are not widely traded internationally." *See* Policy Bulletin 04.1. However, although Commerce does possess flexibility in forming the surrogate country list when considering an unusual or rare product, that does not negate Commerce's proper adherence to its usual practice when, as in this case, the facts do not warrant such a departure. *See Fresh Garlic*, 121 F. Supp. 3d at 1341-42.

Bio-Lab argues that chlorinated isos are "unusual or unique" due to a complex production process, limited number of countries with finished production of chlorinated isos, and the presence of CYA, which imparts unique physical characteristics to the end product. Pl. Br. at 7-8, 20-21. However, the record does not support Bio-Lab's contention that Commerce did not consider whether chlorinated isos is such a unique or unusual product that would warrant Commerce deviating from its sequential practice of considering economic comparability before merchandise comparability in selecting surrogate countries. Pl. Br. at 2-3, 8-9, 21. Commerce addressed the arguments that CYA is a critical component of chlorinated isos. Although that was done in the context of considering whether it was a "specialized or dedicated" major input that would affect product comparison, Commerce did not deem the presence of CYA as so significant

that it would warrant a departure from Commerce's normal surrogate country selection methodology.  *See* IDM at 9-10.

Commerce concluded that "the petitioners have not demonstrated that Romania, a country on the {surrogate country} list, is not a significant producer of comparable merchandise, does not provide a reliable source of publicly available {surrogate value} data, *or is not suitable for use for other reasons.*"  (emphasis added).  *Id.* at 10.  Although Commerce may not have explicitly used the terms "unusual or unique" in discussing chlorinated isos, evident from Commerce's decision not to deviate from its sequential practice is that Commerce did not consider CYA so unique or unusual as to warrant deviating from the sequential analysis, as contemplated by the *Policy Bulletin.  See NMB Sing. Ltd v. United States*, 557 F. 3d 1316, 1319 (Fed. Cir. 2019) ("while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court") (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Thus, after an assessment of record evidence, Commerce reasonably determined that it "will continue to follow its *sequential* practice of first identifying the countries found to be at a comparable level of economic development before considering whether these countries are significant producers of comparable merchandise."  IDM at 7 (emphasis in original).

IV.    **Commerce's Determination That Sodium Hypochlorites And Calcium Hypochlorites Are Comparable To Chlorinated Isos Is Based On Substantial Evidence And Is In Accordance With Law**

To find that Romania was the proper primary surrogate country, Commerce determined, in keeping with its past practice, that sodium and calcium hypochlorites are comparable products to chlorinated isos.  During this administrative review, parties provided export and import data to show whether the countries on Commerce's surrogate country list were significant producers of

comparable merchandise.  *See* Pet. Rebuttal SC Comments at Attachment 1; and Rebuttal GNI

Comments at Attachment 1.  This export data supported a finding that Malaysia and Romania

had exports of comparable merchandise during the period of review.  *See* PDM at 14; *see also*

IDM at 9.  The comparable merchandise for Malaysia and Romania included calcium and

sodium hypochlorites.  *See* PDM at 13-14; *see also* IDM at 10.  For the final results, Commerce

considered interested parties' data submissions and found that "only one of these countries,

Romania, to be a significant producer of comparable merchandise because it is the only net

exporter of comparable merchandise."  *See* IDM at 9 (citing Pet. Rebuttal Surrogate Country

Comments at Attachment 1).  Accordingly, Commerce determined that Romania was a

significant producer of comparable merchandise, in accord with the 19 U.S.C. § 1677b(c)(4)

requirements.

    As an initial matter, we acknowledge that the Court has rejected a similar comparability

finding in this Court's order in a previous administrative review–a determination that chlorinated

isos, calcium and sodium hypochlorites share similar physical characteristics.  *Bio-Lab, Inc*., 776

F. Supp. 3d at 1336.  However, prior decisions of the Court do not bind the present dispute.  *See*

*Hyundai Steel Co. v. United States*, 659 F. Supp. 3d 1327, 1335 n.18 (2023) (citing *Algoma Steel*

*Corp., Ltd. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989)).  Further, the Court has not

entered judgment in that litigation, in which Commerce is currently proceeding under protest.

Further, Commerce acknowledges that this administrative review's decision on comparability

was largely guided by its prior administrative review that was remanded by the Court.  *See* IDM

at 10 ("The petitioners have provided no new information or argument to rebut our findings

made in the *Preliminary Results* and the prior review that calcium and sodium hypochlorites are

comparable merchandise."). Because each administrative proceeding is unique, we address Bio-Lab's product comparability argument while cognizant of the Court's prior holding on this issue.

Bio-Lab argues that sodium and calcium hypochlorites are not "comparable" to chlorinated isos, because chlorinated isos have a more complex production process and contain CYA, which imparts distinct physical characteristics that differentiate chlorinated isos from sodium and calcium hypochlorites. *See* Pl. Br. at 22-30. Bio-Lab' arguments throughout this administrative review focus primarily on requesting Commerce to deviate from its practice by going off the surrogate country list because "Mexico is the only country economically comparable to China that produces chlorinated isos." Petitioner Prelim Comments at 4; *see also* Additional Surrogate Country Comments at 4 ("The primary surrogate selected by Commerce should be a country that produces identical merchandise"). Bio-Lab argues that Commerce should have narrowly defined comparable merchandise to the extent that only an identical product–"that {} includes chlorine as an input, but also includes {CYA}"–can satisfy the statutory requirement in 19 U.S.C. § 1677b(c)(4)(B). *See* Petitioner's Case Br. at 10; *see also* Pl. Br. at 22 (citing *Dupont Teijin Fils v. United States*, 997 F. Supp. 2d 1338, 1342) (Ct. Int'l Trade 2014)).

However, these assertions are based on an inappropriate interpretation of the statute and Commerce's practice. The statute does not require Commerce to identify an identical product; the product must be only comparable, as determined by Commerce's three-part test laid out below. *See, e.g., Shanghai Foreign Trade Enters. Co. v. United States,* 318 F. Supp. 2d 1339, 1349 (Ct. Int'l Trade 2004) (listing prior administrative reviews where Commerce had "given the term 'comparable' an expansive interpretation."); *see also* 19 U.S.C. § 1677b(c)(4)(B) ("significant producers of *comparable* merchandise" (emphasis added)). Moreover, Bio-Lab has

not demonstrated that CYA qualifies as a major input, as contemplated in Policy Bulletin 04.1, such that Commerce should have defined product comparability more narrowly.

### A.    Legal Framework For Merchandise Comparability

Congress required that Commerce "shall determine the normal value of the subject merchandise on the basis of the price at which merchandise that is *comparable* to the subject merchandise" is sold. 19 U.S.C. § 1677b(c)(2)(A) (emphasis added). As this Court has explained, "{t}he statute does not speak directly to the meaning of 'comparable'; therefore, Commerce's interpretation will govern if it is reasonable." *Heze Huayi Chemical v. United States*, No. 17-0032, 2018 WL 2328183, at *4 (Ct. Int'l Trade May 22, 2018) (citing *United States v. Eurodif*, 555 U.S. 305, 316 (2009)). As explained in Policy Bulletin 04.1, Commerce has developed a methodology for assessing comparability. Commerce's Policy Bulletin 04.1 states that comparable merchandise "is not defined in the statute or the regulations, since it is best determined on a case-by-case basis." The Policy Bulletin 04.1 states that although identical merchandise qualifies as comparable merchandise, "{i}n cases where identical merchandise is not produced, the team must determine if other merchandise that is comparable is produced." *Id.* Nevertheless, although identical products may be preferable*, see Mid Continent Nail Corp. v. United States*, 712 F. Supp. 2d 1370, 1377 n.7 (Ct. Int'l Trade 2010), and *Heze Huayi Chemical* 2018 WL 2328183, at *4 n.3, the statute does not require that they be identical. In fact, the statute is intentionally broad to allow Commerce flexibility to do a fact-specific inquiry, including discarding countries with identical products for other considerations like data quality. *See Dorbest Ltd. v. United States,* 462 F. Supp. 2d 1262, 1274 (Ct. Intl. Trade 2006).

Bio-Lab argues that Mexico must be selected because it is the only producer with identical merchandise. *See* Pl. Br. at 8. However, Bio-Lab improperly stretches the statutory

standard.  19 U.S.C. § 1677b(c)(4)(A)-(B).  Although using identical merchandise may be easier

for Commerce, the Tariff Act requires only "comparable," not identical, merchandise.  *Id.*  If the

product is comparable and the country economically comparable to the non-market economy,

then Commerce's statutory duty is satisfied.  *See Dorbest,* 462 F. Supp. 2d at 1274-75 ("The

statute does not require Commerce to find a producer of identical merchandise, but rather a

producer of comparable merchandise").

 To determine whether a producer produces "identical or comparable merchandise,"

Commerce often applies a three-part test examining "physical characteristics, end uses, and

production processes." *Shanghai Foreign Trade Enters. Co. v. United States,* 318 F. Supp. 2d

1339, 1348 (Ct. Int'l Trade 2004) (citation omitted); *see, e.g., Pure Magnesium from the People's*

*Republic of China: Final Results of the 2008-2009 Antidumping Duty Administrative Review of*

*the Antidumping Duty Order*, 75 Fed. Reg.  80,791 (Dep't of Commerce Dec. 23, 2010), and

accompanying IDM at Cmt. 2; *Certain Woven Electric Blankets from the People's Republic of*

*China: Final Determination of Sales at Less Than Fair Value,* 75 Fed. Reg. 38,459 (Dep't of

Commerce Jul. 2, 2010), and accompanying IDM at Cmt. 2.

Policy Bulletin 04.1 contemplates that Commerce might define comparable merchandise

more narrowly when the subject merchandise involves a "specialized or dedicated" major input,

such as "processed agricultural, aquatic, and mineral products."  *See* Policy Bulletin 04.1.  In

contrast, Policy Bulletin 04.1 specifically mentions "industry commodity chemicals" as products

that do not require a narrow definition of "comparable merchandise" in consideration of a major

input because for such goods, "the large number, and generic nature, of the inputs makes input

matching very complicated."  *Id.*  Applying this framework, Commerce reasonably determined

that (1) CYA is not a "specialized or dedicated" major input, and (2) sodium and calcium

hypochlorites are comparable to chlorinated isos based on similarities in physical characteristics, end use, and production process.  *See* IDM at 13-14.

### B.    Sodium And Calcium Hypochlorites Are Comparable Products To Chlorinated Isos:  Major Inputs

Commerce reasonably determined that CYA did not constitute a major input to chlorinated isos that would warrant finding that sodium and calcium hypochlorites were not comparable merchandise due to their lack of CYA.  *See* IDM at 9.  Commerce made the same finding in the prior review and determined that there were no new facts in this review to warrant a different conclusion.  *See id.; see also Chlorinated Isocyanurates from the People's Republic of China*, 89 Fed. Reg. 455 (Dep't of Commerce Jan. 4, 2024), and accompanying IDM (21-22 IDM) at 8.  Thus, although Bio-Lab argues that "CYA . . . is a stabilizer and binds free chlorine in the pool water and releases it slowly, extending the time needed to deplete each dose of the sanitizer", Pl. Br. at 23, in the prior review Commerce found that that CYA does "not impart any special qualities that separate subject merchandise from the comparable products, which is the basic function of chlorination."  *See* 21-22 IDM at 8.  Commerce explained that CYA "merely acts as a binding agent that allows for the slower release of chlorine" and this one distinctive feature does not meet the definition of major input.  *See* IDM at 10 (citing *Chlorinated Isocyanurates from the People's Republic of China: Preliminary Results of Antidumping Administrative Review; 2021–2022*, 88 Fed. Reg. 43271 (Dep't of Commerce July 7, 2023), and accompanying PDM (21-22 PDM) at 26).

Based on similar record evidence, Commerce continued to find in this administrative review that CYA does not meet the definition of a major input as described in Policy Bulletin 04.1, which generally involves "processed agricultural, aquatic, and mineral products."  IDM at 9.  Commerce further recognized that Policy Bulletin 04.1 identifies "industrial commodity

chemicals" as a category of products for which "the large number, and generic nature, of the inputs makes input matching very complicated," and thus would warrant a less narrow standard for identifying comparable merchandise.  *Id*.  Thus, in the absence of new information directly rebutting Commerce's prior findings, Commerce reasonably continued to find that CYA is not a major input that warrants narrower definition of comparable merchandise.  *See id.*

### C.    Sodium And Calcium Hypochlorites Are Comparable Products To Chlorinated Isos:  Physical Characteristics

Commerce also reasonably determined that there were no new facts on the record of this review to alter its finding in the prior review that calcium and sodium hypochlorites are comparable in terms of physical characteristics.  *See* IDM at 10.  Commerce previously found that chlorinated isos, calcium hypochlorites, and sodium hypochlorites are "all part of the same chlorine family that includes unstabilized and stabilized chlorines."  21-22 IDM at 8.  Commerce, for example, found that calcium hypochlorite and chlorinated isos contain similar chlorine content (*e.g.*, 65 percent and 56-90 percent, respectively):

> As a finished product, calcium hypochlorite contains a chlorine level of 65 percent, while the subject merchandise contains 56-90 percent chlorine. Therefore, calcium hypochlorite and subject merchandise have similar physical characteristics. {} The record evidence shows that, "{{g}}enerally the commercial substance is sold with a purity of a 65 to 73 {percent}."

*See Chlorinated Isocyanurates from the People's Republic of China*, 88 Fed. Reg. 43,271 (Dep't of Commerce Jul. 7, 2023), and accompanying PDM (21- 22 PDM) at 28-29 (internal citations omitted), unchanged in the *Final Results,* 21-22 IDM at 6. Additionally, Commerce found that sodium hypochlorite and chlorinated isos share similar inputs (for example, chlorine gas, caustic soda, and salt).  *See id*.  Specifically, Commerce found that:

> Regarding physical characteristics, the subject merchandise contains three major intermediate inputs: cyanuric acid, caustic soda, and chlorine gas. According to Kirk-Othmer's Encyclopedia of Chemical Technology (Kirk-Othmer Encyclopedia), sodium hypochlorite is prepared using chlorine gas and caustic soda. Salt, a main input into subject merchandise, is also a main input used to form sodium hypochlorite.

See id. (citing *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 4386 (Dep't of Commerce Jan. 22, 2013), and accompanying IDM); *see also* 21-22 IDM at 8 ("these two comparable products and the subject merchandise are both used as swimming pool sanitizers and are both part of the same chlorine family that includes unstabilized and stabilized chlorines"). Because the record of this review did not contain any new evidence, Commerce reasonably continued to find that sodium and calcium hypochlorite are comparable to chlorinated isos in terms of physical characteristics. *See* IDM at 10.

**D. Sodium And Calcium Hypochlorites Are Comparable Products To Chlorinated Isos: End Use**

Similarly, the record of this review contains no new evidence to alter Commerce's finding in the last review that calcium hypochlorite, sodium hypochlorite, and chlorinated isos share a common purpose as pool sanitizers used as a "disinfectant for swimming pools in theme parks." 21-22 IDM at 8. Commerce concluded in the prior review that the products share similar end uses involving many of the same chemical inputs that are used in subject merchandise for chlorination by many of the same end users. *See* 21-22 PDM at 27-29, unchanged in *Final Results*. Moreover, Bio-Lab appears to concede that the three products all share the same end use as pool sanitizers. *See* Pl. Br. at 23 ("Chlorine, which is common to {chlorinated} isos and hypochlorites (calcium and sodium), is a sanitizer that functions as a disinfectant and purifies the water in a swimming pool"). Furthermore, Commerce recognized

41

that in the underlying United States International Trade Commission's investigation of chlorinated isos from China and Spain, the USITC found that these two comparable products share similar end uses for treating and sanitizing pools and can act as substitute products for subject merchandise:

> Substitute products for chlorinated isos cited by producers, importers, and purchasers include calcium hypochlorite, sodium hypochlorite, lithium hypochlorite, enzymes, liquid bleach, sodium percarbonate, bromine, biguanide, salt generators, and bacquacil. All of these products can be used as replacements as pool shock treatments, pool sanitizers, and for cleaning and bleaching stains.

IDM at 10 (citing *Chlorinated Isocyanurates from China and Spain*, Inv. Nos. 731-TA-1082 and 731-TA-1083 (Final), USITC Pub. 3782 at II-8 (June 2005)).  Thus, Commerce reasonably continued to find in the *Final Results* that chlorinated isos, calcium hypochlorites, and sodium hypochlorites are comparable in terms of end uses.  *See* IDM at 10.

### E.    Sodium and Calcium Hypochlorites Are Comparable Products To Chlorinated Isos: Production Process

Lastly, Commerce reasonably determined that the production processes of chlorinated isos and sodium and calcium hypochlorite are comparable, again based on similar record evidence as in the prior administrative review.  *See* IDM at 10.  In the prior review, Commerce determined that the production process of chlorinated isos sufficiently mirrors that of calcium hypochlorite and sodium hypochlorite because the three products all "involve{} a multi-stage production process requiring the production of two of the three same intermediate inputs, caustic soda and chlorine."  21-22 IDM at 8; *see also Chlorinated Isos from China Investigation* IDM at Cmt. 2.

Bio-Lab argues that production of chlorinated isos requires more resources and more stages of production.  *See* Pl. Br. at 26-30, but beginning with the investigation of chlorinated

isos, Commerce has acknowledged that the production of chlorinated isos is a complex multi-stage process:

> With respect to production processes, the subject merchandise is produced in three different steps with the first step making intermediate inputs (cyanuric acid, caustic soda, and chlorine gas), the second step combining these intermediate inputs, and the third step shaping the finished products.

*See* 21-22 IDM at 27 (citing *Notice of Final Determination of Sales at Less Than Fair Value: Chlorinated Isocyanurates from the People's Republic of China*, 70 Fed. Reg. 24,502 (Dep't of Commerce May 10, 2005), and accompanying IDM at Comment 1). Commerce found that this process is similar to the production of calcium hypochlorite and sodium hypochlorite, and involves many of the same inputs. For instance, Commerce found that sodium hypochlorite, "involves a multi-stage production process requiring the production of two of the three same intermediate inputs, caustic soda and chlorine." 21-22 IDM at 8; *see also Chlorinated Isos from China Investigation* IDM at Cmt. 2. Thus, Commerce has considered the complex production processes that Bio-Lab alleges, and Commerce has concluded that the production processes are comparable.

Additionally, Bio-Lab relies on a USITC investigation of calcium hypochlorite to conclude that calcium hypochlorite and subject merchandise are not "manufactured in common facilities with common employees." *See* Pl. Br. at 26 (citing Additional Surrogate Country Comments at Exhibit 1 (USITC Pub. 4515)). However, Bio-Lab's reliance on the USITC Investigation report is misplaced because the provided USITC Investigation report examined whether calcium hypochlorite, sodium hypochlorite, and chlorinated isos are part of a "single domestic-like product." *Id.* The criteria underlying the USITC's investigation and its domestic-like product determination test are not the same as those underlying Commerce's comparability

analysis. *See Jeld-Wen, Inc. v. United State*s, 567 F. Supp. 3d 1344, 1354-55 (Ct. Int'l Trade 2022) (discussing factors the USITC uses including interchangeability of the product, consumer perceptions, and price). Furthermore, as Bio-Lab acknowledgs, USITC reports are "instructive, but not dispositive." Surrogate Country Comments at 7. Unlike the USITC, Commerce's analysis is guided by its Policy Bulletin 04.1 and prior practice. "{T}o impose a requirement that merchandise must be produced by the same process and share the same end uses to be considered comparable would be contrary to the intent of the statute." 21-22 PDM at 8 (citing *Sebacic Acid from the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 65674, 65675-676 (Dep't of Commerce Dec. 15, 1997)); *see also* 21-22 IDM at 6 (finding the same results).

Further, the Court previously observed that "in prior reviews of the AD order, Commerce had found calcium hypochlorite and sodium hypochlorite comparable to subject merchandise because those compounds all share similar physical characteristics, end uses, and production processes." *Heze Huayi Chem.*, No. 17-32, 2018 WL 2328183, at *3 (Ct. Intl. Trade 2018) (citing *Chlor-Isos from the PRC*, 80 Fed. Reg. 4,539 (Jan. 28, 2015) (final results of AD admin. review) and accompanying I&D Memo at cmt. 2)); *see also Juancheng Kangtai Chem. Co., Ltd. v. United States*, No. 14-56, 2017 WL 218910, at *4 (Ct. Intl. Trade 2017) ("Kangtai has not identified any record evidence that the Philippines' production of the comparable merchandise, sodium hypochlorite, was so low that it completely failed to affect world trade.").

Accordingly, Commerce's comparability decision is supported by substantial evidence, supported by its past practice affirmed by this Court, and otherwise in accordance with law.

CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' motion for

judgment on the administrative record and sustain Commerce's final results.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
OF COUNSEL:                                 Assistant Director

Charlie Chung
Attorney                                    /s/ Tate N. Walker
Office of Chief Counsel                      TATE NATHAN WALKER
For Trade Enforcement & Compliance           Trial Counsel
Department of Commerce                       U.S. Department of Justice
                                             Civil Division
                                             Commercial Litigation Branch
                                             P.O. Box 480
                                             Ben Franklin Station
                                             Washington, D.C.  20044
                                             Tel: (202) 307-0163
                                             Fax: (202) 305-7643

September 12, 2025                           *Attorneys for Defendant*

45

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that defendant's motion in this matter complies with the Court's type-volume limitation rules.  According to the word count calculated by the word processing system with which the motion was prepared, the brief contains a total of 13,114.

September 12, 2025                    <u>/s/ Tate Walker</u>