**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| BIO-LAB, INC., ET AL. ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Ct. No. 25-00054 |
| ) | |
| UNITED STATES, ) | |
| *Defendant,* ) | **PUBLIC DOCUMENT** |
| ) | |
| AND ) | |
| ) | |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. AND ) | |
| HEZE HUAYI CHEMICAL CO., LTD., ) | |
| ) | |
| *Defendant-Intervenors.* ) | |

**BIO-LAB, INC., ET AL'S REPLY BRIEF**

James R. Cannon Jr.
Chase J. Dunn
CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave, N.W., Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to Plaintiffs Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation*

Date:   October 31, 2025

i

**Table of Contents**

**Page**

ARGUMENT .......................................................................................................... 1

I.  Mexico Should Have Been Considered as a Potential Surrogate Equally
    Alongside the Surrogate Country List Countries ............................................. 1

    A. Commerce Must Consider the Record as a Whole, Including the World
       Bank's Update to its GNI List ................................................................... 1

    B. Pursuant to Its Own Regulations and Practice, Commerce May Not
       Simply Freeze the Surrogate Country List in Time .................................. 6

       1.    Commerce had adequate time to evaluate whether Mexico should be the
             primary surrogate .......................................................................... 6
       2.    Commerce's refusal to add Mexico to its list of countries at "the same" level
             of economic development is inconsistent with past practice .................... 7

    C. Apart from Whether Mexico Should Be Added to the GNI List, the
       Record Does Not Support Commerce's Decision to Exclude Mexico
       Based on July 2023 World Bank Data ....................................................... 9

II. Commerce's Failure to Consider Whether Chlor Isos Constitute "Unusual or
    Unique" Merchandise Under Policy Bulletin 04.1 Warrants Remand ......................... 10

III. Commerce's Determination that Chlor Isos are "Comparable" to Sodium and
     Calcium Hypochlorite is Not Supported by Substantial Evidence ................................. 13

    A. This Issue Should be Remanded for the Same Reasons it Was
       Remanded in *Bio-Lab, Inc. v. United States* (2025) .................................. 13

    B. Commerce Failed to Evaluate Record Evidence Concerning the
       Physical Characteristics and Production Processes .................................. 14

    C. Commerce's Determination that CYA is a Not a Major Input is not
       Supported by Substantial Evidence ......................................................... 15

    D. Commerce's Assertion that Chlor Isos and Calcium/Sodium
       Hypochlorite Have Comparable Physical Characteristics is Not
       Supported by Substantial Evidence ......................................................... 17

    E. Commerce's Assertion that Chlor Isos and Calcium/Sodium
       Hypochlorite Have Comparable Production Processes is Not Supported
       by Substantial Evidence .......................................................................... 19

    F. Commerce's Determination that Calcium and Sodium Hypochlorite are

Comparable to Chlor Isos is Not Supported by Substantial Evidence
Nor In Accordance with Law ..................................................................................... 20

CONCLUSION ............................................................................................................................. 21

## Table of Authorities

**Page(s)**

**Statutes**

19 U.S.C. § 1677b(c) ................................................................................ 20

19 U.S.C. § 1677b(c)(4).............................................................................2

19 U.S.C. § 1677b(c)(4)(B) ........................................................................5

**Regulations**

19 CFR § 351.301(c)(3)............................................................................6, 7

**Court Decisions**

*Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315 (Ct. Int'l Tr. 2025)........................... *passim*

*Bonney Forge Corporation v. United States*, 560 F. Supp. 3d 1303 (Ct. Int'l Trade 2022) ...............................................................................12

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ............................12

*Catfish Farmers of America v. United States*, 2023 WL 4560815 (Ct. Int'l Trade 2023) ...............................................................................10

*Clearon Corp. v. United States*, 38 C.I.T. 1122, 2014 WL 3643332 (2014) .......................................................................................5

*Inner Mongolia Jianlong Biochemical Co., Ltd. v. United States*, 279 F. Supp. 3d 1332 (Ct. Int'l Trade 2017)..............................................5

*Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308 (Ct. Int'l Trade 2018)....................................................................6, 8, 10

*Jiaxing Bro. Fastener Co., Ltd. v. United States*, 961 F. Supp. 2d 1323 (Ct. Int'l Trade 2014)...........................................................2, 5

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...................................................................13

*Saha Thai Steel Pipe Public Company Ltd. v. United States*, 663 F. Supp. 3d 1356 (Ct. Int'l Trade 2023)........................................................5

*Shandong Huarong Mach. Co. v. United States*, 29 C.I.T. 484 (2005).........................14

*Shijiazhuang Goodman Trading Co., Ltd. v. United States*, 172 F. Supp.

3d 1363 (Ct. Int'l Trade 2016) ...................................................................................5

*Tudor v. Department of Treasury*, 639 F.3d 1362 (Fed. Cir. 2011) ...............................17

*United States v. Harper*, 118 F.4th 1288 (10th Cir. 2024) ......................................7-8

**Administrative Determinations**

*1,1,1,2-Tetrafluoroethane from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 62597 (Oct. 20, 2014) ............................................................................................... 18-20

*Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2015–2016*, 83 Fed. Reg. 5243 (Feb. 6, 2018) ...........................................................................14

*Chlorinated Isocyanurates from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 56303 (July 9, 2024)........................................................4

*Steel Wire Garment Hangers from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 47587 (Aug. 14, 2008)...........................................................................19

**Other Administrative Materials**

Policy Bulletin 04.1 ........................................................................... *passim*

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation (hereinafter "Bio-Lab, IWC, and OxyChem" or "Plaintiffs"), respectfully submit this reply brief responding to briefs submitted by the Defendant, the United States, and by Defendant-Intervenors Heze Hauyi Chemical Co., Ltd. ("Huayi") and Juancheng Kangtai Chemical Co., Ltd. ("Kangtai"). *See* Defendant's Corrected Response to Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record (Sept. 12, 2025) ("Defendant's Br."); Corrected Defendant-Intervenors' Response Brief (Oct. 3, 2025) ("Intervenors' Br."); *see also* Plaintiffs' Rule 56.2 Motion for Judgement Upon the Agency Record (July 14, 2025) ("Plaintiffs' Br."); *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 9710 (Feb. 18, 2025) ("*Final Results*") (P.R. 133) and accompanying Issues and Decision Memorandum ("IDM") (P.R. 132).[1]

## ARGUMENT

### I. Mexico Should Have Been Considered as a Potential Surrogate Equally Alongside the Surrogate Country List Countries

#### A. Commerce Must Consider the Record as a Whole, Including the World Bank's Update to its GNI List

A major difference between this action, contesting the 2022-23 administrative review of antidumping duty order on chlorinated isos ("Chlor Isos") from China, and the pending action contesting the 2021-22 review[2] is that the World Bank revised Mexico's 2022 per capita Gross

---

[1] All citations to the administrative record take the form "P.R.__" or "C.R.__".

[2] *See Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315 (Ct. Int'l Tr. 2025) (this appeal is pending before this Court following remand to Commerce with respect to the comparable merchandise issue discussed in Section III below).

National Income ("GNI") on December 18, 2023, six months before Commerce issued its

*Preliminary Results*. This revision is a critical fact because, as corrected, Mexico's 2022 per

capita GNI was no longer outside the GNI range that Commerce deemed to represent the "same

level" of economic development as China.

Commerce relies exclusively on per capita GNI as reported by the World Bank to identify

countries at the "same level" of economic development as China and to be included on its

surrogate country list. *See* Commerce Memorandum, "Request for Economic Development,

Surrogate Country and Surrogate Value Comments and Information" (Oct. 12, 2023) ("*SC*

*Memo*") at 1 and Attachment 1 (Commerce Memorandum, "List of Surrogate Countries for

Antidumping Investigations and Reviews from the People's Republic of China ("China")" (Aug.

27, 2023) ("*SC List Memo*")) (P.R. 29).[3] This is the sole basis for identifying potential surrogates

that are economically comparable to China for purposes of 19 U.S.C. § 1677b(c)(4). *See* Policy

Bulletin 04.1 at 2. Commerce has consistently relied on per-capita GNI as the litmus test for

economic comparability. *See, e.g., Jiaxing Bro. Fastener Co., Ltd. v. United States,* 961 F. Supp.

2d 1323, 1328 (Ct. Int'l Trade 2014) (explaining that Commerce relies on per capita GNI

because it "is reported across almost all countries by an authoritative source (the World Bank),

and because the Department believes that the per capita GNI represents the single best measure

of a country's level of total income and thus level of economic development").

Although Commerce asserts that Mexico's "GNI was not within the set range from

China," this is incorrect. Defendant's Br. at 22. As shown below, Mexico's revised 2022 per-

---

[3] The *SC List Memo* specifically cites the "World Development Indicators database, World Bank, 1 July 2023," as the source for its list of countries deemed to be at the "same level" of economic development as China.

capita GNI is within the upper and lower bounds of per capita GNI established in the *SC List Memo*. Indeed, Mexico's revised per capita GNI was closer to China's per capita GNI than the per capita GNI of three on-list countries (*i.e.,* Turkey, Romania, and Chile):

| Table 1<br>COMPARISON OF THE PER CAPITA GNI (ATLAS METHOD)<br>FOR THE COUNTRIES ON COMMERCE'S *SC LIST* WITH<br>THE REVISED PER-CAPITA GNI FOR MEXICO | | | |
|---|---|---|---|
| **Country** | **World Bank GNI Data (Year)** | **Per Capita GNI (Atlas Method)** | **%Diff from China** |
| Romania | 2022 | 15,570 | 21.17% |
| Chile | 2022 | 15,360 | 19.53% |
| Bulgaria | 2022 | 13,350 | 3.89% |
| **China** | **2022** | **12,850** | |
| Costa Rica | 2022 | 12,920 | -0.54% |
| Malaysia | 2022 | 11,780 | -8.33% |
| **Mexico** | **2022** | **10,820** | **-15.80%** |
| Turkey | 2022 | 10,640 | -17.20% |

*Source*: *SC List Memo* at 2; Letter from Petitioners, "Rebuttal Comments on Surrogate Values" (Jan. 2, 2024) ("*Rebuttal SV Cmts*") (P.R. 65-66) at 3 and Attachment 1 (World Bank updated GNIs).

Rather than correct the 2022 per capita GNI figure for Mexico to reflect the World Bank's most recent GNI data, Commerce dismisses the December 2023 update as a "partial" GNI update. Defendant's Br. at 26. However, simply labeling the World Bank's December 2023 data as "partial"—17 times in Commerce's brief—does not alter the fact that the World Bank corrected the per capita GNI for Mexico from 10,410 to 10,820.

In the *SC List Memo*, Commerce explained that the "{p}er capita GNI data {it used} represent the latest available information as of 2022." *SC List Memo* at 2, n.1. The World Bank explains that its GNI data "list 217 economies, but rankings include only those {countries} with confirmed GNI per capita estimates for at least one year during the last three years period." *Id.* at 6. No record evidence suggests that the World Bank's database of per capita GNI by country is

"partial," incomplete, or unreliable. Rather, based on the World Bank's description of its methodology, the record indicates that the World Bank confirmed its GNI estimates for all of the potential surrogate within a three-year window before it issued its July 2023 *World Development Report*.[4] However, shortly after issuing that review (within six months) the World Bank revisited and revised the GNI figures for certain countries, including Mexico.

Elsewhere, Defendant suggests that the July 2023 *World Development Report* is a "comprehensive" update to the World Bank's database, rather than a snapshot of that database at a particular point in time (*i.e.,* July 2023). *See* Defendant's Br. at 29. However, the World Bank itself does not state that its hard-copy *World Development Report* is more "comprehensive" than the database from which that report is derived. Indeed, as just noted, Commerce's own *SC List Memo* describes the *World Development Report* as "the latest available information" at the time of publication. *SC List Memo* at 2, n.1. Commerce acknowledges, however, that if "the World Bank updates data for certain countries prior to that publication, *the new data is published on the World Bank database*." IDM at Comment 1 (emphasis added). That is exactly what happened here. The World Bank issued an update of the 2022 GNI database, which increased the per-capita GNI for Mexico. Bio-Lab, IWC, and OxyChem then submitted that update well before the deadline for Commerce's *Preliminary Results. Compare Rebuttal SV Cmts* (Jan. 2, 2024), *With Chlorinated Isocyanurates from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 56303 (July 9, 2024) (P.R. 108).

Neither Huayi nor Kangtai submitted any evidence that the World Bank's update to its

---

[4] Commerce relies on the annual release of the World Bank's *World Development Report* as the triggering event for the creation of the surrogate country list. *See* IDM at Comment 1.

GNI database was incorrect or unreliable. Nor did Commerce place any information on the record suggesting that the World Bank's GNI database was unreliable. Instead, Commerce only speculates that the annual *World Development Report* is somehow more reliable than the database from which that report is drawn. Yet, the substantial evidence standard "requires more from Commerce than reference to a dearth of evidence and a conclusion based upon mere speculation." *Inner Mongolia Jianlong Biochemical Co., Ltd. v. United States*, 279 F. Supp. 3d 1332, 1340 (Ct. Int'l Trade 2017); *see also Saha Thai Steel Pipe Public Company Ltd. v. United States*, 663 F. Supp. 3d 1356, 1368 (Ct. Int'l Trade 2023) ("Bare speculation is not substantial evidence").

Ultimately, Commerce relies on the World Bank's GNI data because it is "an authoritative source" that Commerce and courts have found to be a "consistent, transparent, and objective metric" for identifying economically comparable countries. *Jiaxing Brother Fastener Co., Ltd. v. United States*, 961 F. Supp. 2d at 1329; *see also Clearon Corp. v. United States*, 38 C.I.T. 1122, 2014 WL 3643332 at *9 (2014) (holding that "Commerce's reliance on per capita GNI {from the World Bank} is reasonable and in accordance with law"). As noted above, one hallmark of the World Bank database is the fact that the per-capita GNI figures are regularly confirmed and updated. By ignoring the undisputed change in Mexico's 2022 per capita GNI, Commerce relied on inaccurate data for purposes of identifying potential surrogate countries that are "at a level of economic development comparable to {China}" pursuant to 19 U.S.C. § 1677b(c)(4)(B). For this reason, Commerce's decision is unsupported by substantial evidence. *See Shijiazhuang Goodman Trading Co., Ltd. v. United States*, 172 F. Supp. 3d 1363, 1374 (Ct. Int'l Trade 2016) (noting that Commerce is "required to consider the evidence on the record as a whole").

**B. Pursuant to Its Own Regulations and Practice, Commerce May Not Simply Freeze the Surrogate Country List in Time**

> **1. *Commerce had adequate time to evaluate whether Mexico should be the primary surrogate***

Defendant argues that using the World Bank's revised GNI rate for Mexico would "upend{} the entire surrogacy list months into the proceeding" and "would result in administrative impracticability." Defendant's Br. at 24, 25-29. This argument ignores the fact that the revised World Bank GNI rates were placed on the record six months before the *Preliminary Results* and a year before Commerce issued its *Final Results*. Considering Mexico as a potential surrogate alongside the surrogate country list countries hardly "upends" a process for surrogate country selection when Commerce did not even select a country until its *Preliminary Results* on July 9, 2024.

Moreover, Commerce <u>invites</u> parties to comment on its list of economically comparable countries, at least through the deadline for submitting factual information regarding surrogate values in 19 CFR § 351.301(c)(3) (*i.e.*, 30 days before the *Preliminary Results*). The *SC Memo*—issued in this and all non-market economy proceedings—states that the surrogate country list is a "starting point" and Commerce asks the parties to "propose for consideration other countries that are at a level of economic development comparable to China." *SC Memo* at 1. Pursuant to Commerce practice, when "an interested party proposes an alternative country with a *per capita* GNI within the range of countries on the list, *Commerce affords that country the same consideration as others on the list*." *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1308, 1318 (Ct. Int'l Trade 2018) (emphasis added). Here, Bio-Lab, IWC, and OxyChem timely submitted the December 18, 2023, update in rebuttal comments regarding proposed surrogate values on January 2, 2024. *See Rebuttal SV Cmts* at 3 and Attachment 1.

Having notified the parties that the World Bank's GNI database is periodically updated, and having invited the parties to comment on whether countries were economically comparable to China, Commerce cannot then ignore updated World Bank GNI data that are timely submitted on the record. Commerce regulations, 19 CFR § 351.301(c)(3), indicate that 30 days is adequate time to consider new surrogate value data before a preliminary determination. Given its regulations, and given that neither Commerce, Huayi nor Kangtai provided any evidence rebutting the updated GNI data within the six month period before the *Preliminary Results*, it follows that adding Mexico to the list of potential surrogates does not present any "administrative impracticability" or unfairness to the parties. *See* Defendant's Br. at 24, 25-29; Intervenor's Br. at 4.

### 2. Commerce's refusal to add Mexico to its list of countries at "the same" level of economic development is inconsistent with past practice

In the 2020-21 *Chlor Isos* review, Commerce expanded the six-country list of economically comparable countries by three countries. *See* Plaintiffs' Br. at 15-17. Defendant argues that this case is distinguishable because it issued two different surrogate country lists during the review period and placed both lists on the record. *See* Defendant's Br. at 30. However, this distinction elevates form over substance. As just discussed, the World Bank's *World Development Report*—which was the source for both of the surrogate country lists in the 2020-21 review—is the hard-copy version of the World Bank's GNI database. Commerce recognizes the World Bank's report as "authoritative" and acknowledges that the World Bank makes periodic updates to its database that are available online. Ignoring the online updates, despite ample time to utilize the correct data, amounts to a decision to disregard the correct per capita GNI rates because the update is published electronically, not printed in the *World Development Report*. *Cf. United States v. Harper*, 118 F.4[th] 1288, 1298 (10th Cir. 2024) (noting that the Federal Rules of

Evidence treat "electronically stored information" as an "original" copy so long as it is readable and "accurately reflects the information").

Defendant's argument thus reduces to the proposition that Mexico is not at "the same" level of economic development as China or Romania because it was not included on the original, August 2023, surrogate country list. But as noted above, Commerce's *SC Memo* notes that the surrogate country list is "non-exhaustive" and invites parties to propose other potential surrogates. *See SC Memo* at 1. Commerce's practice is that when "an interested party proposes an alternative country with a *per capita* GNI within the range of countries on the list, Commerce affords that country the same consideration as others on the list." *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d at 13187. Thus, Defendant's assertion is contradicted by Commerce's own *SC Memo* and its longstanding practice.

Given the record evidence that Mexico's per-capita GNI was in fact within the range of countries considered "the same" as China in terms of economic development, the results of the 2020-21 review show that all Commerce needed to do is include Mexico on the surrogate country list or consider Mexico alongside the surrogate country list countries and proceed to compare Mexico with the other potential surrogates in terms of the production of comparable merchandise and the quality of available surrogate value information. As Commerce's surrogate country memorandum states:

> Countries on the case record *that are at the same level of economic development as China should be given equal consideration for the purposes of selecting a surrogate country*. Countries that are not at the same level of economic development as China's, but still at a level of economic development comparable to China, should be selected only to the extent that data considerations outweigh the differences in levels of economic development.

*SC List Memo* at 2. In other words, because the record showed Mexico was at least at "same level" of economic development as China (*i.e.,* its GNI falls within the range of GNI's

established by the surrogate country list), Commerce should have proceeded to address the other "data considerations" that may distinguish potential surrogates.

**C.  Apart from Whether Mexico Should Be Added to the GNI List, the Record Does Not Support Commerce's Decision to Exclude Mexico Based on July 2023 World Bank Data**

Even if this Court concludes that Commerce may disregard the December 2023 World Bank update, Commerce's determination that Mexico was not at the "same level" of economic development as China is not supported by record evidence. *See* IDM at Comment 1; Defendant's Br. at 2. This is because the GNI data Commerce used to establish the surrogate country list demonstrates that Mexico's per capita GNI was within the range of GNI's established by the list, and thus Mexico was at "same level" of economic development as China. As shown in the table below, Mexico's per-capita GNI was closer in proximity to China's per capita GNI than two of the countries on the surrogate country list:

| Table 2<br>COMPARISON OF THE PER CAPITA GNI (ATLAS METHOD) FOR ALL COUNTRIES ON COMMERCE'S SC LIST WITH THE JULY 2023 PER-CAPITA GNI FOR MEXICO | | | |
|---|---|---|---|
| **Country** | **World Bank GNI Data (Year)** | **Per Capita GNI (Atlas Method)** | **%Diff from China** |
| Romania | 2022 | 15,660 | 21.87% |
| Chile | 2022 | 15,360 | 19.53% |
| Bulgaria | 2022 | 13,250 | 3.11% |
| **China** | **2022** | **12,850** | |
| Costa Rica | 2022 | 12,670 | -1.40% |
| Malaysia | 2022 | 11,780 | -8.33% |
| Turkey | 2022 | 10,590 | -17.59% |
| Mexico | 2022 | 10,410 | -18.99% |

*Source*: *SC List Memo* and Letter from Petitioners, "Comments on Surrogate Country List" (Oct. 19, 2023) ("*Comments on SC List*") (P.R. 32) at 9 and Exhibit 5

Commerce practice is to "look{} for GNI ranges that are '*evenly distributed around {China's} GNI*.'" *Jacobi Carbons AB v. United States*, 222 F. Supp. 3d 1159, 1178 (Ct. Int'l Trade 2017) (emphasis added). Commerce has previously explained that "any country whose GNI per capita falls within the two extremes of the six-country list should be considered to be at 'the same' level" of economic development as the NME country. *Catfish Farmers of America v. United States*, 2023 WL 4560815 at *6 (Ct. Int'l Trade 2023); *see also Jacobi Carbons AB v. United States*, 313 F. Supp. 3d at 1318 ("When an interested party proposes an alternative country with a *per capita* GNI within the range of countries on the list, Commerce affords that country the same consideration as others on the list.").

As shown above, the per capita GNI data that Commerce used to create its surrogate country list demonstrates that Mexico's and Chile's per capita GNI are approximately the same distance from China's per capita GNI, and Mexico's per capita GNI is significantly closer in proximity to China's per capita GNI than Romania's per capita GNI. In other words, Mexico's per capita GNI "falls within the two extremes of the six-country" range and therefore should have been given equal consideration as a potential surrogate. *Catfish Farmers of America v. United States*, 2023 WL 4560815 at *6; *Jacobi Carbons*, 313 F. Supp. 3d at 1318.

## II.    Commerce's Failure to Consider Whether Chlor Isos Constitute "Unusual or Unique" Merchandise Under Policy Bulletin 04.1 Warrants Remand

Bio-Lab, IWC, and OxyChem argued before Commerce that Chlor Isos constitute "unusual or unique" merchandise within the meaning of Policy Bulletin 04.1 and thus required Commerce to consider merchandise comparability before economic comparability. *See* Plaintiffs' Br. at 19-21. Neither Defendant nor Defendant-Intervenors dispute that Commerce failed to address this argument explicitly. *See* Defendant's Br. at 32-34; Intervenor's Br. at 5-10.

Instead, Defendant contends that it implicitly addressed this argument by considering whether cyanuric acid ("CYA") was a "specialized or dedicated" input under Policy Bulletin 04.1 *See* Defendant's Br. at 32-34. Defendant-Intervenors further contend that record evidence does not support finding Chlor Isos are "unusual or unique" merchandise under Policy Bulletin 04.1. *See* Intervenor's Br. at 5-10. The Court should reject both arguments.

At the outset, Bio-Lab, IWC, and OxyChem do not advance a "new rule" or reject "court-affirmed, usual practice." Defendant's Br. at 32-33. Rather, Bio-Lab, IWC, and OxyChem observe that record evidence shows that CYA is a key, distinguishing ingredient in the production of Chlor Isos and should be considered "unusual or unique" for purposes of applying Policy Bulletin 04.1. As this Court has previously recognized, in Policy Bulletin 04.1 Commerce "contemplated and provided expressly for situations in which the second factor {(*i.e.,* merchandise comparability)} should function as a 'threshold' when screening potential surrogate countries." *Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d *Id.* at 1331; *see also id.* (recognizing that "in certain circumstances, Commerce provides a full exception to its default treatment of the first factor, economic comparability, as a 'threshold' criterion.").

Defendant contends that although Commerce failed to address whether Chlor Isos were "unusual or unique" under Policy Bulletin 04.1, it "addressed the arguments that CYA is a critical component of chlorinated isos. Although that was done in the context of considering whether it was a 'specialized or dedicated' major input that would affect product comparisons, Commerce' did not deem the presence of CYA as so significant that it would warrant a departure from Commerce's normal surrogate country selection methodology." Defendant's Br. at 33-34. But this argument conflates two separate and distinct analyses under Policy Bulletin 04.1: (1) whether *Chlor Isos* are "unusual or unique" merchandise, which determines the sequencing of

Commerce's analysis; and (2) whether _CYA_ is a "specialized or dedicated" input, which determines how narrowly Commerce will define comparable merchandise. _See_ Policy Bulletin 04.1. Accordingly, Commerce's consideration of whether CYA constituted a "specialized or dedicated" input does not cure its failure to analyze whether chlorinated isos constitute "unusual or unique" merchandise under Policy Bulleting 04.1.

Moreover, Bio-Lab, IWC, and OxyChem's argument that Chlor Isos were "unusual or unique" merchandise rested on more than the critical physical characteristics imparted by CYA. _See_ Plaintiffs' Br. at 20-21. Indeed, Defendant concedes that the question presented also involved the "complex production process, limited number of countries with finished production of chlorinated isos, and the presence of CYA, which imparts unique physical characteristics to the end product." Defendant's Br. at 33. It follows that Commerce's evaluation whether CYA was a "specialized or dedicated" input does not substitute for evaluating whether chlorinated isos constitute "unusual or unique" merchandise under Policy Bulletin 04.1.

Finally, although Huayi and Kangtai argue that chlorinated isos are not "unusual or unique" for purposes of Policy Bulletin 04.1, they do not dispute that Commerce failed to address this argument. _See_ Intervenor's Br. at 5-10. On this point, Bio-Lab, IWC, and OxyChem agree. However, Defendant-Intervenors' argument in the first instance must be addressed by Commerce. Before this Court, these arguments are _post hoc_ rationalization. _See Burlington Truck Lines, Inc. v. United States_, 371 U.S. 156, 168-169 (1962) (noting that the Court may not accept "post hoc rationalizations for agency action" and agency action may be "upheld, if at all, on the same basis articulated…by the agency itself").

In sum, Commerce's failure to consider whether Chlor Isos are "unusual or unique" merchandise requires remand. _See, e.g., Bonney Forge Corporation v. United States_, 560 F.

Supp. 3d 1303, 1312 (Ct. Int'l Trade 2022) (noting "a failure to address an essential argument in making a final decision is sufficient grounds for remand"); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (noting that an agency explanation is unreasonable if the agency "entirely failed to consider an important aspect of the problem").

### III. Commerce's Determination that Chlor Isos are "Comparable" to Sodium and Calcium Hypochlorite is Not Supported by Substantial Evidence

#### A. This Issue Should be Remanded for the Same Reasons it Was Remanded in *Bio-Lab, Inc. v. United States* (2025)

Defendant acknowledges that Commerce's determination that calcium and sodium hypochlorite are comparable to Chlor Isos "was largely guided by its prior administrative review." Defendant's Br. at 35. This court remanded that prior review to address the exact issue here (*i.e.,* whether Chlor Isos are comparable to calcium or sodium hypochlorite). *See Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d at 1338-1339. It should again do so in this case.

Despite this Court's prior decision, Defendant asserts that it (1) "reasonably determined that CYA did not constitute a major input…that would warrant finding that sodium and calcium hypochlorites were not comparable merchandise due to their lack of CYA," (2) "reasonably determined that there were no new facts on the record of this review to alter its finding in the prior review that calcium and sodium hypochlorite are comparable in terms of physical characteristics," and (3) "reasonably determined that the production process of chlorinated isos and sodium and calcium hypochlorite are comparable." Defendant's Br. at 39-44; *see also* Intervenors Br. at 10-12. Yet, Commerce failed to consider or evaluate record evidence demonstrating that CYA is a "specialized or dedicated" input that imparts unique physical characteristics to Chlor Isos and that the production process for Chlor Isos is significantly more

complex and costly than the production process for calcium and sodium hypochlorite, which demonstrates they are not comparable merchandise. Accordingly, this Court should remand this matter to Commerce for the same reasons that it remanded Commerce's determination in the immediately preceding review.

### B. Commerce Failed to Evaluate Record Evidence Concerning the Physical Characteristics and Production Processes

Commerce failed to conduct any analysis, evaluate any record evidence, or otherwise address the physical characteristics of Chlor Isos and the complex and costly production process for Chlor Isos. *See generally* IDM at Comment 1. Rather than address the detailed record with respect to these factors, Commerce cited its prior determination (currently under appeal) that "these products share similar physical characteristics and end uses involving many of the same chemical inputs that are used…for chlorination" and found that "certain similarities in the production process exist." IDM at 10.

It is well-established that "each administrative review is a separate segment of proceedings with its own unique facts. Indeed, if the facts remained the same from period to period, there would be no need for administrative reviews." *Shandong Huarong Mach. Co. v. United States*, 29 C.I.T. 484, 491 (2005). It follows that Commerce cannot cure its failure to consider record evidence in the instant review by citing conclusions made in prior segments of the proceeding. *Cf. Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2015–2016*, 83 Fed. Reg. 5243 (Feb. 6, 2018), IDM at Comment 5.A (acknowledging that each administrative review "is a separate proceeding covering merchandise entering the United States during a specific time period, and the facts of each review are considered separately, based on information submitted for that

14

review").

### C. Commerce's Determination that CYA is a Not a Major Input is not Supported by Substantial Evidence

Commerce asserts that it "reasonably determined" that CYA was not a major input to Chlor Isos because it "made the same finding in the prior review and determined that there were no new facts in this review to warrant a different conclusion." Defendant's Br. at 29. As Commerce concedes, however, this Court rejected that previous determination and remanded the issue for reconsideration. *See* Defendant's Br. at 25; *Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d at 1335. Therefore, the Court should remand Commerce's finding for the same reasons identified in the prior case.

*First*, Defendant's assertion that "CYA 'merely acts as a binding agent that allows for the slower release of chlorine' and this one distinctive feature does not meet the definition of a major input" is conclusory and is not based on any analysis or evaluation of record evidence. Defendant's Br. at 39 (citing IDM at 10). Though CYA is a binding agent (and a stabilizer), Commerce does not offer any rational for concluding that the presence of a "binding agent" that allows for the slow release of a swimming-pool disinfectant is not a "major" change in physical characteristics or end-use. Calcium and sodium hypochlorites do not share these characteristics.

Nor are hypochlorites "derivatives of cyanuric acid." *See* Letter from Petitioners, "Petitioners' Comments on Primary Surrogate Country Selection" (Dec. 6, 2023) ("*SC Selection Cmts*") (P.R. 45-47; C.R. 36-38) at 5-6. CYA is critical to regulating the amount of chlorine released in a given body of water, which is essential to protecting human health and ensuring the efficacy of the chlorine in the water. As the USITC explained, "significant differences exist in {the} chemical compositions" of chlorinated isos and calcium/sodium hypochlorites,

15

"particularly in the level of available chlorine, as well as the differing non-chlorine inputs involved." *SC Selection Cmts* at 7 and Exhibit 1 (USITC Pub. 4452 at 7). It is for this reason that respondents admit that CYA is the "major material" input used to produce chlorinated isos. Letter from Heze Huayi, "Section C&D Response" (Nov. 13, 2023) ("Heze Huayi DQR") (P.R. 39; C.R. 20) at DQR at 5.

*Second*, Defendant argues that a major input for purposes of Policy Bulletin 04.1 "generally involves 'processed agricultural, aquatic, and mineral products.'" Defendant's Br. at 39; *see also* IDM at 9-10. Yet, Defendant cites no authority to support this claim. More important, as this Court previously recognized, "Commerce's definition of 'major inputs' in Policy Bulletin 04.1 does not limit the category to 'agricultural, aquatic and mineral products' exclusively." *Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d at 1336. Accordingly, Commerce "was required to explain the reason that CYA does not constitute a major input even through the record {in that case} indicates that it is 'specialized or dedicated or used intensively{} in the production of' chlorinated isos." *Id.* As Commerce concedes, the factual record in the instant review is nearly identical to the factual record in the prior review. It follows that the Court's logic applies with equal force here.

*Third,* Defendant argues that "Policy Bulletin 04.1 identifies 'industrial commodity chemicals' as a category of products for which 'the large number, and generic nature, of the inputs makes input matching very complicated,' and thus would warrant a less narrow standard for identifying comparable merchandise." Defendant's Br. at 39-40; *see also* IDM at 9-10. As noted above, there are only three inputs used in Chlor Isos, which is hardly a large number or complex exercise in "input matching." *Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d at 1335. Moreover, Commerce "failed to explain how chlorinated isos belong to the category of

16

'industrial commodity chemicals.'" *Id.* Again, the rationale for the remand in *Bio-Lab, supra,* applies with equal force here.

In short, Commerce's determination that CYA does not constitute a "major input" under Policy Bulletin 04.1 is not supported by substantial evidence. *See Tudor v. Department of Treasury*, 639 F.3d 1362, 1366 (Fed. Cir. 2011) (noting "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Therefore, the court should remand this issue to Commerce, consistent with its decision in *Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d at 1335-1336.

### D. Commerce's Assertion that Chlor Isos and Calcium/Sodium Hypochlorite Have Comparable Physical Characteristics is Not Supported by Substantial Evidence

Defendant asserts that "Commerce reasonably determined that there were no new facts on the record of this review to alter its finding in the prior review that calcium and sodium hypochlorites are comparable in terms of physical characteristics" to chlorinated isos. Defendant's Br. at 40 (citing IDM at Comment 1). Consistent with Commerce's analysis from the prior administrative review, Defendant asserts Chlor Isos and calcium and sodium hypochlorite have comparable physical characteristics because they "contain similar chlorine content" and "share similar inputs." *Id.* However, there are dozens of chlorine salts, esters, and derivates in the market. Some are more comparable to Chlor Isos than others, ranging across a broad spectrum. Neither Defendant nor the Intervenors explain why the common chlorine element demonstrates that Chlor Isos and calcium/sodium hypochlorite have comparable physical characteristics.

Moreover, Commerce has previously found products to not be comparable even when both products contained similar inputs. For example, R-134a is a hydrofluorocarbon ("HFC") gas

used in air conditioning applications. R-134a is comprised of fluorine, carbon, and hydrogen. In evaluating whether other products were comparable to R-134a, Commerce found that hydrocarbons, which are comprised of carbon and hydrogen but lack fluorine, were not comparable even though both contained carbon and hydrogen. This is because fluorine is a major input of R-134a and imparted unique physical characteristics to R-134a that were not shared by hydrocarbons. *See 1,1,1,2-Tetrafluoroethane from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 62597 (Oct. 20, 2014) ("*R-134a from China*"), IDM at Comment 16 ("We disagree that hydrocarbon products are comparable merchandise").

The same logic applies here. Chlor Isos are made up of three different inputs: CYA, chlorine, and caustic soda. As noted above, although chlorinated isos contain chlorine, they are in fact "derivatives of cyanuric acid" and have a unique chemical composition that imparts physical characteristics different from calcium and sodium hypochlorites. *SC Selection Cmts* at 5-6. Moreover, Defendant's assertion that "calcium hypochlorite and chlorinated isos contain similar chlorine content" is not supported by record evidence. Defendant's Br. at 40. The U.S. International Trade Commission ("USITC") explained that although calcium hypochlorite "is sold in a wide range of available chlorine, from 45 percent to 75 percent in the most common applications, {chlorinated isos} is much higher in available chlorine at 90 percent and sodium hypochlorite is much lower at 15 percent." *SC Selection Cmts* at Exhibit 1 (USITC Pub. 4452 at 7). That is why the USITC held that "significant differences exist in {the} chemical compositions" of Chlor Isos and calcium/sodium hypochlorites, "particularly in the level of available chlorine, as well as the differing non-chlorine inputs involved." *Id.*

Accordingly, Defendant's assertion that Commerce reasonably determined that

chlorinated isos and calcium/sodium hypochlorite have comparable physical characteristics is not supported by record evidence.

### E.  Commerce's Assertion that Chlor Isos and Calcium/Sodium Hypochlorite Have Comparable Production Processes is Not Supported by Substantial Evidence

Defendant's assertion that "Commerce reasonably determined that the production process of chlorinated isos and sodium and calcium hypochlorite are comparable" was based on Commerce's prior finding that the production of Chlor Isos and calcium/sodium hypochlorite all "involve{} a multi-stage production process requiring the production of two of the three same intermediate inputs, caustic soda and chlorine." Defendant's Br. at 42. This Court, however, has previously rejected this argument, explaining that Commerce "must support its determination of similarity with more than the mere assertion that the processes are both multi-stage and share some inputs." *Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d at 1338.

Furthermore, the mere fact that chlorinated isos and calcium/sodium hypochlorite have some common inputs and both require a multi-stage production process is not a sufficient basis for finding that they have a comparable production process. Indeed, Commerce has previously found that use of common inputs is not sufficient for finding production processes are comparable. *See Steel Wire Garment Hangers from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 47587 (Aug. 14, 2008), IDM at Comment 3 (finding that producers of steel wire do not have a comparable production process to those of steel wire hangers "because wire hangers are a downstream product of wire requiring additional manufacturing processes"). Commerce has also found multi-stage production processes to not be comparable where the nature and sophistication of the production stages differed in significant ways. *See R-134a from China,* IDM at Comment 16 ("We disagree that

hydrocarbon products are comparable merchandise" even though "both the hydrocarbon and tetrafluoroethane production use high temperatures and a refining process to derive the end product" because "hydrocarbon production involves distilling crude oil at many different temperatures to create various hydrocarbon products, whereas tetrafluoroethane production requires a catalyst to create a reaction between two inputs to create the product").

Accordingly, Defendant's assertion that Commerce reasonably determined that Chlor Isos have a comparable production process as calcium or sodium hypochlorite is not supported by record evidence.

F. **Commerce's Determination that Calcium and Sodium Hypochlorite are Comparable to Chlor Isos is Not Supported by Substantial Evidence Nor In Accordance with Law**

As demonstrated above, Commerce failed to conduct any meaningful analysis of whether CYA constitutes a major input under Policy Bulletin 04.1 or whether Chlor Isos have comparable physical characteristics or production processes as calcium or sodium hypochlorite. By failing to meaningfully evaluate whether CYA constitutes a major input, the significant importance of CYA in imparting unique physical characteristics to Chlor Isos, and the significantly more costly and complex production of Chlor Isos, Commerce failed to identify a surrogate country that satisfies both prongs of 19 U.S.C. § 1677b(c). Therefore, Commerce's selection of Romania as the primary surrogate is not supported by substantial evidence nor in accordance with law and the Court should remand this matter to Commerce consistent with the arguments above.

**CONCLUSION**

For the reasons discussed above, this Court should find Commerce's *Final Results* are not supported by substantial evidence and is otherwise not in accordance with law and should remand this matter to Commerce consistent with the arguments above.

Respectfully submitted,

/s/ James R. Cannon, Jr.
James R. Cannon, Jr.
Chase J. Dunn

CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave, N.W.
Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation*

Date:   October 31, 2025

21

Court. No. 25-00054

## <u>Certificate of Compliance</u>

The undersigned hereby certifies that the forgoing submission of "Bio-Lab, Inc. et al's Reply Brief" filed by Plaintiffs on October 31, 2025, contains 5,981 words, including footnotes, and excluding the table of contents, table of authorities, and signature block, and therefore, complies with the maximum 7,000-word limitation set forth in the Standard Chambers Procedures.

BY: <u>/s/  James R. Cannon Jr.</u>