A-570-898
Remand
Slip Op. 26-74
POR: 06/01/2022-05/31/2023
**Public Document**
E&C/OII: TEAM

***Bio-Lab, Inc. Innovative Water Care LLC and Occidental Chemical Corporation v. United States*, Court No. 24-00054, Slip Op. 26-74 (CIT July 14, 2026)**
**Chlorinated Isocyanurates from the People's Republic of China**

# FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

## I. SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the opinion and remand order of the U.S. Court of International Trade (CIT or the Court) in *Bio-Lab, Inc. Innovative Water Care LLC and Occidental Chemical Corporation v. United States*, Court No. 24-00054, Slip Op. 26-74 (CIT July 14, 2026) (*Remand Order*). These final results of redetermination concern the final results of the 2022-2023 administrative review of the antidumping duty (AD) order on chlorinated isocyanurates (chlorinated isos) from the People's Republic of China (China) covering the period of review (POR) June 1, 2022, through May 31, 2023.[1] The petitioners in the underlying administrative review are Bio-Lab, Inc., Innovative Water Care, LLC, and Occidental Chemical Corporation (collectively, the petitioners). The respondents selected for individual examination are Heze Huayi Chemical Co., Ltd. (Heze Huayi) and Juancheng Kangtai Chemical Co., Ltd. (Kangtai).

Pursuant to the Court's *Remand Order*, we have further clarified, explained, or reconsidered the issues remanded by the Court. The Court remanded this matter to Commerce

---

[1] *See Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 FR 9710 (February 18, 2025) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

to: (1) address expressly whether chlorinated isos constitute "unusual or unique" merchandise under Policy Bulletin 04.1[2]; (2) explain whether cyanuric acid is a major input under Policy Bulletin 04.1 and whether calcium hypochlorite shares similar physical characteristics with chlorinated isos; and (3) explain further or reconsider the similarity of the production processes of chlorinated isos, sodium hypochlorite, and calcium hypochlorite.

Based on this analysis, we had: (1) determined that chlorinated isos do not constitute "unusual or unique" merchandise under Policy Bulletin 04.1; (2) reversed our prior determination and explained that cyanuric acid is a major input under Policy Bulletin 04.1 because it is specialized, dedicated, and used intensively in the production of chlorinated isos; (3) reversed our prior determinations and determined that calcium hypochlorite and sodium hypochlorite do not share similar physical characteristics with chlorinated isos; and (4) reversed our prior determinations regarding production processes and explained, relying on the detailed information provided by the petitioners, that the processes used to manufacture chlorinated isos, sodium hypochlorite, and calcium hypochlorite are fundamentally different.

Because we do not find that chlorinated isos constitute "unusual or unique" merchandise under Policy Bulletin 04.1, an exception to the standard "sequential approach" is not warranted, however, adhering to the sequential approach does not preclude Commerce from evaluating the nature of the inputs used to produce subject merchandise. Furthermore, because we now find cyanuric acid is a major input for chlorinated isos, Policy Bulletin 04.1 advises that comparable merchandise should be defined narrowly. Upon reconsidering the physical characteristics and production processes under this narrow definition, we determine that sodium hypochlorite and

---

[2] *See* Enforcement and Compliance's Policy Bulletin No. 04.1, regarding, "Non-Market Economy Surrogate Country Selection Process," (March 1, 2004) (Policy Bulletin 04.1), available on Commerce's website at https://www.trade.gov/enforcement-and-compliance-policy-bulletins-0.

calcium hypochlorite are not comparable to chlorinated isos. Because we no longer consider calcium hypochlorite and sodium hypochlorite comparable merchandise, pursuant to Policy Bulletin 04.1, we reversed our selection of Romania as the primary surrogate country for valuing factors of production (FOPs). Moreover, based on record evidence and as a result of our redetermination regarding calcium hypochlorite and sodium hypochlorite, none of the countries on the "surrogate country list" (list of countries to be considered at a comparable level of economic development pursuant to section 773(c)(4) of the Tariff Act of 1930, as amended (the Act)) is a significant producer of comparable merchandise. Therefore, we selected Mexico as the most appropriate surrogate country, as it is the only country left that is a significant producer of comparable merchandise, and that has publicly available data on the record to value the FOPs, pursuant to Policy Bulletin 04.1. We have revised the applicable AD rates accordingly.

## II. BACKGROUND

In the *Final Results*, because China is a non-market economy (NME) country, Commerce selected a surrogate country in accordance with section 773(c)(4) of the Act in order to value the FOPs. Commerce selected Romania as the surrogate country because Commerce determined that Romania is at a comparable level of economic development and is a significant producer of comparable merchandise, pursuant to section 773(c)(4) of the Act. Specifically, Commerce determined that Romania is a significant producer of two comparable products: calcium hypochlorite and sodium hypochlorite. Commerce also determined that Romania has publicly available data to value all FOPs that constitute the best available information on the record.[3] In the *Final Results*, Commerce found that calcium hypochlorite and sodium hypochlorite are comparable merchandise because these two products share similar physical characteristics and

---

[3] *See Final Results* IDM at 9-21.

end uses, and a similar production process, as the subject merchandise (*i.e.*, chlorinated isos).[4] Commerce made this determination over the objections of the petitioners, who argued that calcium hypochlorite and sodium hypochlorite are not comparable products because they are not produced from cyanuric acid, which the petitioners argue is a major input in the production of chlorinated isos, in accordance with Policy Bulletin 04.1.[5] The petitioners further argued that chlorinated isos constitute "unusual or unique" merchandise under Policy Bulletin 04.1. Based on this designation, the petitioners contended that the second factor in Commerce's sequential approach, finding a producer of comparable merchandise, must take precedence over economic comparability. Consequentially, the petitioners argued that because calcium hypochlorite and sodium hypochlorite are not made from the same "major input," cyanuric acid, as chlorinated isos, they cannot be considered comparable products. Therefore, the petitioners argued, the only potential surrogate country on the record that is a producer of comparable merchandise is Mexico, which produces the identical merchandise (chlorinated isos), and thus, Commerce must select Mexico as the surrogate country pursuant to section 773(b)(4) of the Act.

On July 14, 2026, the Court sustained, in part, and remanded, in part, the *Final Results*. In the *Remand Order*, the Court held that certain of Commerce's positions and explanations within the Final Results were insufficient, and ordered Commerce to:

> (1) address expressly whether chlorinated isos constitute "unusual or unique" merchandise under Policy Bulletin 04.1; (2) explain whether cyanuric acid is a major input under Policy Bulletin 04.1 and whether calcium hypo shares similar physical characteristics with chlorinated isos; and (3) explain further or reconsider the similarity of the production processes of chlorinated isos, sodium hypochlorite and calcium hypochlorite.[6]

---

[4] *Id.* at 6-9.
[5] *See* Petitioners' Letter, "Petitioners' Case Brief," dated November 1, 2024, at 9-10.
[6] *See Remand Order* at 21.

On September 18, 2026, we re-opened the record, asking parties for information regarding, among other things, whether cyanuric acid and urea are "specialized, dedicated or used intensively" in the production of chlorinated isos.[7]

As requested, parties submitted data concerning the relationship of cyanuric acid and subject merchandise, the amount of cyanuric acid produced globally and used specifically for the production of subject merchandise, and the chemical characteristics cyanuric acid imparts upon the molecular structure of chlorinated isos.[8] We also timely received rebuttal comments and new factual information from the petitioners.[9]

Based upon the new factual information placed on the record, as well as the questions posed by the Court concerning how to determine whether cyanuric acid is a "major input" in chlorinated isos and whether chlorinated isos constitute "unique or unusual" merchandise, we have further explained and reconsidered our positions, as stated below.

On October 23, 2026, Commerce issued its Draft Results of Redetermination and provided interested parties with an opportunity to comment.[10] On November 2, 2026, Commerce received comments from the petitioners and from the respondents.[11]

---

[7] *See* Memorandum, "Request for Additional Information," dated September 18, 2026.
[8] *See* Petitioners' Letter, "Petitioners' Comments and New Factual Information," dated September 23, 2026 (Petitioners' NFI); *see also* Respondents' Letter, "NFI," dated September 23, 2026 (Respondents' NFI).
[9] See Petitioners' Letter, "Petitioners' Rebuttal Comments and Factual Information," dated September 28, 2026.
[10] *See* Draft Results of Redetermination Pursuant to Court Remand, *Bio-Lab, Inc. et al. v. United States*, Consol Court No. 24-00054; Slip Op. 26-74 (CIT July 14, 2026), dated October 23, 2026 (Draft Results of Redetermination).
[11] *See* Respondents' Letter, "Comments on Draft Remand," dated November 2, 2026 (Respondents' Comments); and Petitioners' Letter, "Petitioners' Comments on Draft Results of Redetermination," November 2, 2026 (Petitioners' Comments).

## III. FINAL ANALYSIS

### A. Chlorinated Isos Do Not Constitute "Unusual or Unique" Merchandise

In selecting a surrogate country in NME proceedings, Commerce typically adheres to the "sequential approach" outlined in Policy Bulletin 04.1. In this process, economic comparability is seen as the "threshold criterion" while production of highly comparable merchandise is the second factor. However, while Commerce typically adheres to a sequential approach, Policy Bulletin 04.1 allows an exception, allowing the second factor to take precedence in cases where subject merchandise is "unusual or unique (with correspondingly unusual or unique inputs or other unique aspects of the cost of production).[12]

Upon consideration of the record evidence, Commerce determines that chlorinated isos do not constitute "unusual or unique" merchandise within the narrow meaning of Policy Bulletin 04.1 that invokes an exception from Commerce's sequential approach of finding a producer of comparable merchandise before considering the economic comparability of potential surrogate countries.

Under Commerce's practice and the language of Policy Bulletin 04.1, the "unusual or unique" exception is a departure from the sequential approach, utilized for merchandise characterized by highly idiosyncratic production requirements, exceptional input, or production concentrated in very few countries. Chlorinated isos, however, are widely manufactured across multiple global markets, enter under multiple standard tariff classifications, and are produced via standard commercial industrial processes.[13]

---

[12] *See* Policy Bulletin 04.1 at 4.
[13] *See Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 FR 56303, 56304 (July 9, 2024); *see also* Kangtai's Letter, "Section D Response," dated November 14, 2023, at 9.

Further, Commerce has acknowledged that our practice allows for the placing of greater emphasis on the significant production criterion of Policy Bulletin 04.1, but only in circumstances in which the subject merchandise is unusual or unique or where major inputs are not traded internationally.[14] Commerce has also established that the "significant producer of comparable merchandise" requirement is particularly important in cases involving subject merchandise with unique or unusual inputs, such as crawfish, because it is produced by only a few countries.[15] Additionally, the requirement is important for cases that involve certain subject merchandise, such as pure magnesium, because the major input is electricity, which is not widely traded internationally but is used intensively in the production of magnesium.[16] Commerce further explained that the significant producer requirement is particularly important in these cases because Commerce wants to avoid selecting a surrogate country in which the relative scarcity (either through domestic sources or through imports) of a major non- or little-traded input precludes the country from being a competitive producer of comparable merchandise.[17] Chlorinated isos are neither made in few markets, nor do they require unusual inputs that are not traded internationally. As such, Commerce finds that a deviation from the sequential approach is not warranted in this instance.

However, adhering to the sequential approach does not preclude Commerce from evaluating the nature of the inputs used to produce subject merchandise. Discussed further

---

[14] *See Diamond Sawblades and Parts Thereof from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review: 2010-2011*, 77 FR 73417 (December 10, 2012), and accompanying IDM at 12.

[15] *See Folding Metal Tables and Chairs from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Review, and Revocation of the Order in Part*, 76 FR 66036 (October 10, 2011), and accompanying IDM at 3-4.

[16] *Id.*

[17] *Id.*

in Section B, record evidence indicates that the production of chlorinated isos heavily relies on cyanuric acid, a "specialized and dedicated" major input. Chlorinated isos depend on this specialized, dedicated major input to impart the fundamental molecular structure and defining physical characteristics of the subject merchandise. In such a case, Policy Bulletin 04.1 directs that comparable merchandise should be identified narrowly, based on a comparison of that major input.[18] Under this standard sequential analysis, identifying a producer of comparable merchandise defined narrowly under Policy Bulletin 04.1 governs our surrogate country determination.

**B. Cyanuric Acid is a Major Input**

**1. Cyanuric Acid Comprises a Predominant Portion of Chlorinated Isos**

As further explained below, based upon new factual information submitted in response to our reopening of the record, specifically new factual information submitted by the petitioners, we are reversing our position and find that cyanuric acid comprises a predominant portion of chlorinated isos, and is a major input.

In its *Remand Order*, the Court held that Commerce did not proffer support for its determination that cyanuric acid is not a major input in the production of chlorinated isos and that Commerce's mere suggestion that cyanuric acid is not a major input because it is not a "processed agricultural, aquatic {or} mineral product{}," without accompanying analysis and explanation does not provide sufficient support for Commerce's finding.[19]

The Court stated in the *Remand Order*, that Commerce is instructed to explain whether cyanuric acid is a major input under Policy Bulletin 04.1.[20] As an initial matter,

---

[18] *See* Policy Bulletin 04.1 at 3.
[19] *See Remand Order* at 17-18.
[20] *Id*. at 19

Commerce notes that Policy Bulletin 04.1 does not use the term "predominant input," but instead, as the Court notes, uses the terms "specialized," "dedicated," and "intensively used" in defining a major input. Commerce used phrasing such as "predominant usage" or "predominant input" simply because "predominant" is synonymous with the term "major" and not because Commerce intended to create a subsidiary step in the determination of what constitutes a "major input" based on whether the input is "predominant." Predominance is defined by "having superior strength, influence, or authority … {being} more noticeable or important, or larger in number, than others."[21] In this manner, the definition includes not just quantitative factors (*i.e.*, larger in number), but qualitative ones as well (*i.e.*, strength, influence or authority). Accordingly, the Court ordered Commerce to "address {petitioner's} arguments and explain further or reconsider its determination that cyanuric acid does not comprise a predominant portion of chlorinated isos."[22]

To comply with the Court's *Remand Order*, Commerce re-opened the record and requested additional information to ensure that a comprehensive analysis could be made as to whether cyanuric acid is a "major input" of subject merchandise. Specifically, Commerce requested information concerning whether cyanuric acid is "specialized, dedicated or used intensively" in the production of chlorinated isos, as directed by *Remand Order*. The information submitted in response also sheds light on whether cyanuric acid comprises a "predominant" portion of chlorinated isos as referenced by the Court.

---

[21] *Id.* at 10.
[22] *See* Predominant, Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/predominant, last accessed October 15, 2026; *see also* Predominant, Cambridge Online Dictionary, available at https://dictionary.cambridge.org/us/dictionary/english/predominant, last accessed October 15, 2026.

The petitioners' new factual information demonstrates that out of the inputs that go into chlorinated isos, only cyanuric acid creates the defining molecular structure of the finished product and imparts the unique physical characteristics and use of chlorinated isos (*i.e.*, chemical stability). The cyanuric acid molecule serves as the chemical structure to which chlorine bonds during the production process and thus, serves as the foundational molecular structure of the finished product.[23] Likewise, the petitioners' new factual information demonstrates that cyanuric acid serves as a strategic intermediate input as it acts as the "critical chemical backbone" and primary precursor required to manufacture chlorinated isos;[24] it is what bonds the chlorine together, creating a stable and durable water treatment.[25] In fact, the petitioners' new factual information indicates that chlorinated isos are a derivative of cyanuric acid (citing a report from the U.S. International Trade Commission (ITC)).[26] Commerce concludes this is strong "qualitative" evidence that cyanuric acid is a predominant portion of chlorinated isos. As chlorinated isos are derived from cyanuric acid and as cyanuric acid imparts the essential characteristic to chlorinated isos that separates it from other swimming pool and water treatment applications (*i.e.*, stability or durability in water), Commerce determines that cyanuric acid is the predominant part of chlorinated isos.[27]

Further, when analyzing the per kilogram inputs on the record by Kangtai and Heze Huayi, cyanuric acid accounts for a significant portion of the total weight of all chemical inputs used by Heze Huayi and Kangtai, respectively, to produce chlorinated isos, which

---

[23] *See* Petitioners' NFI at 7 and Exhibit 2.
[24] *Id.* 3 and Exhibit 3.
[25] *Id.* at Exhibits 2, 3, and 5.
[26] *Id.* at 2.
[27] We note that Policy Bulletin 04.1 explains that a major input is "specialized," "dedicated" and "used intensively," in the production of subject merchandise. Policy Bulletin 04.1 does not use the term "predominant."

makes cyanuric acid the largest input in the production process by weight,[28] or, as the petitioners phrase it, "the plurality" of chlorinated isos.[29] Thus, this fact serves as "quantitative" evidence reinforcing the conclusion that cyanuric acid is predominant in chlorinated isos.

### 2. Three Inputs Do Not Constitute a "Large Number" of Inputs Under Policy Bulletin 04.1

In the *Final Results*, Commerce held that that cyanuric acid does not meet the definition of a major input as described in Policy Bulletin 04.1, which "generally involve processed agricultural, aquatic, and mineral products," that would warrant a narrow definition of comparable product. Commerce further noted that "Policy Bulletin 04.1 identifies "industrial commodity chemicals" as one of the category of products where "the large number, and generic nature, of the inputs makes input matching very complicated."[30] As an initial matter, Commerce notes that chlorinated isos consist of only three intermediate inputs: cyanuric acid, chlorine, and caustic soda.[31] Commerce re-examined the issue and determines that there is no information from Commerce's practice or prior caselaw that would strongly support the finding that three inputs constitute a "large number" of inputs for determining whether an input is a "major input," pursuant to Policy Bulletin 04.1, for the purpose of assessing whether comparable merchandise should be identified narrowly in the consideration of surrogate country selection.

---

[28] *See* Memorandum, "Calculations for Heze Huayi Chemical Co., Ltd.," dated concurrently with these draft results of redetermination (Draft Remand Analysis Memorandum), at 6.

[29] *See* Petitioners' Letter, "Comments on Remand Redetermination," dated September 3, 2025 (Petitioners' Comments for Bio-Lab I Remand), at 5-6; *see also* Remand Order at 10.

[30] *See Final Results* at 9-10; *see also* Policy Bulletin 04.1 at 3.

[31] *See* Petitioners' Letter, "Petitioners' Comments on Primary Surrogate Country Selection," dated December 6, 2023.

Commerce notes that three is not a large number of factors compared to the number of factors used in the production of many other products Commerce has examined. For example, in the investigation of low-speed personal transportation vehicles, Commerce had to value hundreds FOPs.[32] As such, while Policy Bulletin 04.1 sets neither floor nor ceiling on what constitutes a "large number" of inputs, we find that three inputs does not constitute a "large number" of inputs.

**3. Cyanuric Acid is "Specialized," "Dedicated," and "Used Intensively" with Respect to Chlorinated Isos**

According to Merriam-Webster, "specialized" is defined as highly differentiated, especially in a particular direction or for a particular end, as well as designed, trained, or fitted for one particular purpose or occupation.[33] Likewise, the Cambridge Dictionary defines "specialized" as, "working in and knowing a lot about one particular subject, skill, service, *etc.*"[34] Similarly, "dedicated" is defined by Merriam-Webster as given to a particular purpose.[35] The Cambridge Dictionary defines "dedicated" as "designed to be used for one particular purpose."[36] In this manner both "specialized" and "dedicated" refer to something being used for a particular purpose.

Although cyanuric acid can be used as an input for other merchandise, the vast majority of cyanuric acid is consumed for the production of chlorinated isos.[37] As stated above, the petitioners' new factual information indicates that chlorinated isos are a

---

[32] *See, e.g.*, Letter, "Lvtong's Response to Section D Questionnaire," October 23, 2024, at Exhibit D-6.
[33] *See* Specialized, Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/specialized, last accessed October 15, 2026.
[34] *See* Specialized, Cambridge Online Dictionary, available at https://dictionary.cambridge.org/dictionary/english/specialized, last accessed October 15, 2026.
[35] *See* Specialized, Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/dedicated, last accessed October 15, 2026.
[36] *See* Dedicated, Cambridge Online Dictionary, available at https://dictionary.cambridge.org/dictionary/english/dedicated, last accessed October 15, 2026, 2026.
[37] *See* Petitioners' NFI at 5-6 and Exhibits 2-3.

derivative of cyanuric acid (citing an ITC report).[38] Further, both Heze Huayi and Kangtai have described cyanuric acid as the "major material" utilized in the production of chlorinated isos, which also imparts the key physical characteristics of chlorinated isos.[39] Moreover, as explained above, new evidence on the record demonstrates that cyanuric acid provides the foundational chemical structure that defines the subject merchandise.[40] In addition, as previously mentioned, the vast majority of global demand for cyanuric acid that is utilized specifically for the production of chlorinated isos highlights a "dedicated" relationship between the input and final product.

Additionally, the cyanuric acid molecule serves as the chemical structure to which chlorine bonds, forming chlorinated isos and providing the chlorine-stabilizing properties that distinguish chlorinated isos from alternative water-treatment chemistries, providing the foundational molecular structure and defining characteristics of the final product.[41] With cyanuric acid acting as a critical component of the chemical and molecular structure of chlorinated isos, cyanuric acid is a specialized and dedicated input in the production process that serves the particular purpose of providing the key molecular structure, and thus, the defining characteristics.

Next, "intensively" is defined as highly concentrated; tending to strengthen or increase.[42] The fact that cyanuric acid constitutes the plurality of the total weight by volume of the chemical input of the finished product, indicates that cyanuric acid meets the

---

[38] *Id*. at 2.
[39] *See* Heze's Letter, "Section C and D Response," dated November 14, 2022, at 5; *see also* Kangtai's Letter, "Section C and D Response," dated November 14, 2022, at 5.
[40] *See* Petitioners' NFI at 5.
[41] *Id.* at 7 and Exhibit 2-3.
[42] *See* Intensively, Merriam-Webster Online Dictionary, available at https://www.merriamwebster.com/dictionary/intensively, last accessed October 15, 2026.

criteria to be considered "used intensively" in the production of chlorinated isos.[43] As explained above, the per kilogram inputs information on the record demonstrates that cyanuric acid accounts for a significant portion of the total weight of all chemical inputs, which makes cyanuric acid the largest input in the production process, by weight,[44] or "the plurality" of chlorinated isos.[45] Accordingly, we find that cyanuric acid is used intensively as it is "highly concentrated" and intended to "strengthen or increase" the characteristics of chlorinated isos as an essential input that provides fundamental molecular structure and the largest input in the production process, by weight.[46]

For these reasons, Commerce reconsidered its prior determination, and finds that, based on new factual information, cyanuric acid is "specialized, dedicated or used intensively" in the production of chlorinated isos.

**C. Calcium Hypochlorite and Sodium Hypochlorite are Not Comparable Products**

**1. Comparable Merchandise Should be Defined Narrowly**

As explained above, upon redetermination pursuant to remand, Commerce determined that cyanuric acid is a "major input" as defined by Commerce's Policy Bulletin 04.1, which states:

> . . . where there are major inputs, *i.e.*, inputs that are specialized or dedicated or used intensively, in the production of the subject merchandise, *e.g.*, processed agricultural, aquatic and mineral products, comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs, including energy, where appropriate.[47]

---

[43] *See* Draft Remand Analysis Memorandum at 6.
[44] *Id.*
[45] *See* Petitioners' Comments for Bio-Lab I Remand at 5-6; *see also Remand Order* at 10
[46] *See* Intensively, Merriam-Webster Online Dictionary, available at https://www.merriamwebster.com/dictionary/intensively, last accessed October 15, 2026.
[47] *Id.*

With respect to cyanuric acid, when considering: (1) the volume of cyanuric acid involved in the production of chlorinated isos; (2) that cyanuric acid acts as the basis of the chemical structure of the final product; and (3) the vast majority of cyanuric acid used globally is used in the production of chlorinated isos, cyanuric acid is specialized and dedicated in the production process enumerated within the Policy Bulletin 04.1 and the new factual information on the record now supports the finding that cyanuric acid is a major input.

**2. Calcium Hypochlorite and Sodium Hypochlorite are Not Comparable to Chlorinated Isos**

As discussed above, Commerce has reconsidered its prior position and finds that the comparable merchandise should be narrowly identified because cyanuric acid is a major input. As such, despite Commerce's prior three-prong comparability analysis finding that chlorinated isos, sodium hypochlorite, and calcium hypochlorite share similar physical characteristics and end-uses, Commerce finds that cyanuric acid moots any such analysis because it is a "major input" of subject merchandise but not an input of calcium hypochlorite and sodium hypochlorite. Specifically, Policy Bulletin 04.1 suggests products made from a major input should be analyzed for comparability under an alternative method, rather than on the standard comparability analysis applied to products involving a "large number" of factors of a "generic" nature.

For example, Policy Bulletin 04.1 discusses examining physical characteristics and the production process as part of that standard comparability analysis, before noting that in cases involving a "major input" a different analysis should apply. In particular, Policy Bulletin 04.1 states that "where there are major inputs . . . comparable merchandise should be identified narrowly, *on the basis of a comparison of the major* inputs," the implication

being that in such circumstances there is a strong preference for limiting comparable merchandise to merchandise using the same major input, rather than relying on the standard three-prong analysis in analyzing comparability.[48] As neither calcium hypochlorite nor sodium hypochlorite uses any cyanuric acid, Commerce finds that they are not comparable to chlorinated isos.

**3. Production Processes of Chlorinated Isos, Calcium Hypochlorite, and Sodium Hypochlorite**

Pursuant to the Court's remand order, Commerce has been tasked to explain further or reconsider the similarity of the production processes of chlorinated isos, sodium hypochlorite, and calcium hypochlorite.[49] Upon consideration of the record evidence, Commerce determines that the production processes are not similar but rather are fundamentally different.

Record evidence demonstrates that the production of chlorinated isos involves a complex, multi-stage process involving substantial plant investment, highly specialized equipment, and a large workforce.[50] Specifically, the process of chlorinated isos production produces an intermediate chemical product, cyanuric acid, that is produced through multiple distinct stages, including condensation reactions, hydrolysis reactions, ammonium sulfate reactions, and centrifugation.[51] Production of cyanuric acid also involves numerous additional processes at a different site, which involves chlorination reactors, tower driers, granulating machines, and tableting machines to produce the solid final product.[52]

---

[48] *See* Policy Bulletin 04.1 at 3 (emphasis added).
[49] *See Remand Order* at 20-21.
[50] *See* Petitioners' Letter, "Petitioners' Comments Concerning the Preliminary Determination," dated May 29, 2024 (Petitioners' Prelim Comments), at Exhibit D.
[51] *Id.*
[52] *Id.*

In contrast, the production of sodium hypochlorite and calcium hypochlorite consists of a simpler, single-stage process. Sodium hypochlorite is produced through a one-step reaction of chlorine gas with sodium hydroxide (caustic soda).[53] This process involves no intermediate chemicals like cyanuric acid, relies on basic, standard liquid handling equipment rather than complex liquid handling as well as drying, compaction, granulation and tableting operations, and involves a workforce and plant investment that are orders of magnitude smaller than those required for chlorinated isos.

Furthermore, the ITC has recognized that chlorinated isos and hypochlorites are manufactured in completely different facilities, further noting that producing chlorinated isos and calcium hypochlorite in close proximity presents severe safety hazards, including the risk of rapid explosion and fire.[54]

In light of the sheer number of processing steps, the need for extensive solid handling and drying equipment, the vastly different chemical reactions involved, and the incompatibility of their manufacturing environments, Commerce finds that the production processes for calcium hypochlorite and sodium hypochlorite are fundamentally different from, and not comparable to, the production of chlorinated isos.

**4. Mexico is the Most Appropriate Surrogate as the Sole Producer of Comparable Merchandise on the Record**

When Commerce investigates imports from an NME country, section 773(c)(1) of the Act directs it to determine normal value, in most circumstances, on the NME producer's FOPs based on the best available information regarding the values of such factors in a surrogate market economy country, or countries, considered to be appropriate by

[53] *Id.*
[54] *Id.*

Commerce. In accordance with section 773(c)(4) of the Act, in valuing FOPs, Commerce shall utilize, to the extent possible, the prices or costs of FOPs in one or more market economy countries that are: (a) at a level of economic development comparable to that of the NME country; and (b) significant producers of comparable merchandise. Moreover, Commerce's practice is to select an appropriate surrogate country based on the availability and reliability of data from the potential countries.[55]

Specifically, as a general rule, Commerce selects a surrogate country that is at the same level of economic development as the NME, unless none of the countries are viable options because they either: (a) are not significant producers of comparable merchandise; (b) do not provide sufficient reliable sources of publicly available SV data; or (c) are not suitable for use based on other reasons.[56] Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh the difference in levels of economic development. To determine which countries are at the same level of economic development as the NME, Commerce generally relies on per capita gross national income (GNI) data from the World Bank's World Development Report.[57]

As the starting point for the surrogate country selection analysis, Commerce places on the record a "surrogate country list," which is updated annually and contains three market economy countries with slightly higher GNI per capita, and three with slightly lower

---

[55] *See* Policy Bulletin 04.1 at 4.
[56] *See, e.g., Certain Steel Nails From the People's Republic of China: Preliminary Results and Partial Rescission of the Third Antidumping Duty Administrative Review*, 77 FR 53845, 53848 (September 4, 2012) ("{U}nless we find that all of the countries determined to be equally economically comparable are not significant producers of comparable merchandise, do not provide a reliable source of publicly available surrogate data or are unsuitable for use for other reasons, we well rely on data from one of these countries.").
[57] *Id.*

GNI per capita, than China. On October 13, 2023, Commerce placed on the record of the underlying review a surrogate country list that identified countries at the same level of economic development as China, including Romania, Panama, Costa Rica, Malaysia, Chile, and the Republic of Türkiye (Türkiye),[58] and provided parties with an opportunity to comment. In response, no party argued that any country on the list might be a significant producer of comparable merchandise, other than Romania and Malaysia, which are producers of calcium and sodium hypochlorite. As noted, Commerce is finding upon redetermination that calcium and sodium hypochlorite are not comparable products. Therefore, none of the countries on the surrogate country list are producers of comparable merchandise and thus Commerce finds that none of the countries on the list are viable.

As a result of our determination that sodium hypochlorite and calcium hypochlorite are not comparable merchandise, there remain no countries on the surrogate country list, where we have identified countries that are economically comparable to China, that are also a producer of comparable merchandise. As such, Mexico is the only country for which Commerce has data on the record and that is a producer of comparable (*i.e.*, here, *identical*) merchandise. Accordingly, Commerce now determines that Mexico is the only appropriate surrogate country as the Mexican data constitutes the only available information on the record for this remand redetermination.

Commerce has selected Mexico as the surrogate country in other reviews under this order but Mexico was not on the surrogate country list issued in October 2023 because Mexico's GNI was slightly lower than the other countries on that year's list. As a result,

---

[58] *See* Memorandum, "2022-2023 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China: Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information," dated October 12, 2023.

Commerce did not initially select Mexico as the surrogate country, as it was not on the surrogate country list at that time.[59] The fact that Mexico was temporarily not on the list of economically comparable countries notwithstanding, as explained above, Commerce now finds that calcium hypochlorite and sodium hypochlorite are not comparable merchandise, as they do not share the same major input, cyanuric acid. Therefore, there is no remaining country on the surrogate country list that is a producer of comparable merchandise. When that happens, Commerce next examines countries not on the surrogate country list for which there is record information regarding the production of comparable merchandise, and for which there exists useable surrogate values. The only country with information on the record that is a producer of comparable merchandise and for which there exists useable data is Mexico. Further, although Mexico was not listed in Commerce's initial October 2023 list of economically comparable surrogate countries, the World Bank has updated its 2022 per capita GNI figures, showing that Mexico's updated per capita GNI was $10,820 making it more comparable to China than Türkiye, Romania, or Chile, all three of which were initially included on Commerce's list of economically comparable surrogate countries.[60]

In this manner, despite the fact that Mexico is not on the surrogate country list, in accordance with section 773(c)(4) of the Act, we find that Commerce may consider Mexico as the appropriate surrogate country, as it remains the only producer of comparable merchandise on the record of this administrative review and thus provides superior and more accurate surrogate value data than other countries on the surrogate country list that are not producers of comparable merchandise.

---

[59] *See Chlorinated Isocyanurates From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2022– 2023*, 89 FR 56303 (July 9, 2024), and accompanying Preliminary Decision Memorandum (PDM) at 8-9.
[60] *See* Petitioners' Prelim Comments at 2-3.

For these reasons, we reconsidered our selection of Romania as the surrogate country, as we find that Romania, which produces calcium hypochlorite and sodium hypochlorite, is no longer a producer of comparable merchandise. Therefore, as none of the countries on the surrogate country list are viable, we selected Mexico as the appropriate surrogate country in this instant case, because it is a producer of identical merchandise, which provides the most appropriate and accurate data on the record for utilization of surrogate values and calculating an accurate margin.

For these reasons listed above, Commerce finds that sodium hypochlorite and calcium hypochlorite are not comparable merchandise to chlorinated isos to outweigh the use of surrogate values from a country that produces identical merchandise (*i.e.*, Mexico), as supported by Policy Bulletin 04.1.

## IV. COMMENTS ON DRAFT RESULTS OF REDETERMINATION

On November 2, 2026, Commerce received comments from the petitioners and the respondents.[61] We have responded to all comments below. After considering these comments, we made no changes to our conclusions in the Draft Results of Redetermination for these final results of redetermination, except regarding our calculation of ocean freight.

**Comment 1: Whether Calcium Hypochlorite and Sodium Hypochlorite are Products Comparable to Chlorinated Isos**

*Respondents' Comments:*

The following is a verbatim summary of argument submitted by the respondents. For further details, *see* Respondents' Comments at 3-9.

> Cyanuric acid ("CYA") should not be considered a predominant, major, specialized, dedicated, or intensively used input for chlorinated isocyanates such that a comparable product for country selection purposes must use cyanuric acid.

[61] *See* Respondents' Comments; *see also* Petitioners' Comments.

> Respondents do not consume CYA, rather they produce CYA. This is typical in the industry. Ultimately, there is no predominant, major, specialized, dedicated, or intensively used input for chlorinated isocyanates. Commerce's original comparable product analysis considering product characteristics and end-uses as contemplated by Policy Bulletin 04.1 was appropriate for chlorinated isocyanates and in accordance with the statute and past practice. Accordingly, calcium hypochlorite and sodium hypochlorite are comparable products and Commerce has no reason to consider a country not economically comparable as a primary surrogate, Mexico.

*Petitioners' Comments:*

The following is a verbatim summary of argument submitted by the petitioners.

For further details, *see* Petitioners' Comments at 5-11.

> Commerce correctly determined that cyanuric acid ("CYA") is a "major input" used in the production of chlorinated isocyanurates ("chlorinated isos") within the meaning of Policy Bulletin 04.1. CYA comprises a predominant portion of chlorinated isos because it provides the foundational molecular structure and defining characteristics of the finished product and represents the largest chemical input by weight. CYA is one of only three intermediate chemical inputs used to produce chlorinated isos, and three is not a "large number" of inputs for purposes of Policy Bulletin 04.1. Finally, CYA is a specialized input, largely dedicated to the production of chlorinated isos, and provides the essential molecular structure and stability found in chlorinated isos. Indeed, respondents characterize CYA as the "major material" of chlorinated isos. Accordingly, Commerce correctly determined that CYA is a major input for purposes of Policy Bulletin 04.1.
>
> Commerce correctly determined that calcium and sodium hypochlorite are not comparable merchandise to chlorinated isos. Where subject merchandise includes a major input that is specialized, dedicated, or used intensively in the production process, "comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs." Having found that CYA is a major input used in the production of chlorinated isos, Commerce appropriately applied this framework to assess comparability. The presence of CYA in chlorinated isos, in the context of the narrower inquiry indicated by Policy Bulletin 04.1, supports the conclusion that calcium and sodium hypochlorite are not "comparable" to chlorinated isos for purposes of 19 U.S.C. §1677b(c)(4)(B).

**Commerce Position:** Commerce disagrees with the respondents' argument that cyanuric acid is not a major input of chlorinated isos simply because the respondents do not purchase the cyanuric acid, but rather manufacture it on-site.[62] Commerce finds that that distinction is irrelevant for the determination of cyanuric acid as a major input as the Court expressly rejected the reasoning that the major-input analysis should focus on purchased rather than self-produced cyanuric inputs.[63] The Court held that "nothing in the statute or in Policy Bulletin 04.1 requires Commerce to focus on purchased inputs rather than self-produced ones."[64] Moreover, the Court explained "nothing in the statute or in Policy Bulletin 04.1 {} requires that Commerce must consider inputs purchased in the surrogate country for the 'comparable merchandise' inquiry."[65] Lastly, neither the Act nor Policy Bulletin 04.1 indicates that the comparable merchandise inquiry is respondent specific, and thus the particular production process of the two respondents in this review appears irrelevant. Also, the respondents' production process is not indicative of chlorinated isos production more generally as the respondents' argue. To the contrary, as discussed above, the evidence demonstrates cyanuric acid is *purchased* for chlorinated isos production globally.

While the respondents offer further evidence that cyanuric acid is generally self-produced, and thus, not relevant to our surrogate country analysis, Commerce finds the implications of their evidence to be unclear. Specifically, the respondents cite to Exhibit 4 of their September 23, 2026, new factual information submission,[66] which provides ITC data indicating international trade under Harmonized Tariff Schedule subheading 2933 (which

[62] *See* Respondents' Comments at 4.
[63] *See Bio-Lab Inc. v United States*, Slip Op. 26-43 (CIT April 27, 2026) (*Bio-Lab Slip Op. 26-43*) at 15-18.
[64] *Id.*
[65] *Id.* at 17.
[66] *See* Respondents' Comments at 4.

includes both cyanuric acid and chlorinated isos), and articles concerning the trichloroisocyanuric acid market. The respondents do not elaborate on the conclusions to be drawn from this information in their comments on the draft redetermination,[67] and thus, Commerce continues to find (as explained above) that the record demonstrates cyanuric acid is a major input into chlorinated isos.

The respondents emphasize that the "entire purpose of the economic comparability and comparable product statutory guidance is to select a surrogate country with available, high quality surrogate data. Commerce will not be selecting a CYA input, since Respondents have no such input, so it is wholly illogical and contrary to statutory intent for CYA to be the driving force of the comparable product—and therefore surrogate country choice."[68] The Court also rejected this argument, however. In a separate litigation involving the same order, Commerce argued that "focusing on purchased inputs is appropriate as the purpose of the surrogate country analysis is to determine whether a surrogate country will likely have accurate prices available . . . for valuing the respondents' input and by-products and co-products."[69] The Court found that this argument "is not supported by the language of the statute or Commerce's regulations. . . . {T}he determination of normal value is downstream from the surrogate country selection process."[70]

Furthermore, the respondents' claim that cyanuric acid is not specialized, dedicated or used intensively completely ignores the totality of the evidence and discussion in the Draft Remand Redetermination, such as: (1) cyanuric acid acts as the critical component of the chemical and molecular structure of chlorinated isos, indicating that cyanuric acid is a specialized input in the production process; (2) the vast majority (*i.e.*, over 79 percent) of global

---

[67] *Id.*
[68] *See Bio-Lab Slip Op. 26-43* at 17.
[69] *Id.* at 16.
[70] *Id.*

production of cyanuric acid is utilized in water treatment applications[71] (such as chlorinated isos), which is indicative of a dedicated relationship; and (3) the per kilogram inputs information on the record, demonstrating cyanuric acid accounts for a significant portion of the total weight of all chemical inputs used to produce chlorinated isos,[72] demonstrate that cyanuric acid accounts for the plurality of the total weight of all chemical inputs of chlorinated isos, making cyanuric acid the largest input in the production process, by weight, indicating intensive usage within the production process.

The respondents also argue that when Commerce has relied on the major input analysis it has done so in cases where there are very few inputs (*i.e.*, fresh garlic, shrimp, or fish filets).[73] They claim that such analysis is reasonable in those contexts because "that input essentially drives the entire value of the final product."[74] They further argue that because there are multiple suggested surrogate countries on the record of this review having all surrogate values needed to value the chemical inputs used by the respondents, Commerce should follow Policy Bulletin 04.1's alternative directive to focus on "physical characteristics" and "end-uses" in determining comparable merchandise.

We find that respondents' arguments are flawed. We disagree that the "major input" analysis of Policy Bulletin 04.01 should be limited to "processed agricultural, aquatic and mineral products." While Policy Bulletin 04.1 lists such types of products as *examples* of where the "major input" analysis might be applied, and the respondents cite garlic, shrimp, and fish filets as precedent, Policy Bulletin 04.1 does not expressly limit the major input analysis to those three product categories and the respondents fail to cite to any legal authority establishing such a

---

[71] *See* Petitioners' New Factual Information at 3.
[72] *See* Petitioners' Comments for Bio-Lab I Remand at 5-6; *see also Remand Order* at 10.
[73] *See* Respondents' Comments at 5.
[74] *Id*.

limitation or even expressing the same rationale that the respondents put forward (*i.e.*, that the major input analysis is limited to situations where the purchased input is not widely available).

Moreover, even if the respondents are correct that a major input is an input that "essentially drives the entire value of the final product" the record demonstrates that cyanuric acid is, in fact, the essential component of chlorinated isos. As Commerce explains above, according to the record: the cyanuric acid molecule serves as the chemical structure to which chlorine bonds during the production process and thus serves as the foundational molecular structure of the finished product;[75] it acts as the "critical chemical backbone" and primary precursor required to manufacture chlorinated isos;[76] it bonds the chlorine together, creating a stable and durable water treatment;[77] and chlorinated isos are a derivative of cyanuric acid.[78] Thus, the relationship between cyanuric acid and chlorinated isocyanurates is similar to the relationship between raw and processed garlic, raw and processed shrimp, and fresh fish and fillets.

Policy Bulletin 04.1 does not indicate that a major input must be "unusual" on the world market (although, even conceding this point, cyanuric acid is unusual as the record demonstrates its specialized usage in chlorinated isos production,[79] which does not appear to be widely produced). In short, the respondents appear to be adding a requirement into Policy Bulletin 04.1 that does not exist, nor is there any precedent for this interpretation.

Therefore, we continue to conclude that cyanuric acid is a major input in the production of chlorinated isos and that, in accordance with the "scrutiny" called for by Policy Bulletin 04.1,

---

[75] *See* Petitioners' NFI at 7 and Exhibit 2.
[76] *Id.* 3 and Exhibit 3.
[77] *Id.* at Exhibits 2, 3, and 5.
[78] *Id.* at 2.
[79] *See* Petitioners' Comments at 3.

comparable merchandise must be limited to products produced with cyanuric acid. Thus, calcium hypochlorite and sodium hypochlorite are not comparable merchandise.

**Comment 2: Surrogate Country**

*Respondents' Comments:*

The following is a verbatim summary of argument submitted by the respondents. For further details, *see* Respondents' Comments at 9-13.

> Lastly, even if Commerce continues to find sodium hypochlorite are comparable products are not comparable products, the selection of Mexico as the primary surrogate country is still not supported by the record. Mexico is not economically comparable to China. Thus, even in this draft remand, Malaysia and Mexico each fail to fulfill one prong of Commerce's surrogate country analysis. Thus, the third prong, data quality, should determine the surrogate country. Malaysia sources the best available information.

*Petitioners' Comments:*

The following is a verbatim summary of argument submitted by the petitioners. For further details, *see* Petitioners' Comments at 11-15.

> Commerce correctly selected Mexico as the only viable surrogate country on this record. Commerce's surrogate country list identified Romania, Chile, Bulgaria, Costa Rica, Malaysia, and Turkey as countries at the same level of economic development as China. Commerce previously treated Romania and Malaysia as producers of comparable merchandise based on their production of calcium or sodium hypochlorite. However, having now determined that calcium and sodium hypochlorite are not comparable merchandise, none of the countries on the SC List qualify as a producer of comparable merchandise. Commerce therefore reasonably selected Mexico as the surrogate country because record evidence demonstrates Mexico is a producer of comparable — in fact, identical — merchandise and contains complete surrogate value data coverage for all factors of production. For these reasons, Commerce should select Mexico as the surrogate for China in its final remand results.

**Commerce Position:** The respondents argue that Commerce has effectively limited comparable merchandise to identical merchandise, in contradiction to the language of the statute which limits Commerce's surrogate country analysis to producers of comparable merchandise, not identical

merchandise, and has thus improperly limited the choices for surrogate country to Mexico, a country that is not economically comparable.[80] The respondents' argument is incorrect. While Mexico is, in fact, a producer of identical merchandise, our analysis above demonstrates that Romania and Malaysia, the only other countries with complete surrogate value data on the record, are not producers of comparable merchandise. The guidance provided by Policy Bulletin 04.1 is to "narrowly scrutinize" the available record evidence at the beginning of the analysis (*i.e.*, Romania, Mexico, Malaysia) and select a surrogate country that best meets the established criteria. Indeed, Commerce must select the "best available information on the record" in selecting a surrogate country.[81] Given the facts of this remand proceeding, Commerce's analysis is left with only one acceptable outcome (Mexico) based on record evidence, and thus, is not a result that is unreasonable, or that contradicts the Act, our regulations, our practice, or Policy Bulletin 04.1.

The respondents further argue that section 773(c)(4) of the Act directs Commerce to rely on countries that produce comparable, not identical products.[82] In this instant case, as we have stated above, Commerce is indeed following the statutory guidance, as Mexico is now the only country on the record that produces either comparable or identical merchandise. Commerce also disagrees that, in selecting a country with identical merchandise, Commerce is ignoring the Act; clearly, these two terms are not necessarily mutually exclusive, as merchandise that is identical is also comparable. Indeed, Policy Bulletin 04.1 provides Commerce's preference and states that

---

[80] *See* Respondents' Comments at 7-13.
[81] *See Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016) (stating "the statute {section 773(c)(1) of the Act} directs Commerce to value the factors of production through "the best available information" in the market economy").
[82] *See* Respondents' Comments at 6.

"there are some basic rules that every team should follow. In all cases, if identical merchandise is produced, the country qualifies as a producer of comparable merchandise."[83]

Commerce also disagrees with the respondents' claim that it is not established that Mexico is a "significant producer" of subject merchandise. The petitioner placed on the record of the underlying administrative review documents demonstrating that identical merchandise, *i.e.* chlorinated isos, are, and continue to be produced in Mexico by AquaClor, S.A. de C.V. (AquaClor).[84] For example, the petitioners have provided AquaClor's listings with the National Association of the Chemical Industry in Mexico and the National Pesticide Information Retrieval System of Purdue University, as well as AquaClor's cross-border export data showing large numbers of imports of subject merchandise into the U.S. during the POR.[85] They further note that in the prior six administrative reviews, Commerce found Mexico to be the appropriate surrogate country from which to value the FOPs, due in part to record evidence that demonstrated actual production in Mexico of the identical subject merchandise, chlorinated isos.[86] This information includes cross-border (*i.e.*, truck and rail) data showing that AquaClor exported approximately 1.5 million kilograms (*i.e.*, around 45 standard shipping containers or 7,212 drums) of chlorinated isos to the United States during the POR, indicating that Mexico is a significant producer of subject merchandise consistent with Commerce's findings within the previous six administrative reviews.[87] Further, Policy bulletin 04.1 states:

> The operations team determines whether any of the countries which produce comparable merchandise are "significant" producers of that comparable merchandise. The extent to which a country is a significant producer should not be judged against the NME country's production level or the comparative production

---

[83] *See* Policy Bulletin 04.1 at 3.
[84] *See* Petitioners' Letter, "Petitioners' Comments on Primary Surrogate Country Selection," dated December 2, 2022 (Petitioners' 21-22 AR SC Comments), at 5 and Exhibits 5-6.
[85] *Id.* at Exhibit 6.
[86] *See* Petitioners' 21-22 AR SC Comments at 5.
[87] *Id.* at Exhibit 6.

> of the five or six countries on OP's surrogate country list. Instead, a judgement should be made consistent with the characteristics of world production of, and trade in, comparable merchandise (subject to the availability of data on these characteristics). Since these characteristics are specific to the merchandise in question, the standard for "significant producer" will vary from case to case. For example, if there are just three producers of comparable merchandise in the world, then arguably any commercially meaningful production is significant… Given that the decision as to what constitutes "significant production" in a particular case depends on available (often source) data, the specific criteria and supporting factual information used to determine whether a potential surrogate country is a significant producer is left to the discretion of the operations team.

The final sentence, notwithstanding, Commerce has found Mexico to be considered a "significant producer" of identical merchandise across multiple administrative reviews of the *Order* when examining similar data put on the record by the petitioners, as they have provided in this administrative review.[88]

While the respondents note that the financial statements on the record for Mexico are for a company that does not produce identical merchandise, as explained above, questions of data quality affect surrogate country selection after Commerce has identified countries that are producers of comparable merchandise. Thus, again, because Mexico is the only producer of comparable merchandise, Commerce selects Mexico as the surrogate country. Nevertheless, the company at issue (CYDSA) is a chemical producer, including a producer of chlorine products and sodium hypochlorite, which was previously considered a comparable product.[89] Thus, while CYDSA is not a producer of comparable merchandise and may otherwise not provide an ideal set of surrogate financial statements and ratios, it is not an unreasonable surrogate, and, given that Mexico has been identified as the only producer of comparable merchandise, there is no other

---

[88] *See, e.g.*, *Chlorinated Isocyanurates from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 84 FR 42891 (August 19, 2019), and accompanying PDM at 11-14; unchanged in *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 10411 (February 24, 2020).
[89] *See* Petitioners' Letter, "Petitioners' Initial Surrogate Value Data," dated December 21, 2023, at Exhibit 9.

information on the record identifying surrogate financial ratios for Mexican production of chlorinated isos. (In this regard we note that the parties had the opportunity to submit any information they wanted to submit regarding Mexican surrogate values – including surrogate financial ratios – during the underlying review.) Likewise, while the respondents take issue with the fact that the surrogate value data on the record for raw materials is reported on an "free on board" (FOB) basis, which must be adjusted to a "cost insurance and freight" (CIF) basis, this again is a data quality issue that comes into consideration after the identification of potential surrogate countries. And, as with the surrogate financial ratios, parties had the opportunity during the review to submit information to use in making the adjustment from FOB to CIF, which Commerce did and continues to do for this final remand redetermination.

**Comment 3: Whether Commerce Must Find Chlorinated Isos Unusual or Unique**

*Petitioners' Comments:*

The following is a verbatim summary of argument submitted by the petitioners. For further details, *see* Petitioners' Comments at 15-18.

> Commerce need not address whether chlorinated isos are "unusual or unique" merchandise, given its revised findings that CYA is a major input and that calcium and sodium hypochlorite are not comparable merchandise. If addressed, however, the record supports the conclusion that chlorinated isos are "unusual or unique" merchandise within the meaning of Policy Bulletin 04.1.13 Chlorinated isos are not widely manufactured across global markets, and the production is not a "standard" industrial process. Indeed, this finding conflicts with Commerce's finding that chlorinated isos require a complex, multi-stage production process involving substantial investment, highly specialized equipment, and a skilled workforce. Commerce should therefore find in the final remand results that chlorinated isos are "unusual or unique" merchandise for purposes of Policy Bulletin 04.1.

No other party commented on this issue.

**Commerce Position:** We continue to find that chlorinated isos do not constitute "unusual or unique" merchandise under Policy Bulletin 04.1. An exception to the standard "sequential

approach" is not warranted; however, adhering to the sequential approach does not preclude Commerce from evaluating the nature of the inputs used to produce subject merchandise. Thus, we agree with the petitioners that it is not necessary to find that chlorinated isos are "unusual or unique" to maintain our determinations that calcium hypochlorite and sodium hypochlorite are not comparable merchandise and that Mexico is the only viable surrogate country on the record. We continue to address the question (in the analysis above), however, per the Court's instructions.

**Comment 4: Calculation Error**

*Petitioners' Comments:*

The following is a verbatim summary of argument submitted by the petitioners. For further details, *see* Petitioners' Comments at 18.

> Commerce should correct an error in its calculation of the surrogate value for the ocean freight. The revised remand calculations used the surrogate value for ocean freight from the 2021-22 period of review (*i.e.*, $0.073). For the 2022-23 period, here on remand, the correct ocean freight rate surrogate value is $0.116 per kilogram.

No other party commented on this issue.

**Commerce Position:** Commerce agrees that it inadvertently used ocean freight information from the prior POR in the draft remand redetermination. For this final redetermination, we have updated the ocean freight rate to reflect information on the record of the 2022-23 review. In doing so, we have used an average of the information provided by the petitioners and the respondents. Commerce has chosen an average because there are no obvious differences between the two datasets that indicate one dataset is better than the other; *e.g.*, both datasets are from recognized data sources (*e.g.*, Descartes), both sets rely on shipping routes between the United States and Mexico, and both sets appear to be inclusive of fees and surcharges. This

change causes the rate for Heze Huayi to increase from 77.35 percent in the draft remand redetermination to 81.84 percent for this final remand redetermination. Likewise, the rate for Kangtai increases from 102.48 percent to 107.89 percent.

## III. FINAL RESULTS OF REDETERMINATION

Upon remand, Commerce has: (1) determined that chlorinated isos do not constitute "unusual or unique" merchandise under Policy Bulletin 04.1; (2) reversed our prior determination and explained that cyanuric acid is a major input under Policy Bulletin 04.1 because it is specialized, dedicated, and used intensively in the production of chlorinated isos; (3) reversed our prior determinations and determined that calcium hypochlorite and sodium hypochlorite do not share similar physical characteristics with chlorinated isos; and (4) reversed our prior determinations regarding production processes and explained, relying on the detailed information provided by the petitioners, that the processes used to manufacture chlorinated isos, sodium hypochlorite, and calcium hypochlorite are fundamentally different.

If these remand results are affirmed by the Court, we intend to issue amended final results providing the updated estimated weighted-average dumping margins below:

| **Respondent** | ***Final Results*** **Weighted-Average Dumping Margins (percent)** | **Draft Remand Weighted-Average Dumping Margins (percent)** | **Final Remand Weighted-Average Dumping Margins (percent)** |
|---|---|---|---|
| Heze Huayi Chemical Co., Ltd. | 50.27 | 77.35 | 81.84 |
| Juancheng Kangtai Chemical Co., Ltd. | 73.84 | 102.48 | 107.89 |

11/12/2026

X

Signed by: STEVEN PRESING

Steven Presing
Executive Director
for AD/CVD Policy and Negotiations